**Robert W. GRINE, II, et al., Plaintiffs,**

v.

**William R. COOMBS, et al., Defendants.**

**Civil Action No. 95–342 Erie.**

United States District Court,
W.D. Pennsylvania.

May 5, 2003.

Janice Haagensen, Enon Valley, PA, for plaintiffs.

Billie M. Yost, Eric R.I. Cottle, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, Thomas W. Leslie, New Castle, PA, Robert J. Grimm, Israel, Wood & Puntil, Pittsburgh, PA, Matthew L. Wolford, Pennsylvania Department of Environmental Protection, Meadville, PA, Thomas J. Dempsey, Jr., Paul E. Skirtich, United States Attorney's Office, Pittsburgh, PA, Mark A. Nitczynski, United States Department of Justice, Environmental & Natural Resources Division, Denver, CO, for defendants.

## MEMORANDUM OPINION

MCLAUGHLIN, District Judge.

This case, which has now been pending in this Court for over seven years, involves allegations by the Plaintiffs that their up-gradient neighbor and other culpable parties engaged in unlawful disposal practices that resulted in the contamination of their Tionesta Borough property. Presently pending before the Court are motions by several of the Defendants seeking summary judgment. We conclude that dismissal of this case with prejudice is appropriate because of the willful conduct of Plaintiffs and their counsel in failing to respond to the Defendants' respective motions for summary judgment. In order to give proper context to the Court's present situation, it is necessary to set forth the highlights of this long and complicated case in some detail.

## I. PROCEDURAL HISTORY

### A. *THE ALLEGED OPERATIVE FACTS*

Plaintiffs Robert W. Grine, II and JoAnne Grine are residents of Tionesta Borough in Forest County, Pennsylvania.[1] The tract of land on which they reside includes a wet weather spring and a water well. Defendant Billie M. Yost–Hepfer ("Yost") owns a parcel of land immediately adjacent to the Grines' property on an up-gradient slope. Yost acquired this property from her parents, Mr. and Mrs. William Coombs, in 1990. Prior to his death in 1997 Defendant William Coombs owned a camp site (the "Coombs Property") located immediately adjacent to, and further up-gradient from, Yost's parcel. Also named as a Defendant in this case is Jack W. Shrum, et ux. ("Shrum"), the son-in-law of William Coombs. Shrum is the title-holder of a separate tract of property located adjacent to the Grines' property and previously owned by Coombs.

It has been Plaintiffs' contention that, beginning in or around 1993–94, hazardous waste was illegally stored, handled, or otherwise disposed of on the Coombs, Yost and/or Shrum properties. This mishandling of hazardous waste, it is alleged, resulted in contamination that migrated to the Grines' property, causing them both personal harm and property damage. [*See* Amended Complaint ("AC"), Doc. No. 4, at ¶ 18.] Plaintiffs have also complained that raw sewage has invaded their property and their well water, allegedly as the result of Defendant Coombs's use of an outdated septic system. [*Id.* at ¶¶ 20, 28.]

In July of 1994, Robert Grine contacted officials from the Borough of Tionesta regarding a sewage discharge that Mr. Grine perceived was collecting in the area of his wet weather spring. According to Plaintiffs, raw sewage was draining from Coombs's land onto the Grines' property via a pipe connected to a toilet in Coombs's cabin. [AC ¶ 20.]

Robert Grine continued to notice unusual events thereafter. In August 1994, Mr. Grine discovered what he described as a "white snake" of foamy water flowing from his wet weather spring and traversing his property. Soon thereafter, Plaintiffs noticed that vegetation and small animals were dying in close proximity to the path of the spill. [AC at ¶ 22.] Mr. Grine expressed concern to the Pennsylvania Department of Environmental Protection ("DEP")[2] that contaminants emanating from his neighbors' up-gradient properties were polluting his land.

The DEP responded by conducting a site inspection of the Grines' property on September 22, 1994, at which time soil and water samples were taken from the property. It was noted that the dead animals found on Mr. Grine's property ranged from small mammals to invertebrates, such as earthworms. A tissue sample was taken from one of the dead mammals and sent to the U.S. Fish and Wildlife Service Laboratory for

---

1. At the time this lawsuit was commenced, the Grines resided with Robert Grine's mother, Margaret Grine, who was also a named Plaintiff. Margaret Grine has since passed away and her estate has been substituted as a Plaintiff in this action.

2. At the time these events commenced, the Department was actually designated the Pennsylvania Department of Environmental Resources. The Department was officially renamed the "Department of Environmental Protection" effective July 1, 1995. *See* PA. STAT. ANN. tit. 71, § 1340.501 (Purdons 1996 Supp.). For purposes of this opinion, we will refer to the Department throughout as the "DEP."

analysis. However, due to the intervening time lapse and the advanced state of decomposition of the tissue sample, no meaningful analysis could be performed. [*See* Doc. 127, Ex. 6.]

Plaintiffs allege that, on or about October 4, 1994, DEP Agent Gary Wozniak videotaped a yellow plastic drum and lid in plain view on the Coombs Property which was embossed with the designation "DOT–E9775," the corporate designation "Essex Environmental Industries, Inc. of Tube Drive, Hurst, Texas," and the trademark "Enviropack, TM." [AC at ¶ 26.] According to Plaintiffs, Wozniak informed them on or about November 22, 1994 that one of the yellow plastic drums had been dragged by Coombs into his cabin, where it was used as a water reservoir that flushed a primitive toilet inside Coombs's Cabin. [*Id.* at ¶ 27.] Plaintiffs claim that one of several pipes running from the toilet emptied into a septic tank with no leach field and discharged directly onto their property. [*Id.* at ¶ 28.]

The DEP conducted additional site investigations and samplings of the Grines' property on October 5, 7, and 31 of 1994. According to the DEP, initial sampling of the Grines' well revealed trace amounts of pesticide compounds and low levels of coliform bacteria. Although the presence of trace amounts of pesticides was considered somewhat unusual in light of the sound construction and depth of the Grines' well, the DEP did not consider the amounts to be above reportable levels or at levels harmful for *human consumption*. The Grines were informed of the laboratory results concerning the presence of coliform bacteria in the well and were advised by the DEP that they could avoid any adverse health effects by boiling their water before consuming it. At or around that time, the Grines began using bottled water. In addition, the DEP conducted air monitoring tests with various instrumentation, including a photo-ionization detector (PID), a flame-ionization detector (FID), and oxygen meters. The air monitoring tests revealed sporadic oxygen deficits and the presence of low levels of unidentified compounds. [Doc. No. 127, Ex. 3, 6.]

Meanwhile, in October 1994 Mr. Grine himself began to collect various samples from his wet weather spring and soil, which he submitted to an entity known as Stewart Laboratory for testing. The parties dispute the results of this testing. Defendants contend that the initial analysis conducted by Stewart revealed the presence of low level concentrations of thirteen volatile compounds. [Doc. 127, Ex. 4.] However, Plaintiffs allege that these results indicated the presence of some 58 volatile organic chemicals in heavy concentrations. [AC at ¶ 23.] According to Plaintiffs, "Stewart Laboratories' personnel, upon obtaining these results, informed [Robert Grine] that an extremely dangerous situation had been created on his property, and directed him to inform the [DEP] and the county emergency manager ... that an emergency response should be initiated." [*Id.* at ¶ 24.] Plaintiffs claim that the DEP did not respond until four or five days later. In the meantime, Plaintiffs claim, Agent Wozniak of the DEP "threatened Robert Grine with a retaliatory prosecution" if the Plaintiffs persisted in the filing of a complaint and insisted on initiating a site investigation. [*Id.* at ¶ 25.]

On November 27, 1994, Coombs's septic system was inspected by Randall Spence, Sewage Enforcement Officer of Tionesta Borough. At that time, Defendant Coombs informed Mr. Spence that he (Coombs) was using a 300 gallon septic tank located immediately south of his dwelling. According to Mr. Spence, his inspection of the Coombs Property yielded no evidence of a leech field, discharge pipe, or evidence of sewage discharges. Nevertheless, by letter dated November 29, 1994, Mr. Spence notified Coombs that Coombs's then existing septic system was inadequate in the following respects:

1. The existing tank (300 gal.) is under sized. The minimum size permitted is 1000 gal.

2. You showed us where your gray water[3] was not being discharged to the Septic Tank, but rather to a pit next to

---

**3.** "Gray water discharge" is typically rinse water residue from washing and cleaning. [Doc. No. 127, Ex. 1.]

the tank. Under the rules and regulations, all discharge must go to the primary treatment tank.

3. You showed us where your discharge line from your tank went. It is a single line, not installed in the proper manner, (being level for even distribution of effluent).

Mr. Spence advised that Coombs could bring his septic system into compliance with current standards by installing a holding tank of the proper size. [Doc. No. 127, Ex. 1, attachment E.]

Meanwhile, in October of 1994 the investigation of the Grines' case was referred by the DEP to the U.S. Environmental Protection Agency ("EPA"). Vincent Zenone, the on-site coordinator ("OSC") for the EPA's Region III Hazardous Waste Management Division, conducted an assessment of the Grines' property on December 6, 1994. Accompanying Zenone were agents of Roy F. Weston, Inc. ("Weston")—the EPA's designated technical assistance team ("TAT"), officials from the DEP, and the Tionesta Borough Manager. Weston personnel conducted air monitoring with photo-ionization detectors (PID) and flame-ionization detectors (FID). They also conducted a radiation survey with a Micro–R gamma radiation meter. Although no elevated radiation readings were obtained, both the PID and FID recorded elevated levels of organic vapors at or just below the soil surface. [*See* Declaration of Vincent Zenone dated 5/28/96 at ¶ 7 [Doc. No. 29, Ex. B] and attachments thereto.]

Based on the elevated vapor readings, OSC Zenone concluded that further investigation of the property was warranted. Accordingly, on December 20, 1994, Weston collected seven soil gas samples from the area of the Grines' wet weather spring and the swale that received the drainage. Despite the elevated vapor readings, lab analysis of all soil samples revealed no detection of the compounds tested. Nonetheless, Zenone ordered further sampling of the Grines' property in an attempt to identify the source of the vapors that were apparently present in the soil. [Zenone Decl. at ¶¶ 7–8.]

Additional testing was conducted in January 1995. On January 24–25, 1995, the EPA's TAT attempted to collect ground wa-ter samples near the ground surface in order to determine whether groundwater in the area was contaminated. TAT personnel could not obtain subsurface groundwater samples, however, due to the presence of a stratified, impervious "hard pan" layer approximately 12 to 18 inches below the surface. This "hard pan" layer suggested to Zenone that foamy water from the Grines' wet weather spring originated from surface run-off, as opposed to groundwater migration, since groundwater would likely not be capable of penetrating the hard-pan layer. This theory was also consistent with the fact that the Grines' wet weather spring reportedly manifested itself only after heavy rains or snow melts. Zenone also thought that the hard-pan layer might be impervious to penetration by gas, thus explaining why the PID and FID readings had detected low concentrations of volatile organic compounds ("VOCs") at or just below the ground surface during the December 6 and 20, 1994 inspections, yet no VOCs had been detected in the soil-gas samples collected on December 20, 1994 from below the hard-pan layer. [Zenone Decl. at ¶ 9.] Despite the presence of the hard-pan layer, Weston personnel were able to test for contamination of the Grines' ground water supply by collecting two water samples from the Grines' well system. One sample was taken from the kitchen sink, which included a filter system, and another was taken from an outside spigot, which did not include the filter system. According to the EPA, these samples did not reveal detectable results for any of the contaminants they had been tested for. [Zenone Decl. at ¶ 10.]

Zenone next arranged for soil testing above the hard-pan layer in areas both up-gradient and down-gradient from the Grines' wet weather spring. On February 9, 1995, the TAT collected thirteen samples from ten different locations on the Grines' property, including five samples from the Grines' wet weather spring and the down-gradient swale into which the spring drained and three samples from the Grines' up-gradient northwest property line, which bordered on Yost's parcel. Two samples were also collected from outside of the area under investigation. According to the EPA, the results from these

samples generally failed to detect any of the chemical compounds being tested. With respect to the samples that came back with positive results, the EPA considered those concentration levels to be well below any level which would justify a removal action or which would pose a health risk to the Grines. [Zenone Decl. at ¶¶ 11–12.]

Concurrent with the EPA's removal evaluation, the EPA enlisted the support of the Department of Health & Human Services, Agency for Toxic Substance and Disease Registry ("ATSDR") and the Pennsylvania Department of Health in order to determine the human health implications for the Grines based on the data that had been gathered from the investigation of their case. On March 9, 1995, the ATSDR reported that all analytical data had been "evaluated for it's [sic] potential to cause adverse health effects in the human population residing in and around the Grine property." With regard to the analytical testing performed, the report made the following observations:

The samples which were analyzed for VOCs, semi-VOCs, PCBs, pesticides, metals, cyanide and bacteria were all essentially nondetectable except for a few extremely low level concentrations in the soil of benzoic acid, di-n-butylphthlate, bis(2–ethylhexyl) phthalate. The naphthalene, methylene chloride and 1,2,3–trichlorobenzene concentrations which were detected are all considered non-detect due to blank contamination. In addition, the concentrations of metals detected in the soil and water were all levels which are considered background or naturally occurring in the ambient environment.

The 6 compounds previously mentioned in the preceding paragraph could be explained, in the case of the methylene chloride, as a commonly found artifact or contaminant of laboratory analysis; the 2 phthlates are pervasive throughout the soils of the U.S. because of their usage as plasticizers in all sorts of consumer products (trash bags, PVC pipe, plastic toys, paints, varnishes, ink, etc.); the naphthalene and benzoic acid are both constituents of kerosene and fuel oil, as well as the benzoic acid being found in plugging agents used in sealing subterranean oil formations; and, finally, the 1,2,3–trichlo-

robenzene which is found in dyes, solvents, and as a heat transfer solvent. *All of the levels detected are below any level of health concern by all routes of exposure.* The soil gas samples were all non-detect, as were the groundwater samples.

\* \* \*

The soil samples which were analyzed for fecal and total coliform all came back positive which is indicative of possible microbial contamination.

[Zenone Decl. at ¶ 13, and attachment 5 thereto (emphasis added).] Based on all of the analytical data provided, the ATSDR concluded:

1. The levels in the analytical data presented to ATSDR *do not represent a health hazard to the residents living in or around the Grine property.*

2. The contaminants which were detected indicate the strong likelihood of a petroleum or petroleum-like product being released into the environment.

[*Id.* (emphasis added).]

In late February 1995, the Grines' wet weather spring began to flow again. DEP officials visited the Grines' property on February 28, 1995 and, based on their visual observations, detected the presence of a petroleum product in the water. According to the DEP and EPA, subsequent analysis of samples collected from the wet weather spring confirmed that the material was determined to be a weathered kerosene. [Doc. 127, Ex. 4.]

Because Robert Grine remained adamant that dumping had occurred on his neighbors' up-gradient property and had flowed down onto his, Weston personnel collected five soil samples and two drum samples from the Coombs Property on March 14, 1995, at the direction of OSC Zenone. According to Zenone, testing of the drum samples indicated a material consistent with petroleum products, which was also consistent with Coombs's representation that the drums had contained used motor oil. Analytical results of the Coombs soil samples indicated low concentrations of total petroleum hydrocarbons and one semi-volatile compound (9 ug/kl of xylene

in one sample). No PCBs, pesticides, other semi-volatile compounds or VOCs were detected on the Coombs property. [Zenone Decl. at ¶ 14.] Zenone also conducted a visual inspection of the Coombs Property on March 14, 1995 to assess whether it was the likely source of the substances found on the Grines' property. According to Zenone, there was no evidence "indicat[ing] that contaminants had been spilled or dumped on the Coombs' property in anywhere near sufficient quantities to move down the gradient to the Grines' property." [Id.] There was no evidence of damaged or dead vegetation or soil stains that likely would result from such spills or dumps and no physical pathways, such as erosion channels, caused by any spilled material migrating to the Grines' property. Accordingly, based on his observations and the data obtained from the Coombs Property, Zenone considered it "highly unlikely" that the Coombs Property was the source of any hazardous substances on the Grines' property. [Id.]

On March 15, 1995, Zenone attended a meeting with the Robert and Margaret Grine and Ms. Haagensen at the office of Rita Foley, District Representative for the Grines' Congressman, Ronald Klink. Also present at the meeting were representatives from the EPA's Technical Assistance Team, the ATSDR, the DEP and the Pennsylvania Department of Health. In connection with this meeting, Zenone prepared a document outlining the collective efforts undertaken by the EPA and DEP relative to their investigation of the Grine and Coombs properties. Zenone concluded that none of the samples taken by the EPA, the DEP or the Grines during this time-frame met or even approached the Agency's Emergency Removal Guidelines, which set forth pre-established levels of concentrations of certain substances that may trigger an EPA removal action. As an example, Zenone represented that the highest level of any substance detected at the Grines' property was barium, which was detected at a concentration of 345.0 parts per million; the Removal Action Level for barium is 55,000 parts per million. [Zenone Decl. at ¶ 15.] Having considered all of the data relative to samplings conducted by the EPA, DEP and the Grines, Zenone concluded in March 1995 that the amount and/or concentration of any

hazardous substances present on the Grines' property did not warrant a federal removal action. [Id. at ¶ 16.] Robert Grine was apprised that the DEP, as lead agency in the investigation, would continue to evaluate the conditions at his property; however, absent changed conditions or new information, it was the EPA's view that no further federal action was necessary at the property. [Id.]

Notwithstanding the EPA's decision *not* to conduct a removal action, the Plaintiffs continued to complain of environmental problems on their property and related physical complaints. They claim that, in June of 1995, the barrels on the Coombs Property were filled with fluids which foamed over the sides and blackened the ground on the Coombs Property. [AC at ¶ 30.] They further allege that, with every heavy rainstorm throughout the Spring and Summer of 1995, liquid waste would rise up from their spring and flood their back yard, creating a stench that would invade their home. [Id. at ¶ 34.]

On or around June 26, 1995, Defendant Coombs's 300 gallon septic tank was replaced with a 1,000 gallon holding tank. According to Randall Spence, since the replacement of this tank, the Coombs Property has been in compliance with applicable sewage-related regulations. [Doc. No. 127, Ex. 1.] Plaintiffs contend, however, that the contractor hired to remove the old septic tank moved soil with a backhoe, pushed barrels and other debris into waste piles, and graded the ground surface in such a manner that all the runoff would be channeled directly onto the Grines' property. [AC at ¶ 41.] Allegedly, contaminated soil and drums were removed from the Coombs Property in the presence of DEP and Borough officials and transported without a permit to unknown locations. [Id.] The private contractor, Shawn Passauer, denies that he removed any barrels, drums, contaminated soil and/or toxic materials during this event. [Doc. No. 286, Ex. I.]

In August 3, 1995 the DEP tested Coombs's well at the Grines' request. According to the DEP, the results showed trace amounts of pesticides, but not at or near levels that would present a danger to human health. In addition, the tests showed a high bacteria count which DEP officials felt was attributable to the inactivity of the system.

No fecal contamination was detected in Coombs's well. Further, while Coombs's well revealed relatively high iron and manganese concentrations, DEP officials did not consider this unusual for the location or harmful to human health. These results were felt by the DEP officials to be consistent with other neighboring water supplies that were also sampled by the Department. [Doc. No. 127, Ex. 3.]

Further testing of the Grines' well water was conducted in 1996. On July 1, 1996, samples from the Grines' well were tested and found to contain total coliform, fecal coliform, and fecal strep. The DEP claims that the Grines were immediately notified of the results. Because of these heightened levels, the Department conducted follow-up sampling on August 7, 1996. According to the DEP, laboratory analysis of the follow-up samples revealed that the levels of coliform and fecal coliform were still present, but at greatly reduced levels. [Doc. No. 127, Ex. 3.]

In light of the heightened bacteria count, counsel for the DEP contacted the Pennsylvania Department of Health, Bureau of Epidemiology regarding the health risks associated with the presence of total coliform, fecal coliform, and fecal strep in the Grines' water supplies. The DEP's attorney was advised that the July 1, 1996 sample result levels were comparable to other results obtained from a large number of wells throughout the Commonwealth that had been contaminated during flooding in January of that year. While the levels from the July 1 testing did represent a health risk for consumption, they did not present any health risk for bathing and other non-consumption uses. The Grines were instructed as to how they could abate the problem either by cleaning their well or, alternatively, by drilling a deeper one. In the meantime, until the problem was abated, it was recommended that the Grines refrain from any use of the water, such as washing dishes or brushing teeth, that might

result in their ingestion of the bacteria. [Doc. No. 127, Ex. 3.]

Meanwhile, in November of 1994, Special Agent Martin Wright of the EPA's Criminal Investigation Division ("CID") became involved in the case. In the course of investigating whether any criminal violation of the federal environmental law had occurred at the Grine and Coombs properties, Agent Wright spoke with numerous individuals. Among those whom Agent Wright contacted were Daniel Holler and Gary Wozniak of the DEP. In the course of his criminal investigation, Agent Wright discussed with Holler and Wozniak their activities and conclusions relative to the DEP's investigation of the Grines' environmental complaints. Wright's conversations were memorialized in six (6) "Reports of Investigation" ("ROIs"), which collectively covered the period November 4, 1994 through April 30, 1996, when the investigation concluded. Agent Wright also conducted separate interviews with Robert Grine and William Coombs on February 9, 1995 and September 11, 1995, respectively. Each interview was memorialized in a memorandum of Interview ("MOI"). [Doc. No. 165, Ex. 4] At one point in the course of Agent Wright's investigation, both William Coombs and Robert Grine were identified as a possible source of the contamination.[4] However, no criminal charges have ever been filed by the United States Attorney's Office.

Ultimately, both the DEP and EPA appear to have concluded that the source of the Grines' pollution incidents remains unclear. In a letter to Mr. Grine dated May 11, 1995, Dennis P. Carney, Chief of EPA's Region III Superfund Removal Branch, offered the following:

> Because no source has been positively identified, EPA considers that there may be several possible sources. The data collected by EPA and [DEP] have provided clues to possible sources that [DEP] is continuing to pursue in their investigation. The presence of small concentrations of

---

4. Evidently, Robert Grine had his home heating system serviced in February 1995, at which time the service technician discovered that the PVC/Copper line from the Grines' underground kerosine storage tank was corroded and water found in the tank. [*See* ROI of Martin Wright covering the period 2/16/95 to 4/26/95, Doc. No. 167, Attachment 2.] Although the EPA did not necessarily consider this to be a source of the contamination found in the Grines' wet spring, the EPA would not rule out the possibility that the line was leaking and in need of repair. [Doc. No. 127, Ex. 7.]

benzene, toluene, xylene, and naththalene in the wet weather spring, as verified by sampling data, suggests a petroleum source. The presence of coliform bacteria on your property suggests a malfunctioning septic system. The presence of small concentrations of 1,1,1–trichloroethane suggests the possibility of septic tank cleaning or other household cleaning agents. The presence of trace concentrations of pesticides might point to runoff from the farm field upgradient from your property.

[Doc. No. 127, Ex. 7.] Nevertheless, based on his investigation, OSC Zenone considered it "highly unlikely" that the Coombs Property was the source of any hazardous substances on the Grines' property. [Doc. No. 29, Ex. B at ¶ 14.]

## B. THE FOIA PROCEEDINGS

Plaintiffs' attempt to acquire information from the EPA concerning the investigation of their complaints forms a whole separate subchapter of this litigation. On October 13, 1995, Janice Haagensen, Esq., one of Plaintiffs' counsel in the instant matter, submitted a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for all EPA records relating to the complaint which Plaintiff Robert Grine had filed with the Commonwealth DEP. The EPA's Region III Administrator, Michael McCabe, responded by letter dated November 28, 1995. The letter addressed only those documents maintained by the Region III Superfund Removal Program; it did not address any documents maintained by EPA's Criminal Investigation Division ("CID"), a separate EPA office managed from Washington, D.C. McCabe's letter of November 28 identified four distinct categories of documents that the Agency was declining to disclose based on its view that the documents were exempt from disclosure under FOIA, to wit:

a) Ten (10) Technical Directive Documents ("TDDs") and attached documents submitted by Roy F. Weston, Inc. to the EPA under a Technical Assistance Team ("TAT") Contract (withheld under § 552(b)(4) pertaining to trade secrets or commercial or financial information);

b) Five (5) interoffice memoranda distributed via EPA's Region III Local Area Network (withheld under § 552(b)(5) relating to documents protected by the deliberative process privilege);

c) One (1) page of handwritten notes generated by Daniel Isales, Esq., EPA's Assistant Regional Counsel (withheld under § 552(b)(5) pertaining to attorney work product); and

d) Fourteen (14) entries from the log book of EPA On–Scene Coordinator Vincent Zenone (withheld under § 552(b)(7)(A) pertaining to documents that could reasonably be expected to interfere with enforcement proceedings).

Ms. Haagensen appealed the denial of disclosure of these documents on December 20, 1995, and the appeal was assigned to the EPA's Office of General Counsel ("OGC").

In follow-up conversations with EPA's OGC and Office of Regional Counsel, Ms. Haagensen raised concerns that the copies of documents released by EPA were of poor quality, that certain portions of OSC Zenone's log book had been extensively redacted, and that certain test data and correspondence appeared to be missing from the files released. The EPA responded to these concerns by letter dated February 29, 1996. With this letter, the EPA provided new copies of certain documents previously released to Plaintiffs' counsel. In addition, the Agency advised that the redacted portions of Zenone's logbook concerned sites unrelated to the Grine and Coombs Properties and further represented that all sampling data had been released to Plaintiffs.

In the course of these conversations, EPA became aware that Plaintiffs' FOIA request had not been routed to the Criminal Investigations Division in Washington, D.C. for responsive action. On February 29, 1996, EPA rerouted the initial FOIA request to CID for CID's response relative to any documents held in the Washington office.

## C. THE DISTRICT COURT PROCEEDINGS

In the meantime Plaintiffs, dissatisfied with the local, state and federal governments' responses (which they perceived as inadequate), and still convinced that the Coombs, Yost and Shrum properties were the source of hazardous contaminants, commenced this lawsuit in December 1995 through their at-

torneys, Janice Haagensen, Esq. and Donald Williams, Esq. Those named as defendants in the 21–page complaint included William Coombs, Yost, Shrum, Essex Environmental Industries, Rotocast Plastic Products, Tionesta Borough, Ronald Hall (President of the Borough Council), Scott Daum (Borough Manager), the DEP, Gary Wozniak (an agent of the Pennsylvania DEP), and Daniel Holler (Emergency Response Coordinator of the DEP). Plaintiffs' complaint asserted eight causes of action, including federal claims under the "citizen suit" provisions of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901, *et seq.*, the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251, *et seq.*, and the Comprehensive Environmental Response, Compensation, and Liabilities Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, *as amended by* the Superfund Amendments and Reauthorization Act of 1986. Plaintiffs' remaining counts asserted causes of action under Pennsylvania state law theories of intentional infliction of emotional distress, trespass, nuisance, and strict liability, as well as an alleged violation of the Pennsylvania Hazardous Sites Cleanup Act ("PHSCA"), 35 Pa. Stat. tit. 35,

§ 6020.101 *et seq.* (Purdons 1993 and 1996 Supp.). Plaintiffs' theory, in a nutshell, is that all of the named Defendants were liable under one or more of the federal environmental claims (and also liable under some or all of the pendent state law claims) as responsible parties contributing to the contamination of the Grines' property.

No further docket activity occurred until March 19, 1996, when Plaintiffs filed an *ex parte* motion for temporary restraining order. Plaintiffs' TRO motion alleged that Plaintiffs continued to suffer harmful physical effects from the contamination on their property[5] and that the EPA and DEP had failed to conduct sufficient testing and remediation of the problem and/or had failed to communicate the results of such testing. Their motion for a TRO requested that the EPA and DEP be compelled to identify the toxic chemicals allegedly present on their property, identify the source and responsible parties, undertake proper remediation, release all files pertaining to their own independent investigations of the property, and pay for any measures necessary to ensure the Grines' health and safety.[6] This Court denied the motion on March 19, 1996 because no notice had been given to the Defendants

---

**5.** Plaintiffs described the contamination and their on-going maladies thus:

4. With the onset of the August 13, 1994 eruption of flowing water from the dry weather spring and with the arrival of high moisture, rain and snow-melt, the Grines [sic] family was enveloped by a disturbing odor, like unto 'rubber cement', which settled over the area and was visably [sic] noticable [sic] upon the windows of the house as an opaque film. With each arrival of this atmospheric condition, the Grines [sic] family have all suffered reactions in the form of skin rashes, headache development, nausea and unsteadiness or dizziness. The Plaintiffs' physical reactions on these occasions increased in severity, with the increase of water quantity and duration of flow from the yard area and from the dry spring area, all of which originated from the higher elevated land lying to the north, the Defendant Coombs property.

5. On the 21st day of February, 1996, with the melting of the extraordinarily deep snow that had accumulated from the prior days of harsh temperatures and heavy snow fall, surface waters from the elevated area north of the dry spring produced a flooded condition....

6. White suds-like foam again emitted the rubber cement odor with each eruption of water and produced the same physical effects

previously suffered but with a much more frightning [sic] and debilitating effect upon their physiques and emotions.

\* \* \*

8. Robert Grine, during the violent eruption of waters on February 21, did obtain samples of the water, foam and saturated soils and submitted the same to [ ] Stewart Laboratories for analysis ... [R]eports from Stewart Laboratories indicate the water supply at their residence is not fit for human use and ... their physical safety is imperilled by continuing residence in their home, until the contamination is removed.

(Pls.' Motion for Temp. Restr. Order [Doc. No. 2] at ¶¶ 4–6, 8.)

**6.** Appended to Plaintiff's motion were pages of technical lab data from Stewart Laboratories evidently indicating the presence of various contaminants in water samples collected by Robert Grine from his own property. However, this data was unaccompanied by any sworn declaration or interpretive report from an expert (a) verifying what control measures, if any, were used during collection and testing of the samples, (b) explaining the ramifications of the testing in terms of the Grines' personal health and safety, or (c) discussing the possible underlying nature or source of the contamination.

and because Plaintiffs' counsel had failed to comply with Rule 65's requirement that counsel "certif[y] to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required." Fed.R.Civ.P. 65(b).

On April 2, 1996, Plaintiffs filed an Amended Complaint which incorporated all of Plaintiffs' prior claims and added the EPA and Michael McCabe as Defendants in an additional claim under the Freedom of Information Act. Plaintiffs asserted that, following their administrative appeal on December 20, 1995 from Mr. McCabe's partial denial of their FOIA claim, they had received documents from the EPA which were incomplete or illegible. Specifically, Plaintiffs complained that extensive portions of Mr. Zenone's log book had been redacted or rendered illegible, yet were not referenced in McCabe's November 28, 1995 letter as information being deliberately withheld. (AC at ¶ 158.) Additionally, Plaintiffs alleged that certain test results turned over by the EPA were released with pages missing or were provided without any index or internal key to the codes utilized therein. (*Id.* at ¶ 159.)

Plaintiffs next filed on May 8, 1996 a motion for preliminary injunction in which they asked this Court to:

1. enjoin the Defendants from releasing hazardous substances onto the Coombs, Yost, Shrum or Grine properties and/or from allowing such hazardous substances to remain upon those premises;

2. enjoin the EPA and DEP from withholding records relative to the filing of Plaintiff's environmental complaint;

3. enjoin the EPA from refusing to further investigate the ownership and whereabouts of the allegedly offending containers;

4. enjoin the DEP from refusing to test Plaintiffs' well for possible contami-

nants and direct the DEP to supply the Plaintiffs with an alternative water supply;

5. order the Coombs Property to be fenced off with notice prohibiting any further disposal of hazardous substances;

6. order the Commonwealth to release funding to Plaintiffs for alternative temporary housing.

(Pl.'s Mot. for Prelim. Inj. [Doc. No. 12].) Attached to Plaintiffs' motion were affidavits from Plaintiffs JoAnne, Margaret, and Robert Grine, Lee E. Denlinger, M.D. (Margaret Grine's physician), and a lay individual by the name of Douglas Carlson. The Plaintiffs' affidavits outlined their general observations about the changes in their property, the symptoms they had experienced, and the general change in their lifestyles as a result of the contamination of their property. Dr. Lee E. Denlinger's affidavit indicated that he had treated Margaret Grine for multiple past medical problems including a significant underlying cardiopulmonary disorder, multiple medication allergies, and possible multiple myeloma, all of which made Mrs. Grine particularly susceptible to chemical exposures. (*Id.,* Ex. A.) Mr. Carlson's affidavit discussed his activities in assisting Robert Grine collect water samples for chemical testing, his observations as to the unusual odor of the samples he collected, and his observations of drums on the Coombs Property which appeared to contain an oily-type substance. Notably absent from Plaintiffs' motion for a preliminary injunction was any expert report or affidavit that would establish to a reasonable degree of scientific certainty: (i) that Plaintiffs' physical symptoms were attributable to specific hazardous substances to which they had been exposed; (ii) that these same hazardous substances existed in and around their property in quantities that would pose a danger to humans; and (iii) that the geological source of this contamination was the Coombs Property.[7]

---

7. Plaintiffs attempted instead to provide the necessary causal links through their own personal affidavits, which contained hearsay and lay speculation about scientific matters premised on their own anecdotal observations. Just by way of example, JoAnne Grine's affidavit purported to discuss the opinion of an unidentified lab technician who supposedly stated that the Grines had a

"toxic soup of chemicals" in their back yard. Elsewhere, JoAnne Grine insinuated that her mother-in-law's bout with melanoma was causally related to the alleged contamination of their property. (Ex. B.) Robert Grine's affidavit proffered his personal lay opinion, based on personal research, that the chemicals found on his proper-

All Defendants opposed the Plaintiffs' motion for preliminary injunction, but the responses of the government defendants are of particular note. In their opposition papers, the Commonwealth Defendants made several counter-allegations. Substantively, the Commonwealth asserted that it had provided Plaintiffs access to all of the DEP's records in accordance with Pennsylvania's Right–to–Know Law, 65 P.S. § 66.1 *et seq.* Second, the Commonwealth maintained that it had made extraordinary efforts to address Plaintiffs' environmental complaints over the previous 18 months, having conducted at least 18 separate site visits, taken over 200 samples of air, water and soil from the properties, and incurred over $20,000 in sampling costs alone. Through these efforts, the DEP maintained, it had been able to confirm the occurrence of some "pollution incidents" at the Plaintiffs' property. Specifically, it had detected the presence of certain hazardous substances in Plaintiffs' water supply and nearby water supplies, but in concentrations that would not constitute a serious threat to the Plaintiffs' well-being. Thus, while the DEP had not been able to pinpoint the precise cause and extent of the pollution, it had determined that there was no substantial or imminent threat to the well-being of Plaintiffs or the surrounding community on account of these incidents. The Commonwealth maintained that it had refused to repeatedly test the Plaintiffs' water for contaminants only because further testing would be unnecessary and wasteful. Third, the Commonwealth averred that Plaintiffs had failed to cooperate with the DEP's investigative efforts by, e.g., refusing to allow DEP officials to access their property in order to remove discolored soil.

Procedurally, the Commonwealth Defendants challenged this Court's jurisdiction to award the requested relief, arguing that: (1) the Eleventh Amendment barred Plaintiffs from pursuing their claims against the Commonwealth Defendants in federal court; (2) Plaintiffs had stated no viable federal cause of action against the Commonwealth Defendants; and (3) Plaintiffs had failed to comply with the jurisdictional notice-of-suit requirements relative to their federal environmental claims.

The EPA similarly opposed Plaintiffs' issuance of a preliminary injunction. In response to Plaintiffs' demand for additional documents, the EPA asserted that Plaintiffs had never properly perfected service of their Amended Complaint or preliminary injunction motion on the EPA, Plaintiffs had failed to administratively exhaust their FOIA claim, and the disputed documents were exempt from production under FOIA. Insofar as Plaintiffs sought to compel further investigation or remediation by the EPA on their property, the EPA countered that the doctrine of sovereign immunity prevented the Plaintiffs from pursuing these claims against the government, and the Court otherwise lacked subject matter jurisdiction to compel what was essentially discretionary action within the EPA's expertise.[8] In support of their response, the EPA submitted a declaration from Vincent Zenone dated May 28, 1996. Based on information provided in Zenone's declaration (and documents appended thereto), the EPA argued that Plaintiffs could not establish a likelihood of success on the merits of their federal environmental claims or show that irreparable harm would result in the absence of the requested relief.

On May 30, 1996, this Court held a hearing on Plaintiffs' motion for preliminary injunction. At the hearing, the only witness on behalf of Plaintiffs was Robert Grine, who essentially reiterated his personal observa-

---

ty and the Coombs Property exist in quantities that pose a danger to human health. (Ex. D.) Margaret Grine's affidavit purported to relate hearsay medical testimony from an unidentified doctor that the post-surgical problems she experienced in her foot were "most likely" caused by the contaminants in her home water supply, which she was using to soak her foot. (Ex. C.) Mr. Carlson's affidavit proffered his own lay opinion that the only logical source of the Grine's alleged property contamination is the Coombs Property. (Ex. E.)

8. Appended to the EPA's response was correspondence from the EPA's counsel to Plaintiffs' counsel outlining the jurisdictional problems with the Plaintiffs' motion for preliminary injunction and requesting that Plaintiffs withdraw their motion for the sake of saving all parties the unnecessary time and expense of litigating these claims. [Doc. No. 29, Ex. A.]

tions relative to the contamination of his property and the physical symptoms that he and his family had experienced, as set forth in his affidavit. Plaintiffs once again proffered no expert testimony or reports to substantiate their theory that Coombs and/or the other Defendants were responsible for the alleged contamination of the Grines' property and their alleged physical complaints. Instead, Robert Grine attempted to establish the necessary causal links by attempting to testify about his own personal research in the area of hazardous toxins.

At the conclusion of the hearing, this Court denied the Plaintiffs' motion for preliminary injunctive relief. With respect to Plaintiffs' request that the EPA be compelled to produce its file, the Court noted that Plaintiffs' administrative appeal was not complete. It directed the EPA to administratively resolve Plaintiffs' FOIA appeal on or before July 15, 1996, after which time further litigation of the claim could be entertained, if necessary. Insofar as Plaintiffs sought to compel the EPA and the DEP to take additional remedial measures on their property, the Court found that Plaintiffs had failed to demonstrate a likelihood of success in obtaining such relief in light of the holdings of *Allegheny Cty. Sanitary Authority v. U.S.E.P.A.*, 732 F.2d 1167 (3d Cir.1984) (Eleventh Amendment barred municipal sewage authority's state law claims against state environmental agency and its officials arising out of authority's failure to receive funding under the Clean Water Act) and *Proffitt v. Davis,* 707 F.Supp. 182 (E.D.Pa.1989) (federal district court lacked jurisdiction under RCRA and CWA to compel secretary of state environmental agency to enforce consent orders against dischargers of hazardous pollutants). Plaintiffs' likelihood of success was thus undermined by the Commonwealth's apparent immunity under the Eleventh Amendment and the EPA's apparent sovereign immunity. Furthermore, the Court found that Plaintiffs had failed to demonstrate that they would incur irreparable harm in the absence of the requested injunctive relief. Although there had been testimony concerning the Plaintiffs' various physical ailments, they had presented no medical testimony tying their ailments to toxins on their property, let alone toxins for which the Defendants could be held responsi-

ble, and the Court therefore found the Plaintiffs' theory of causation entirely speculative. Further, the Court found that the state and federal Defendants would suffer irreparable harm if forced to undertake a variety of remedial measures based on Plaintiffs' speculative injuries, particularly where the source of Plaintiffs' injuries remained uncertain.

### The DEP's and EPA's Dispositive Motions; Plaintiffs' Petition for Mandamus; Discovery Disputes

From May through July, 1996, there was a flurry of activity as Defendants filed their respective motions to dismiss the Amended Complaint and Plaintiffs filed their briefs in opposition. Much of the Court's attention, however, would be focused on the Plaintiffs' on-going battles with the federal and Commonwealth Defendants.

On June 24, 1996, the EPA's OGC issued a final administrative determination in response to Plaintiffs' FOIA claim. The OGC released portions of six disputed Technical Directive Documents (TDDs) and 4 internal office memoranda; however, as to all other documents previously withheld by the EPA, the Agency stood by its decision that the documents were exempt from disclosure under the FOIA exemptions previously claimed. With regard to the EPA's open criminal file from its Criminal Investigations Division, the Agency determined that six reports of investigation ("ROIs") with attached factual documents and one memorandum of interview ("MOI") were arguably responsive to the Plaintiffs' request. The EPA concluded that the factual attachments to the ROIs had previously been provided to the Plaintiffs. However, the Agency determined that the ROIs and MOI themselves should be withheld from disclosure under the theory that their release could reasonably be expected to interfere with law enforcement proceedings and that release of the MOI would also result in an unreasonable invasion of personal privacy as to the individual interviewed.

On July 22, 1996 Plaintiffs filed a motion to compel the EPA to turn over all of its documents relative to the Grine/Coombs Property investigation. [Doc. No. 45.] In particular, Plaintiffs complained that the EPA had failed to release complete and ac-

curate test results of the water samples collected and radioactive testing conducted on their property on January 25, 1995 and February 9, 1995, respectively. Plaintiffs also alleged that the EPA had improperly withheld the results of sludge and/or water samples that were supposedly going to be collected from Coombs's septic tank on February 8, 1995 and subjected to chemical analysis, as referenced in an EPA document known as a "Property Investigation Soil Sampling Plan." Plaintiffs contended that the EPA had "deliberately concealed the existence of the results" and "exhibited conduct possibly contemptuous" of the Court's previous order to release all non-exempt material by July 15, 1996.

In an attempt to resolve the issues raised in Plaintiffs' motion to compel, the EPA's OGC sent Plaintiffs' co-counsel, Mr. Williams, a letter dated August 6, 1996 memorializing the EPA's position as to the disputed information discussed in Plaintiffs' motion. [*See* Doc. No. 52, Ex. A.] The letter reiterated the EPA's position relative to the redacted portions of the disputed documents (i.e., the TDDs, entries in Zenone's log book, interoffice memoranda, handwritten notices of Daniel Isales, Esq., and CID documents) that were being withheld on the basis of asserted FOIA exemptions. With regard to Plaintiffs' claim that certain "sampling data" had not been turned over, the letter indicated as follows:

> ... As we discussed, all of the sampling data from tests conducted by EPA at the Grine property have been produced to you. Although EPA collected a large volume of water to perform its January 25, 1995 water test, this constituted only two (2) water samples. The complete results from these two samples were released to you on November 28, 1995. No other water samples were collected or tested.
>
> Secondly, the radiation test conducted on February 9, 1995 is a routine scan test performed at the site on a direct reading instrument. This instrument does not generate any paper test results and does not electronically store any of its readings. Accordingly, no radiation test results exist, and any radioactivity readings noted by this test would have been reflected in the [pollution reports, known as] POLREPs,

log book entries, or sampling trip reports previously released to you.

> Finally, your motion to compel contends that sludge/liquid sampling data from the Coombs septic tank was not released by EPA. As we discussed, EPA did not collect any sludge samples from the Coombs septic tank. Accordingly, no such documents exists.

(*Id.*) The correspondence invited Plaintiffs, if satisfied with the EPA's explanation for these withholdings, to countersign the letter, return it to EPA's counsel and move to withdraw the motion to compel. Plaintiffs, however, were not satisfied with the EPA's explanation.

In addition to their motion to compel, Plaintiffs filed a Petition for Writ of Mandamus on July 30, 1996 in which they (a) complained that the EPA had failed to respond to the alleged contamination of their water supply and (b) sought a judgment of mandamus requiring the EPA to pay for the restoration of consumable water on an emergency basis until such time as a more permanent solution could be reached. [Doc. No. 83.] Plaintiffs' petition alleged that the EPA was informed on July 19, 1996 by a DEP agent that Plaintiffs' well water had been infiltrated by fecal streptococcus and fecal coliform bacteria. They again claimed that they had not been given full and complete results of chemical testing performed on their water on January 25, 1995 and that the EPA had failed to sufficiently abate the contamination problem.

The EPA responded by filing a motion to dismiss the mandamus petition as well as any other claims in which Plaintiffs sought to compel the EPA to take particular response actions or to conduct further investigations on Plaintiffs' property. [Doc. No. 56.] The EPA objected that Plaintiffs' mandamus petition was, in effect, nothing more than a second attempt by Plaintiffs to obtain a form of relief which this Court lacked jurisdiction to grant and which the Court had previously declined to grant by way of preliminary injunction. The EPA also filed a separate motion for summary judgment on the Plaintiffs' FOIA claim in which it enumerated all of the documents which were being withheld on the basis of FOIA exemptions and dis-

cussed its rationale for asserting the exemptions. [Doc. No. 53.]

On August 14, 1996, this Court held a status conference to discuss the particulars of Plaintiffs' motion to compel and the EPA's motion for summary judgment on the FOIA claim. Plaintiffs continued to insist that they were missing testing data relative to the water samples taken from the Grines' property on or about January 25, 1995, radiological testing performed on the Grines' property, and samples of sludge that had allegedly been collected from William Coombs' septic tank. As to the water samples, Ms. Haagensen acknowledged that the Grines had received a large packet of materials from the EPA on May 18, 1995 which supposedly included an 11–page report relative to the January 25, 1995 water samplings. Ms. Haagensen contended that, due to lack of pagination and pages being out of order, Plaintiffs could not confirm whether the entire 11–page report had been provided. In addition, Ms. Haagensen disputed the EPA's assertion that only two water samples were taken from the Grine property inasmuch as Plaintiffs contended that numerous containers of water had been drawn from their system. As to the radiological scanning, Plaintiffs insisted that the technician performing the tests had jotted down the readings in a "yellow field survey book," which they demanded be released. Plaintiffs also continued to insist, pursuant to the EPA's "Property Investigation Soil Sampling Plan" of February 8, 1995, that samples of sludge from Coombs's septic tank had been collected for testing, yet the results and underlying data had not been disclosed. Insofar as the EPA had withheld CID documents based on its position that their release could reasonably interfere with an on-going criminal investigation, Plaintiffs objected that they had received no prior documentation pertaining to an open criminal investigation relative to the Grine/Coombs properties. Indeed, Ms. Haagensen openly intimated that the EPA's criminal investigation, insofar as it concerned Robert Grine as a potential source of the contamination, was a form of witness intimidation that was meant to retaliate against the Plaintiffs' for their pursuit of the FOIA litigation. [Doc. No. 84 at pp. 44, 48–51.]

At the conclusion of the hearing, the Court ruled on Plaintiffs' motion to compel by directing counsel for the EPA to check and/or confirm: (a) whether more than two water samples/tests were taken of the Grines' water supply on January 25, 1995; (b) that the EPA's 11–page report relative to these tests was in proper form and properly produced to the Plaintiffs; and (c) whether any samples or tests were in fact taken of the sludge from the Coombs' septic tank. [Doc. no. 82 at pp. 53–54.] In all other respects, the Court denied Plaintiffs' motion to compel without prejudice to be reasserted if, on a more fully developed factual record, Plaintiffs could establish that the information they sought was in fact being improperly withheld. The Court noted that the EPA had addressed these claims through Vincent Zenone's declaration of August 12, 1996, which was appended to the EPA's brief in opposition to the motion to compel and in support of its motion for summary judgment on the FOIA claim (*See* Doc. No. 54, Ex. B.); the Court pointed out that Plaintiffs were free to conduct depositions relative to any contested factual issues if they so chose. [*Id.* at p. 54.] As to the Plaintiffs' mandamus petition, the Court noted that it was hard-pressed to see from a jurisdictional standpoint how it could compel the EPA to do what Plaintiffs' sought—i.e., compel the EPA to take essentially discretionary action—but the Court would await further briefing and assume for present purposes that Plaintiffs were proceeding in good faith. (*Id.* at pp. 62–63.) Ms. Haagensen responded that it was her belief that her clients' lives were in danger and that the EPA had neglected at least "50 mandatory duties," as supported by Third Circuit law. [*Id.* at p. 63.] The Court took this matter under advisement.

In its next status conference on September 16, 1996, the Court again entertained a detailed discussion concerning Plaintiffs' on-going discovery disputes with the EPA. [Doc. No. 99.] The Court noted that it had "never seen a case" where the parties were so "mired in minutiae" such that "almost like individual chestnuts falling off a tree one by one by one by one, there is a continuous and ongoing dispute as to whether [information] was or was not turned over." (*Id.* at p. 33.)

The Court emphasized that it did not want to be in a situation where it was poised to rule on pending dispositive motions, only to have a party object that the record remained undeveloped because of critical materials not being turned over. The Court noted it was "hard-pressed" to "get a handle" on what Plaintiffs felt they were lacking, but invited Ms. Haagensen to provide a checklist so that the Court could resolve outstanding discovery disputes and get the case moving forward. (*Id.* at 34.) Ms. Haagensen responded that she was demanding from the EPA "[e]ach test that's been done on whatever medium, soil, water, what have you, with the technical directive documents which states what pieces of paper were filed with those test results. There is a logbook that was filed as a sample identification, location, date, time, name of sample, type of sample, for every single test that was performed, we do not have it." (*Id.* at p. 35.) Paul Skirtish, Esq., counsel for the EPA, noted that only three specific discovery issues had been left open by the Court at the previous status conference, which he had followed up on, specifically: he was re-submitting to Plaintiffs a complete (and properly paginated) 17–page report which included all of the test data relative to the water samples that had been collected from the Grines' property on January 25, 1995, as well as a one-page memorandum from Brian Moran (a technician employed by Weston) which evidently related to those tests; he had checked on the number of water samples taken from the Grines' groundwater supply; and he had investigated whether there was additional EPA data relative to any water or soil samples taken from the Coombs Property. [*Id.* at p. 25, 36.] Mr. Skirtish also represented that he would check with Marian Murphy, the chemist who analyzed the Grines' groundwater samples, to verify the exact quantity of water received by her laboratory. [*Id.*] Nevertheless, Ms. Haagensen now insisted that the EPA had also failed to turn over the "index" to the EPA's administrative record as allegedly required by 40 C.F.R. § 300.800. The following discussion ensued:

> MR. NITCZYNSKI [counsel for the EPA]: Your Honor, I believe those are the regulations that I believe apply to sites that are on the national priorities list where EPA has made a determination of a removal action, remedial action or to order a potentially responsible party to conduct a cleanup.

> MR. WOLFORD [counsel for the DEP]: Your Honor ... This is again the type of problem I keep running into with plaintiffs' counsel is they don't understand the way federal laws operate. The administrative record hasn't been created here, it's not a [Hazardous Sites Cleanup–Act] site, its not a CERCLA site. Why they would think this, they read something and then they try to apply it to everything, it's just very frustrating.

> THE COURT: The administrative record that I gather that you are looking for, so we're on the same page here, Ms. Haagensen, is apparently not generated until such time as the governmental entity makes a determination that there is going to be some type of remedial action, is that correct?

> MS. HAAGENSEN: Your Honor, under Section 300.41(a) which deals with waste action sites, environmental samples are to be collected, the lead agency shall develop sampling analysis plans that shall provide a process for obtaining data. The next paragraph says that the field sampling plan—sample type of analysis has to be created. We have major problems with every single piece of documentary evidence. For example, I have nothing that gives us location of samples taken from the [Coombs] drums. We don't have that piece of information, that is crucial. The problem with the water sample is that the two documents that have been filed accompanying the 11 pages of test results indicate that many more than the samples were taken than were indicated in their documents and the test itself does not match up with these, either one of those reports.

> MR. SKIRTISH [counsel for the EPA]: [Plaintiffs'] counsel has just an incredible problem of accepting declarations of people, this is why I'm just going to try and point this out. There were two tests that were done on [the Grines'] water. And there's a person, Vince Zenone, who's at-

tested to that under penalty of perjury. He just said it was true and correct to the best of his knowledge. I'm going to find out from Marian Murphy, I can tell the court right now there was a quantity of water that was taken, but not every drop of that water was tested. There were two tests done on the quantity of the water extracted from the Grine property. I'll even provide a declaration from Marian Murphy as to what the quantity is so there's no haggle. That's all I have. She has every test that EPA has in their file. I'm representing that to the court that I have no more paper, I have no more paper, I have nothing else to give her on these water tests, on these ground tests.

THE COURT: Ms. Haagensen, I understand your desire as is true of any zealous advocate to make sure you have obtained a complete paper record. Everything that's within the possession of your opponent. But you can't get something that doesn't exist if you're told that it doesn't exist.

MS. HAAGENSEN: The problem is that Mrs. Murphy has stated that it does exist. In her report she states that certain methods were used to analyze certain samples. When you look at the 11 page report, the methods used, they're at the top of the page. He will say, for example, we used method 608 to test such and such and such and such. When you try to find it, it isn't in the 11 pages, another method is listed. It states certain methods were used, they are not in that report. That does create a problem.

THE COURT: If they don't have them, they don't have them.

MS. HAAGENSEN: They stated they do have them and they're missing from the report.

THE COURT: There's apparently an affidavit that was filed that says they don't have them. I don't know where that leaves us except I have no reason to believe that the affidavit isn't true. All right.

MS. HAAGENSEN: We have to say we have severe problems with an affidavit, very detailed, very technical but very troubling.

THE COURT: Ms. Haagensen, you may very well. But we are about to move on and now I'm going to turn my attention

to the pure legal aspects of this case. I'm also going to turn my attention to the Rule 11 aspects of this case. And I'm going to be taking a very close look at that as well . . .

(Doc. No. 99, at pp. 37–40.)

On October 22, 1996, Plaintiffs filed their own motion for Rule 11 sanctions against the EPA based on alleged "serious factual errors" in the May 28, 1996 affidavit of Vincent Zenone (previously submitted to the Court in connection with the EPA's opposition to Plaintiffs' motion for preliminary injunction [see Doc. No. 29]) and the April 24, 1994 report of Marian Murphy, upon which Zenone's declaration was partially based. [See Doc. No. 68.] Plaintiffs also alleged "serious factual errors" in the reports of Ms. Murphy dated February 13 and March 6, 1995. Without any supporting expert documentation or other interpretive evidence, Ms. Haagensen, on behalf of Plaintiffs, asserted three examples of these "serious factual errors," *to wit:*

> The compound identified as ortho-xylene at CAS No. of 75–01–04 is misidentified; ortho-xylene's correct CAS No; is 95–47–6. The chemical abstract service number is unique for each chemical; it is an impossibility for two different chemicals to share the same CAS number. Accordingly, the chemical identified as ortho-xylene at CAS No. 75–01–04 is in all probability vinyl chloride, an extremely hazardous waste.

\* \* \*

The Murphy report of April 24, 1995, states that methylene chloride and toluene were not detected in the samples. In fact, methylene chloride was detected at a concentration of 74,000 ug/L and toluene was detected at 520,000 ug/L in Sample No. 9511809V. These concentrations far exceed the "blank" concentrations at 5 ug/L (toluene) and 8 gu/L (methylene chloride.)

Thirty-six (36) unknown hydrocarbons are reported in Ms. Murphy's report of April 24, 1995. It is impossible for any expert to assess health or exposure risks without knowledge of the chemical compounds involved. Ms. Murphy states that certain of the tenatively [sic] identified

compounds were discovered in both "blanks" and samples. She states that the scored or crossed out tenatively [sic] identified compounds were discovered in both "blanks" and samples and were in her report considered "non-detect." However, if an "unknown" were found in a blank, Ms. Murphy would have no way of knowing which unknown in the sample data to eliminate.

[Doc. No. 68 at p. 2–3.] Plaintiffs further asserted that the EPA had ignored the Court's order to release all data pertaining to radiation testing, including data from which the background standards were derived and the logbook or field notes of Weston employee Brian Moran relative to the radiation data obtained from the Grines' property on February 9, 1995. As a result, Plaintiffs sought to strike "all of Defendant EPA's denials ... from the record" and suggested that the Agency should be held in contempt and sanctioned for its "deliberate deception." (*Id.* at p. 3.)

Six days later, the parties were again before the Court on a telephonic status conference initiated at Plaintiffs' behest. [Doc. No. 100.] According to Mr. Williams, heavy rains from the previous day had caused a "rubber cement"-type odor to descend upon the Plaintiffs' property, resulting in Plaintiffs experiencing shortness of breath, rashes, headaches and nausea and allegedly causing their dog to suffer seizures. Since then, the air had apparently cleared somewhat and Plaintiffs were feeling better. Nevertheless, their counsel contacted the Court for the purpose of obtaining some type of compensation that would enable Plaintiffs to move out of their home, since Margaret and Robert Grine feared they might not survive another such episode. Matthew Wolford, Esq., counsel for the DEP, objected to Plaintiffs' failure to contact the DEP's emergency response team in the first instance, which might have allowed for a timely response by the Department. Mr. Wolford noted that, in the past, the DEP has had difficulty verifying the Plaintiffs' environmental complaints and he feared that, it now being a day later, a similar result might occur. Nevertheless, it was agreed that a DEP official would visit the Grines' property to investigate their current status. [*Id.* at pp. 1–9.] During this status conference the Court scheduled a hearing date of November 19, 1996 for Plaintiffs' motion for permanent injunction and indicated that it would rule on the Defendants' pending dispositive motions prior to the hearing. (*Id.* at pp. 10–11.)

Two weeks later on November 13, 1996, the Court held another status conference to discuss the propriety of the permanent injunction hearing in light of the Plaintiffs' claim for monetary damages as set forth in the Amended Complaint. [Doc. No. 101.] The Court concluded that, because the damages claim needed to be submitted to a jury, it would be inappropriate to hold a separate evidentiary hearing relative to Plaintiffs' request for a permanent injunction in advance of a jury trial. The Court resolved that a pretrial schedule should be established and the case set down for a jury trial at the soonest available date; however, the Court would first rule on the Defendants' pending motions to dismiss the Amended Complaint in order to determine which parties and/or claims would be appropriately subjected to further litigation. (*Id.* at pp. 4–7, 11–12.) Ms. Haagensen objected to this plan on the ground that the Court needed to first address Plaintiffs' claims that the government had produced falsified evidence:

MS HAAGENSEN: As stated in our recent argument, the evidence itself is falsified, therefore, the situation our clients are in may be even worse than we originally supposed. It may be even worse than was first apparent if the evidence itself is inaccurate that has been put in front of you, therefore, our clients may not be able to sit where they are for another three or four months. We were hoping that these questions would be dealt with next week on the 19th?

THE COURT: Well, I gather. But the fact of the matter is the court didn't draft the complaint, you did. The plaintiffs have requested injunctive relief and legal relief, damage relief and you've requested a jury trial.

MS. HAAGENSEN: When we drafted the complaint, we were not aware that the evidence was actually falsified.

THE COURT: I have made no determination on the record that there has been any falsification of evidence in the case.

MS. HAAGENSEN: We want it to be determined in a hearing with people under oath.

THE COURT: And you'll have an opportunity to do that. But you're not going to have an opportunity to do it on the 19th. And you're also going to have an opportunity by virtue of a discovery schedule that is going to be set in the case to fully and deeply explore all of those contentions relative to alleged falsification of documents. And you're going to have a standard amount of discovery to do that.

\* \* \*

MS. HAAGENSEN: It seems to us the evidentiary problems has to be ruled on before a motion to dismiss can be ruled on. We haven't had a hearing on falsified evidence, that's our position.

\* \* \*

THE COURT: With respect to the claim of falsification of evidence, of course, we're looking at everything, but, Ms. Haagensen ... the fact of the matter remains that with respect to at least the governmental defendants, in the 12(b) papers here, they are asserting in large measure legal defenses which are not fact dependent. That being the case, although I am not only willing, but I think obligated to make sure that an evidentiary hearing is not required to the extent that it may implicate any of the defenses, I'm hard pressed to see, for instance, how a claim of falsification of evidence would cut one way or the other on an 11th Amendment defense.

MS. HAAGENSEN: Your Honor, if we may respond to that. There's an obvious conflict of interest that raises Constitutional problems if the EPA and its investigator did the investigation and made the determination on which your judgment is based when they are now adversary to us, that is most definitely a Constitutional conflict. It is definitely a Constitutional problem if we are not afforded due process.

THE COURT: You lost me on that, I must say. As I said, I'm going to take a look at the issue. It's enough for you to know now that the hearing is canceled on the 19th. If the court determines as it reviews these matters that an evidentiary hearing is necessary with respect to the allegations concerning falsification of testimony, you will be so informed in a timely manner and a hearing will be conducted if I so decide. . . .

[Doc. No. 101, at pp. 8–9, 12–15.] [9]

That same day, the EPA filed its response in opposition to the Plaintiffs' motion for Rule 11 sanctions. [Doc. No. 75.] In its response papers, the EPA vigorously disputed the "serious factual errors" allegedly contained in the May 28, 1996 Declaration of Vincent Zenone and the underlying reports of Marian Murphy. The EPA contended that Plaintiffs' allegations of "serious factual errors" were not only unsubstantiated by any expert testimony, but also speculative and based on Plaintiffs' uninformed misunderstanding of the analyses utilized to produce the Murphy memoranda and the materials supporting it. In support of its position, the EPA appended declarations of Marian Murphy and Vincent Zenone dated November 12, 1996 explaining that the perceived "serious factual errors" were, for the most part, not errors at all or, at most, minor clerical errors which in no way impacted on Vincent Zenone's conclusions about the inadvisability of a removal action on the Grines' property.

On November 29, 1996 Plaintiffs filed a 29–page reply brief relative to their Rule 11 motion which attacked the EPA's explanations of the alleged "serious factual errors" in Ms. Murphy's reports. [Doc. No. 77.] Appended to Plaintiffs' reply brief was an affidavit from one Gordon R. Johnston, Ph.D, a

9. The Court also inquired as to whether the DEP had sent an agent out to investigate the problems alleged by the Grines during the previous conference call. Counsel for the DEP represented that an agent had been dispatched to the Grine property and had not noticed anything unusual and also observed that the Grines' dog appeared to be fine. Ms. Haagensen countered that the DEP agent had not conducted any testing of the "gradient air quality" as requested by Mr. Grine, apparently because he did not have the necessary equipment with him at the time. [Doc. no. 101, at pp. 9–10.] It was agreed that the DEP would attempt to accommodate Plaintiffs' request if given timely notice of any similar future problems. (*Id.* at pp. 10–11.)

chemical consultant, who disputed certain highly technical aspects of Ms. Murphy's November 12, 1996 declaration. Among other things, Dr. Johnston criticized Ms. Murphy's declaration on the grounds that there were "simply too many unknown and tentatively identified compounds" reported by Ms. Murphy; thus, Mr. Johnston "insisted" that the "original mass spectral data be provided to plaintiff." [Doc. No. 77, Johnston affidavit at p. 1.] Dr. Johnston also criticized Ms. Murphy's "calculations used to convert concentrations in units of ug/Kg to ug/L." [*Id.*] Based on his review of lab data, Mr. Johnston opined that one of the drums on the Coombs Property from which samples had been analyzed contained amounts of toluene well above the values that would indicate "immediate danger to life and health ('IDLH')". Mr. Johnston further opined that there was "a distinct possibility" that the concentrations of meta-xylene or para-xylene also exceeded the relevant IDLH value. [*Id.* at p. 2–3.] Mr. Johnston concluded:

> The plaintiffs have been exposed to a number of extremely hazardous chemical compounds. Synergistic effects have been observed with regard to the exposure of individuals to more than one chemical compound.... There is apparently no data available which describes the synergistic effects of all the hazardous chemicals to which the plaintiffs have been exposed. In my professional opinion, therefore, the combined effects of all these hazardous chemicals have been extremely detrimental to the health of the plaintiffs.

[*Id.* at p. 3.]

The EPA filed its sur-reply to the Plaintiffs' Rule 11 motion on December 23, 1996.

[*See* Doc Nos. 80.] In its sur-reply, the EPA contended that Plaintiffs' reply brief had failed to address the procedural deficiencies in their Rule 11 motion, instead raising new matters not previously addressed by any of the parties and making it "even more clear that they are using the Sanctions Motion as a guise to argue the merits of the case." [Doc. No. 80 at p. 1, n. 1.] The EPA appended additional declarations from Marian Murphy and Nancy Rios Jafolla, a toxicologist employed by EPA's Region III Hazardous Waste Management Division (dated December 12 and December 19, 1996, respectively). These affidavits disputed Dr. Johnston's assertions in several respects [10] and generally corroborated the original conclusions of Vincent Zenone concerning the inadvisability of a removal action at the Grines' property. [*Id.* at Attachments 1 and 2.]

*The Court's Memorandum Opinion of December 27, 1996*

On December 27, 1996, this Court issued a 56–page memorandum opinion ruling upon the Plaintiffs' petition for a writ of mandamus, the Plaintiffs' motion for Rule 11 sanctions, the EPA's motion to dismiss the mandamus petition, and the EPA's motion for summary judgment on the FOIA claim. [Doc. No. 81.] With respect to Plaintiffs' mandamus petition, the Court concluded that it lacked jurisdiction to compel further responsive action by the EPA relative to the Grines' water supply. Initially, the Court observed that the only claim asserted against the EPA in the Amended Complaint was Plaintiffs' FOIA claim; hence, there was no cause of action that would allow for the form of relief that Plaintiffs sought in their mandamus petition. We next concluded that, even if Plaintiffs had asserted causes of action

---

**10.** For example, Ms. Murphy asserted in her declaration that Dr. Johnston's suggestion for converting the concentrations of compounds detected in the Coombs drum samples from ug/KG to ug/L was based on the erroneous assumption that the drum samples were analyzed for VOCs as solids; in fact, Ms. Murphy asserted, the samples were analyzed for VOCs in *liquid* solution, making her original calculations correct. Ms. Murphy also maintained that, contrary to Dr. Johnston's criticism, there was nothing sanctionable or improper about use of the NIST–EPA–NIH Mass Spectral Library to identify compounds, as use of the MSL was consistent with well-established protocol. To the extent Dr. Johnston criticized the EPA's conclusions about the conditions at Plaintiffs' property as being in conflict with recommendations issued by the National Institute for Occupational Safety and Health ("NIOSH"), the Murphy and Jafolla declarations asserted that NIOSH's recommendations were inapposite. More specifically, Ms. Rios asserted that NIOSH standards relate to concentrations of compounds in the air to which workers may be exposed in the workplace, as opposed to (1) levels at which removal actions are authorized under CERCLA or (2) concentrations of compounds in residential soil or in drums that would pose a health risk to Plaintiffs. [*See* Doc. No. 80, attachments 1 and 2.]

against the EPA under CERCLA, RCRA and the Clean Water Act, those statutes did not provide a sufficient waiver to overcome the government's sovereign immunity, since the "citizen suit" provisions of those statutes permit suits against the EPA Administrator only insofar as the citizen plaintiff seeks to compel the Administrator to undertake non-discretionary actions. We concluded that the relief sought by Plaintiffs in *this* case—i.e. a writ directing the EPA to pay for an alternative water source for Plaintiffs and to take additional investigatory and/or remedial measures relative to their water contamination—involved discretionary functions that were not the appropriate subject of a citizens' suit or a mandamus petition. Although Plaintiffs insisted that these duties involved purely ministerial decision, we disagreed and found the Plaintiffs' cited authorities insufficient to establish a jurisdictional basis for the requested mandamus relief.[11] The Court therefore denied the Plaintiffs' mandamus petition and granted the EPA' motion to dismiss any claims pursuant to which Plaintiffs sought to compel the EPA to undertake certain responsive action and/or further investigations of Plaintiffs' property.

The Court next addressed the EPA's motion for summary judgment on Plaintiffs' FOIA claim. In support of its motion, the EPA submitted declarations from two agents involved in responding to the FOIA request: (A) Milton H. Taylor–Robinson, Attorney–Advisor in the EPA's Office of Criminal Enforcement, Forensics and Training, Office of Enforcement and Compliance, and (B) Vincent Zenone. Mr. Taylor–Robinson's declaration established EPA's rationale for withholding certain documents contained in the EPA's CID file, while Mr. Zenone's declaration addressed the EPA's reasons for withholding certain Region III documents. At issue were five (5) distinct categories of information sought by Plaintiffs: (i) data relative to the testing of water, soil and sludge samples allegedly taken from the Grine and Coombs properties; (ii) redacted portions of the Mr. Zenone's logbook; (iii) six Technical Direction Documents (TDDs) issued to Roy F. Weston, Inc. pursuant to the EPA's Technical Assistance Team Contract; (iv) redacted portions of four interoffice memoranda in the form of e-mail messages distributed through EPA's Region III's Local Area Network and one page of handwritten notes generated by Daniel Isales, Assistant Regional Counsel for Region III; and (v) various documents from the EPA's CID file, *to wit:* fourteen entries from Mr. Zenone's log book, six Reports of Investigation, and one Memorandum of Interview.

Insofar as the first disputed category was concerned, this Court reviewed the parties' summary judgment papers and concluded that there was no genuinely disputed issue of material fact as to the EPA's representation that it had turned over all information within its file relative to (a) testing of the two water samples collected from the Grines' property on or about January 25, 1995 [12] and (b) testing for radioactive substances which was conducted on the Grines' property in early 1995 using a hand-held radioactivity scanner.[13]

---

**11.** Plaintiffs attempted to establish this Court's jurisdiction by pointing to various ministerial duties purportedly required of the EPA under the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. § 6020.102(12)(ii) and (v), the holding of *FMC Corp. v. U.S. Dept. of Commerce*, 29 F.3d 833 (3d Cir.1994), the doctrine of "primary jurisdiction," the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. §§ 300.1 *et seq.*, and/or the Clean Water Act, 33 U.S.C. § 1319(a)(3). We discussed in detail why Plaintiffs' reliance on each of these purported authorities was misplaced in the present case. (*See* Doc. No. 81 at pp. 17–27.)

**12.** The Court acknowledged Plaintiffs' assertion that Robert and Margaret Grine had supposedly witnessed numerous water samples being collected and prepared by EPA personnel for various types of testing. However, the Court also noted that Plaintiffs had not presented any evidence in support of their allegation, such as an affidavit attesting to the events they claimed to have witnessed. They also never filed a Rule 56(f) affidavit seeking more time to oppose the EPA's motion for summary judgment.

**13.** Mr. Zenone represented that the radioactivity scanners used by the EPA's Technical Assistance Team involved direct reading instruments that do not record their readings in documentary form or otherwise store them electronically. According to Mr. Zenone, to the extent EPA agents may have memorialized any of these scanning results, they were recorded in documents such as logbooks, pollution reports, or sampling trip reports, all of which the EPA had previously produced to Plaintiffs. While Plaintiffs asserted that Robert Grine had witnessed one of EPA's assistants record test scanning results in a yellow

As to the sludge samples allegedly taken from William Coombs's septic tank, the EPA presented unrebutted evidence that, contrary to a reference made in the February 8, 1995 "Property Investigation Soil Sampling Plan," no samples were in fact ever collected and, hence, no records existed relative to those tests.[14] Based on its review of the record, the Court concluded that the EPA was entitled to summary judgment on this claim.

The next disputed FOIA category concerned portions of Vincent Zenone's logbook which had been redacted on the ground that certain portions involved other site investigations unrelated to the Grines' property. Plaintiffs maintained that, contextually, it appeared the redactions pertained to their property. This Court ordered the EPA to produce the log book for *in camera* inspection and took that portion of the EPA's motion under advisement.

The Court next considered the disputed Technical Direction Documents which had been redacted in part to conceal information about Weston's direct labor rates, indirect cost rates, and key personnel. The EPA claimed that this information was exempt from disclosure under 5 U.S.C. § 552(b)(4), pertaining to matters that are "trade secrets and commercial or financial information obtained from a person and privileged and confidential." Upon review of the record, the Court concluded that these documents met the criteria for exemption under *National Parks and Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974). The Court therefore granted the EPA's motion for summary judgment with respect to this category of documents.

As to all of the remaining documents, the Court concluded that an *in camera* review was appropriate in order to better determine whether any of the EPA's claimed exemptions were justified as a matter of law. Accordingly, the Court took the EPA's motion under advisement pending its review of the remaining disputed documents.

Finally, the Court addressed Plaintiffs' motion for Rule 11 sanctions, which was premised partly on the "serious factual errors" allegedly contained in Vincent Zenone's May 28, 1996 declaration and the reports prepared by Marian Murphy and partly on the EPA's alleged failure to release data pertaining to radiation testing on their property. The Court began by observing that Plaintiffs had violated Rule 11's mandatory 21-day notice period, which is designed to give the offending party an opportunity to voluntarily correct any deficiencies in the challenged submission. In addition, the Court also found Plaintiffs' motion to be untimely, in that it had been filed some five months after the EPA had submitted Zenone's declaration in opposition to the Plaintiffs' preliminary injunction motion. Substantively, the Court found that sanctions were not warranted because its review of the record showed that the EPA had acted in an objectively reasonable manner in relying on the challenged papers. And, insofar as Plaintiffs were complaining of the EPA's failure to disclose information relating to the radiation reconnaissance performed by Weston employee Brian Moran, the Court found no evidence in the record to support a finding that the EPA ever had custody of the personal logbook or notes belonging to Mr. Moran. Furthermore, the Court found that the "EPA's actions in attempting to locate any such logbook have been more than objective-

---

field survey notebook, the Court noted that Plaintiffs provided no affidavit or other competent Rule 56 evidence in support of this allegation, nor had they filed any Rule 56(f) affidavit indicating why additional time would be required in order to properly oppose the EPA's motion. The Court further noted that, in response to the Plaintiffs' Motion for Rule 11 sanctions, the EPA had provided declarations from EPA personnel establishing that: Brian Moran, a Weston employee, conducted routine reconnaissance at the Grines' property; Mr. Moran may have documented his readings in his own personal log book; the EPA has never had possession of that logbook; the EPA has undertaken measures to acquire the logbook; however, such efforts have been unsuccessful. The Court noted that Plaintiffs had presented no evidence sufficient to create a genuine issue of fact on this point.

14. Plaintiffs attempted to demonstrate, inferentially, that there was a disputed issue of fact on this issue by pointing to alleged inconsistencies in some of the technical documentation provided by the EPA. Without delving into the particulars of these alleged inconsistencies, the Court noted that the reports involved technical data which Plaintiffs had failed to challenge through any competent expert testimony in their papers opposing the EPA's summary judgment motion.

ly reasonable under the circumstances." [Doc. No. 81 at p. 56.] The Plaintiffs' motion for Rule 11 sanctions was therefore denied.

### The Court's Memorandum Opinion Dated December 31, 1996

On December 31, 1996 the Court addressed the Commonwealth Defendants' motion to dismiss in a separate 34–page memorandum opinion and order. While the Commonwealth asserted several different bases for dismissal,[15] this Court granted the motion solely on the basis that the Commonwealth was immune from this lawsuit under the Eleventh Amendment. Noting that there are only two situations when a state can be sued in federal court—i.e., where the state has expressly waived its immunity or, alternatively, where Congress had validly and unequivocally abrogated Eleventh Amendment immunity—the Court explained at length why neither exception pertained in this case. As to the latter exception, the Court opined that Congress had not attempted to abrogate Eleventh Amendment immunity under the citizens' suits provisions of RCRA, CERCLA and CWA, nor could it validly do so under the Supreme Court's ruling in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Having concluded that Plaintiffs could not sue the DEP in federal court, the Court next concluded that Plaintiffs had failed to state a basis for relief against Defendants Wozniak and Holler under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), for two reasons: (1) Plaintiffs' complaints were directed at wholly retrospective events (as opposed to on-going violations of federal law), and (2) Plaintiffs sought to compel action by the DEP officials which was purely discretionary, as opposed to ministerial, in nature. The Court next concluded that the Eleventh Amendment also barred Plaintiffs' state law claims against the Commonwealth Defendants under *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). We rejected Plaintiffs' assertion that the Pennsylvania Hazardous Sites Cleanup Act evidenced the Commonwealth's consent to be sued under that Act in federal court. We also rejected the argument that Plaintiffs' allegations rendered the Commonwealth Defendants liable as "owners" or "operators" of a "hazardous site" under the authority of *FMC Corp. v. U.S. Dept. of Commerce,* 29 F.3d 833 (3d Cir.1994). Based upon its Eleventh Amendment analysis, the Court dismissed all claims against the Commonwealth Defendants with prejudice.

On January 29, 1997 Plaintiffs took a consolidated appeal from the Court's orders of December 27 and 31, 1996 ("Appeal No. 1"), C.A. No. 97–3083. [Doc. No. 87.]

With a view towards scheduling a Rule 16 conference and establishing a pretrial case management schedule, the Court turned its attention to the remaining dispositive motions. On March 31, 1997 the Court ruled on Defendants Yost's and William Coombs's motions to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6). Yost's principal argument for dismissal was that, at most, she was a mere passive landowner who had had no involvement with the contamination site. The Court nevertheless concluded that Plaintiffs' allegations, liberally construed, asserted Yost's active involvement in the unlawful handling, storage, and disposal of hazardous pollutants. The Court denied her motion on the ground that Yost's involvement (or noninvolvement) in the alleged unlawful conduct and her alleged status as part owner or operator of the "site" must be assessed on a more fully developed record by way of a motion for summary judgment, if appropriate. In other respects, the Court concluded that plaintiffs' averments, though at times inartfully pled, were sufficient to survive a Rule 12(b)(6) motion. Because Coombs's motion to dismiss was essentially an adoption of Yost's motion, the Court similarly denied Coombs's motion. [Doc. No. 103.]

On April 11, 1997, the Court ruled on the motion to dismiss filed by Tionesta Borough

---

**15.** The Commonwealth Defendants' motion was premised on their arguments that: (a) they were entitled to Eleventh Amendment immunity; (b) Plaintiffs failed to state a viable federal cause of action, thus depriving this Court of subject matter jurisdiction; (c) Plaintiffs failed to satisfy the notice of suit jurisdictional prerequisites under the federal environmental laws; and (d) the Amended Complaint failed to comply with the Federal Rules of Civil Procedure.

and Ronald Hall, President of the Borough Council (collectively, the "Borough Defendants"). The Court dismissed Plaintiffs' RCRA, Clean Water Act and CERCLA claims against the Borough Defendants insofar as those claims were premised upon the Defendants' alleged failure to enforce local sewage laws or take other regulatory action; however, it denied the motion to dismiss these claims to the extent Plaintiffs had alleged more active involvement on the Defendants' part in "directing" disposal activity and/or acting in concert to cause the unlawful disposal of hazardous wastes at the Coombs Property. The Court also considered Plaintiffs' state law claims against the Borough Defendants for infliction of emotional distress (Count IV), nuisance (Count VI) and strict liability (Count VII). The Court concluded that the Borough itself was entitled to immunity from these claims under the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. §§ 8541 *et seq.;* however, the motion to dismiss was otherwise denied as to Plaintiffs' state law claims. Finally, the Court addressed the Borough Defendants' assertion that Plaintiffs had failed to satisfy the notice of suit requirements under RCRA, CWA, and CERCLA, which are mandatory and jurisdictional in nature.[16] We denied the Defendants' motion on this ground without prejudice to be reasserted via a Rule 56 motion, if appropriate, following the development of a more complete record clarifying, through affidavit or other appropriate documentation, what notice was provided, when it was provided, and to whom it was sent. [Doc. No. 105.]

Despite the interlocutory nature of this Court's April 11, 1997 memorandum opinion and order, Plaintiffs filed a notice of appeal from the ruling on May 12, 1997. [Doc. No. 108.] The appeal was docketed as C.A. No. 97–3277 ("Appeal No. 2").

On July 17, 1997, the Court held a status conference to discuss the procedural posture of the litigation. [Doc. No. 119.] The Court noted that Plaintiffs' interlocutory appeals, which involved dismissals of less than all parties to the case and less than all of Plaintiffs' claims, were complicating the movement

of the case. (*Id.* at p. 5.) In particular, the pending appeals presented questions about this Court's jurisdiction to address those aspects of the FOIA claim still pending before it on in camera review. (*Id.* at pp. 6–7.) Adding to the confusion was the fact that Plaintiffs had issued a subpoena duces tecum upon Vincent Zenone on December 30, 1996, noticing his deposition and directing him to produce "[a]ll relevant documents, reports, exhibits and written analysis which are products of your supervised investigation as on-scene coordinator of the Coombs and Grines sites ... which were not heretofore suppl[i]ed voluntarily or per F.O.I.A." [Doc. No 90, Ex. A.]. On February 4, 1997, the EPA had filed a motion for a protective order in which it sought to bar all discovery (particularly Mr. Zenone's deposition) and quash the December 30, 1996 subpoena. [*See* Doc. 89 and 90.] The EPA took the position that it was now effectively dismissed from the case inasmuch as the only aspect remaining relative to Plaintiffs' FOIA claim was this Court's in camera review of the remaining withheld documents and a ruling as to whether or not they need be turned over. Accordingly, it was the EPA's view that Plaintiffs could not notice the deposition of Mr. Zenone without first complying with the regulations set forth at 40 C.F.R. § 2.401, which address situations where the deposition of an EPA agent is sought for use in connection with litigation involving only private parties. Counsel for EPA also urged that the subpoena should be quashed because of various procedural deficiencies. The Court ruled that the subpoena would be quashed, as Plaintiffs' counsel conceded that it had been issued out of the wrong court. (*Id.* at p. 15.) Nevertheless, in the interest of proceeding with arguably relevant discovery, the Court permitted Plaintiffs to cure that deficiency, reissue the subpoena from the proper court, and arrange a mutually convenient time for Mr. Zenone's deposition. (*Id.* at pp. 14–15.) Plaintiffs' counsel indicated that they would do so immediately. (*Id.* at p. 15.)

**16.** *See e.g.* 42 U.S.C. § 6972(b)(1)(A) and (b)(2)(A), 33 U.S.C. § 1365(b)(1), 42 U.S.C. § 9659(d)(1).

On August 28, 1997, the Third Circuit issued orders in C.A. Nos. 97–3083 and 97–3277 denying Plaintiffs' appeals ("Appeals Nos. 1 and 2," respectively) for lack of appellate jurisdiction. [Doc. Nos. 124–25.] With the issue of this Court's jurisdiction now cleared up, the Court proceeded with its in camera review of the remaining disputed FOIA documents.

On October 10, 1997, this Court issued its ruling on those aspects of the EPA's motion for summary judgment that had formerly been taken under advisement. [Doc. No. 130.] The Court reviewed the unredacted version of Mr. Zenone's logbook, which consisted of over 150 pages. The Court concluded that, with the exception of two brief entries that made incidental reference to the Plaintiffs' case, all of the information omitted as unresponsive did, in fact, concern activities on other sites unrelated to the Grine and Coombs Properties. The Court allowed for the disclosure of the two incidental entries but observed that, notwithstanding their omission, "it [was] apparent that the government took great care to provide all portions of the log[book] (not otherwise claimed to be privileged) that ma[d]e even incidental reference to the Grines' case." [Doc. No. 130, p. 5.] The Court then turned to the EPA's interoffice memoranda and the handwritten notes of Daniel Isales which had been withheld as "executive privilege" or "attorney work product" materials pursuant to 5 U.S.C. § 552(b)(5). The Court ruled that the internal office memoranda were properly exempt from disclosure but the notes of Mr. Isales should be produced to Plaintiffs. Finally, the Court considered various documents from EPA's CID file which were withheld as materials whose disclosure could reasonably be expected to interfere with law enforcement proceedings under § 552(b)(7)(A). These documents included fourteen (14) entries from Mr. Zenone's log book, six (6) Reports of Investigation compiled by Special Agent Martin Wright, and two (2) Memoranda of Interviews drafted by Special Agent Wright. The Court found that these documents were not so sensitive that they would likely interfere with any on-going criminal investigation and, thus, it concluded that the government had failed to meet its burden of establishing a valid exemption. As for the two memoranda of interviews—one of which concerned Wright's interview with William Coombs on September 11, 1995—the Court further found that there was nothing in these documents that was so sensitive as to constitute a significant invasion of privacy to those persons interviewed. Accordingly, it ordered the production of all the disputed documents from the EPA's CID file.

*Plaintiffs' Motion for Summary Judgment and Related Motions*

While Plaintiffs' initial appeals were pending before the Third Circuit, Plaintiffs filed their motion for partial summary judgment, seeking to establish Defendants Coombs's and Yost's liability under RCRA, the Clean Water Act, CERCLA, the PHSCA and various state common law claims. [*See* Doc. No. 113.] In support of their motion for summary judgment, Plaintiffs submitted videotapes of their own property and the Coombs Property, several affidavits from various lay witnesses, and technical lab data which they believed established each of their claims as a matter of law. The videotape of the Coombs Property generally showed that, during 1994–95, the camp was in a state of some disrepair with various barrels and debris strewn about the grounds. Present on the property were at least two barrels labeled as containing some type of lubricant and an overpack drum and lid embossed with the trademark "Enviropack," the name "Essex Environmental Industries, Inc.," and the number "DOT–E 9775." Also present on the Coombs Property was a burn barrel of about 55 gallon size. Various other debris, such as five gallon plastic jugs, piping, a cast iron bathtub, and at least one refrigerator/freezer were scattered about the property along the eastern border. Plaintiffs' video of their own property depicted two dead field mice and a dead rabbit as well as some areas of stressed or dying vegetation. According to the Grines, these incidents occurred in the area of their wet weather spring directly downgradient from Coombs's camp, thus permitting an inference that hazardous substances flowed from Coombs's camp onto the Grines' property, killing the vegetation and small animals.

Plaintiffs submitted a number of affidavits from lay witnesses—principally Robert Grine—who claimed to have witnessed unusual phenomena occurring on the Grine and/or Coombs properties. Robert Grine attested that he has periodically observed surface run-off originating from a rock pile on the Coombs and Yost properties which emitted a foul chemical odor and a rainbow or white foam sheen and which wended its way down to the Grines' property. Mr. Grine also claimed to have witnessed Coombs receive numerous truck loads of drums, cans and other debris to his camp. He claimed that these drums at times appeared to be overflowing with a thick black substance which would stain the surrounding ground area and which emitted the same chemical odor as that which accompanied the run-off on his property. (*Id.* at ¶ 2.) In addition, Robert Grine alleged that he had witnessed numerous overpack drums, steel drums and other containers on the Coombs Property, some of which appeared to contain substances and others which appeared to be stained, rusted, or corroded as if from usage and/or drainage of a substance. Mr. Grine represented in his affidavit that he has observed sewage flows emanating from the Defendants' properties: one flow was allegedly located on the eastern margin of Yost's property just below the aforementioned rock pile and debris and, according to Mr. Grine, emanated from an overflow of William Coombs's undersized septic tank; the other, located on the western margin of the Yost tract, allegedly emanated from an outlet of a direct discharge pipe. Mr. Grine averred that, since the Spring of 1995, he has observed a number of flows from both areas, many times accompanied by a rainbow or white sheen and a strong odor of rubber cement. According to Mr. Grine, these areas—all of which are allegedly down-gradient from the overflowing drums on Coombs's property—were tested by the DEP and found to contain hazardous chemicals. (*Id.*)

Mr. Grine further stated in his affidavit that many of the hazardous chemicals which had been detected around his home are "well known for their strong aggressive nature." (Grine Aff. at ¶ 11.) He discussed at length the properties of some of these chemicals and expounded on the damage to his home allegedly resulting from this "unrelenting chemical attack." (*Id.*) He averred that his dog had died and that his family has suffered physical discomfort as a result of exposure to chemical toxins. (*Id.* at ¶¶ 12–13.) Plaintiffs also submitted affidavits from other fact witnesses who generally corroborated many of Robert Grine's allegations, especially with regard to their observations of chemical odors, withered or dying vegetation on the Grines' property, run-off water with an iridescent quality, and the presence of drums and other litter on the nearby Coombs Property.

Finally, Plaintiffs submitted technical data in the form of chemical or biological analyses of numerous water and soil samples taken from the Coombs and Grine Properties both by government agents and by Robert Grine himself. Although the Plaintiffs submitted this evidence to buttress their claim that harmful contaminants had polluted their property, they provided no expert report or affidavit interpreting this lab data or placing the results into a meaningful context.

In their briefs opposing the Plaintiffs' motion, Defendants Coombs and Yost appended various materials generated by the investigating governmental agencies as well as several counter-affidavits. [*See* Doc. Nos. 127–29.] Ronald Coombs, who was both William Coombs's son and appointed representative through a power-of-attorney, submitted affidavits from himself and Ronald Lewis Kuis, Esq., a registered professional engineer and practicing environmental lawyer. In his own affidavit, Ronald Coombs averred that his father was unable to provide any meaningful information relative to the litigation, as he had been suffering from dementia since late 1995. Ronald asserted that his father had not returned to the camp site since the Plaintiffs began "harassing" him in 1994 and that, for all intents and purposes, the camp had been abandoned. He stated that his father obtained the drums from a friend and had used them as a cistern for water and/or oil, but claimed the drums had since been removed and properly disposed of by an independent contractor. According to Ronald Coombs, the drums never held more than two gallons of oil at any time and they were

never used to store hazardous or toxic materials. In addition, Ronald acknowledged that the Coombs Property had at one time experienced problems with the sewage system and septic tank; however, he claimed that this problem was resolved in 1995 when the old tank was replaced.

Mr. Kuis's affidavit indicated that he had reviewed reports, videotapes, and other evidence relevant to the Grines' environmental complaints. Based on this data, Mr. Kuis opined that: (a) there is no evidence of chemical staining or chemically stressed vegetation on the Coombs's Property in the summers of 1994 and 1995; (b) excavation activities at the Coombs Property in summer of 1995 showed no evidence of environmental contamination in any surface or sub-surface soil; and (c) there was no apparent environmental contamination emanating from the Coombs Property in the summers of 1994 and 1995.

In support of her oppositional papers, Yost submitted an affidavit generally denying any involvement with the alleged storing or disposal of hazardous wastes on her property or that of her father. She denied even being at those properties after 1990. She stated that her father had not visited the campsite since late 1994 or early 1995 and had never conducted activities on the parcel conveyed to her. Yost also submitted an affidavit of Randall Spence, Sewage Enforcement Officer for the Borough of Tionesta, who had allegedly visited the Coombs and Yost properties in August and November 1994 in connection with his review of the residential sewage facilities of the Borough. Mr. Spence asserted that Coombs's septic tank was replaced with a holding tank in June of 1995 and, since that time, had been in compliance with applicable sewage-related regulations. During his visits to the Coombs Property, Mr. Spence found no evidence of a leech field or discharge pipe, nor did he notice any chemical odors or see evidence of sewage or chemical discharges. Based on his inspection of the Yost property, Mr. Spence considered it is unlikely that any discharge pipe or leech field connected to Coombs's septic tank would have extended onto Yost's lot. He also claimed to have found no evidence of debris or pollutants on Yost's property, which was undeveloped at the time.

Plaintiffs subsequently filed a 5–page motion and 29–page supporting memorandum asking this Court to strike the responses filed by Coombs and Yost in opposition to the Plaintiffs' summary judgment motion or, in the alternative, to strike the affidavits of Ronald Coombs, Mr. Kuis, Yost, and Mr. Spence. [Doc. No. 135.] Plaintiffs objected to the affidavit of Ronald Coombs on the ground that it was not based on personal knowledge and that it contained "flagrant misstatements and contradictions" which "shock the conscience." [Pl.'s Mot. (Doc. No. 135) at ¶ 2.] For example, Plaintiffs alleged that Ronald Coombs's testimony concerning his father's dementia was "without a doubt false" (Pl.s' Mem. at p. 12) based on evidence from William Coombs's Orphans Court proceedings which Plaintiffs felt proved that William Coombs was still of sound mind. Plaintiffs challenged the affidavit of Mr. Kuis on the ground that his testimony was not admissible expert testimony under Fed. R.Evid 702. Plaintiffs sought to strike Yost's affidavit on the ground that her "pleas of ignorance" were insufficient to exonerate her from liability. As a factual matter, they also challenged her averment that William Coombs was not of sound mind prior to his death. Plaintiff also challenged Mr. Spence's affidavit on the ground that it was "based solely on mistruths" and that Mr. Spence was a biased witness "in cahoots with [Yost]." (Pl.'s Mem. at p. 23, 24.)

The Court disposed of Plaintiffs' motion to strike in a 15–page Memorandum Order dated June 29, 1998. [Doc. No. 183.] The Court granted Plaintiffs' request to strike the affidavit of Mr. Kuis to the extent it purported to render an expert opinion on the alleged lack of environmental contamination emanating from the Coombs Property. The Court found two distinct problems with Mr. Kuis's opinion: first, the record did not provide a sufficient foundation to establish Mr. Kuis's expertise; second his testimony was not likely to assist the trier of fact insofar as it purported to interpret or summarize videotapes, agency reports, or other information which would speak for itself. In all other respects, the Court denied the Plaintiffs' motion to strike. As to the affidavits of Ronald Coombs and Yost, the Court noted that any

factual assertions arguably contradicted by other record evidence were fodder for cross-examination, but did not constitute grounds for striking the affidavits. The Court found that Ronald Coombs's affidavit set forth a sufficient foundational basis to establish his personal knowledge about William Coombs's activities during the relevant time period; any challenges in this regard concerned the weight (as opposed to the admissibility) of Ronald's testimony and could be properly explored on cross-examination. Notwithstanding Plaintiffs' allegation that Ronald Coombs's testimony about his father's dementia was "without a doubt false," the Court found no evidence of bad faith sufficient to justify striking the affidavit under Rule 56(e); indeed the Court did not perceive any clear credibility dispute about the fact that William Coombs had suffered some form of dementia prior to his death. As for Yost's affidavit, the Court noted that Plaintiffs had not raised any valid challenge to the admissibility of her testimony; Plaintiffs' argument that Yost's assertions were insufficient to withstand summary judgment went to the merits of Plaintiffs' summary judgment motion but provided no basis for striking the affidavit. Finally, the Court found that Plaintiffs had not stated a proper basis to strike Mr. Spence's affidavit. Notwithstanding Plaintiffs' contention that Spence's affidavit was contradicted by his earlier report filed with the Borough Council, the Court found no evidence of bad faith in the record and, more fundamentally, no obvious contradiction in fact. To the extent any factual discrepancies did exist, the Court ruled that they could be sorted out through cross-examination. Plaintiffs' assertion that Spence was a biased witness "in cahoots" with Yost also failed to state any valid basis for striking the affidavit; it was apparently premised on the mere fact that Spence had offered testimony favorable to Yost and unfavorable to Plaintiffs.

Having ruled on the parameters of Defendants' Rule 56 evidence, the Court then turned to the merits of Plaintiffs' motion for partial summary judgment. The Court issued a 34–page opinion on June 30, 1998 denying the Plaintiffs' motion and discussing in detail both the evidence of record and the required elements of Plaintiffs' various legal claims. As to each of the Plaintiffs' causes of action, the Court found that the record evidence gave rise to competing inferences concerning material issues of fact. Among other things, the Court noted that there was a genuine factual dispute as to whether Coombs and/or Yost ever handled or disposed of solid or hazardous waste that was the cause in fact of contamination on the Grines' property. Noting that there were four possible sources of contamination about which Plaintiffs seemed to be complaining,[17] we perceived a legitimate factual dispute as to whether each one was, in actuality, the source of the Grines' environmental problems. For purposes of Plaintiffs' RCRA claim, we noted that Plaintiffs had never come forward with any expert witness who could establish to a reasonable degree of scientific certainty that the contaminants on their property presented an "imminent and substantial endangerment to health or the environment," as the statute requires. [*See id.* at p. 25 (citing 42 U.S.C.A. § 6972(a)(1)(B)).] We denied summary judgment on the Clean Water Act claim because Plaintiffs had failed to make even a *prima facie* showing that Defendants had discharged pollutants into navigable waters of the United States. [*Id.* at p. 27.] We denied summary judgment on Plaintiffs' CERCLA claim, in part, because Plaintiffs failed to establish as a matter of law that either Coombs or Yost had ever released "hazardous substances" from their properties. We noted that the government agents involved in the investigation had failed to detect "hazardous substances," as defined under CERCLA, on either property. Moreover, Plaintiffs failed to show, as a matter of undisputed fact, that they had been required to incur response costs as a result of the compounds detected on their property. We noted that

---

**17.** The four possible sources of contamination as suggested by the record evidence were: (i) yellow overpack drums which Plaintiffs claimed held "hazardous waste"; (ii) raw sewage which allegedly seeped from Coombs's septic system onto the Grines' property; (iii) trash and debris that was reportedly strewn about the Coombs property; and (iv) barrels or drums of a petroleum product which were kept at the Coombs site. [*See* Doc. No. 182, p. 18.]

the evidence of record "permits (if it does not command) the inference that the level of contamination found on Plaintiffs' property has not presented any serious threat to their well-being." [*Id.* at p. 30.] We observed that the various affidavits from Plaintiffs' lay witnesses who purported to opine about the effects the contaminants were having on Plaintiffs' health were not competent evidence under Fed.R.Evid. 701 or 702 for purposes of establishing a causal nexus between the Defendants' alleged conduct and the Plaintiffs' alleged harm. [*See id.* at p. 30, n. 17.]

Several weeks after this Court denied their summary judgment motion, Plaintiffs filed a 47–page motion asking this Court to recuse itself from the case on the grounds that the ·Court's impartiality might reasonably be questioned. [Doc. No. 189.] The motion appeared to be driven primarily by Plaintiffs' dissatisfaction with this Court's adverse summary judgment ruling and its denial of Plaintiffs' motion to strike the Defendants' affidavits in opposition to the Rule 56 motion. In large measure, the motion to recuse was a rehash of Plaintiffs' arguments that the Coombs and Yost affidavits contained inadmissible hearsay and perjured testimony. Accompanying the motion was a 36–page affidavit from Robert Grine asserting that Plaintiffs could not have a fair trial before this Court. Among other things, Mr. Grine maintained that the Court's opinions were based upon extrajudicial sources including hearsay and perjury. In particular, Grine alleged that the Court's reception of allegedly perjured testimony from Ronald Coombs and Randall Spence exhibited a "gross and pervasive bias" against Grine and a "deep-seated antipathy" toward his case. (*Id.* at p. 3–4, et seq.) Relying once again on his own personal interpretation of the lab data, Mr. Grine challenged this Court's assessment of the scientific evidence, apparently overlooking the fact that the Court was legally bound—in assessing the Plaintiffs' Rule 56 motion—to construe all evidence in the light most favorable to the non-moving Defendants. Grine also asserted that this Court was unaware of the federal permitting and manifest requirements relating to the shipment, storage, and disposal of hazardous wastes:

The drums [on the Coombs Property] were licensed and designed *solely* for the transport of hazardous materials.... Not one iota of probative evidence submitted by Coombs and Yost controverts this fact. If the labeling, marking and manifests which should have accompanied [the drums] were destroyed, such an action constituted a crime. This is the inference that should have been drawn from fact that is of record. It is not a reason to exonerate Yost and Coombs or arrive at the "finding" of fact that the drums were "empty" because all of the shipping papers describing their contents had been destroyed. The Court's willingness to do so demonstrates a deep-seated antipathy and pervasive bias toward me."

(*Id.* at pp. 15–16.)

The Court denied Plaintiffs' motion in a memorandum order dated October 9, 1998. [Doc. No. 193.] In so ruling, the Court observed that Plaintiffs' dissatisfaction with the Court's previous rulings was an inappropriate basis for recusal. The Court rejected Plaintiffs' contention that its rulings had been premised on "extrajudicial information" since the Court's only information concerning this litigation had derived from the proceedings themselves. The Court also noted that Robert Grine's affidavit was based not on factual allegations, but on his own legal conclusions and opinions criticizing this Court's rulings. His conclusory statements, we determined, were insufficient to establish this Court's impartiality. The Court acknowledged that there are rare instances where judicial rulings demonstrate so extreme a degree of favoritism or prejudice as to warrant recusal; however, viewing the facts objectively, we concluded that this was not one of those rare cases.

Undeterred, Plaintiffs sought to compel this Court to recuse from the case by filing a petition for writ of mandamus with the Third Circuit Court of Appeals on October 27, 1998. On November 2, 1998 the Third Circuit entered a certified order denying Plaintiffs' petition·for writ of mandamus in C.A. No. 98–3569. [*See* Doc. No 198.] Plaintiffs thereafter filed a petition for rehearing en banc, which was denied by the Court of Appeals on

January 12, 1999. *See* C.A. No. 98–3569. Plaintiffs sought further review by the United States Supreme Court, which denied certiorari on May 17, 1999. [Doc. No. 200, 201.]

*Plaintiffs' Motion for an Order Adjudging the Government Defendants in Civil Contempt*

Despite this Court's issuance of its December 31, 1996 Memorandum Opinion dismissing the Commonwealth Defendants from the case and its October 10, 1997 Memorandum Order disposing of the remaining aspects of the Plaintiffs' claims against the EPA, Plaintiffs' battles with the government raged on. On December 3, 1997, Paul Skirtish, Esq. wrote the Court advising that the EPA had complied with the Court's October 10, 1997 Memorandum Order by producing to Plaintiffs' counsel the remaining non-exempt FOIA documents. On January 14, 1998, Plaintiffs had conducted the deposition of Vincent Zenone and had the opportunity to question him about the activities conducted on the Grine and Coombs properties under his direction. Two weeks later, the EPA filed a motion requesting that this Court enter a final judgment under Fed.R.Civ.P. 54(b) formally dismissing the EPA from the case. [Doc. No. 140–41.]

In the meantime, however, Plaintiffs filed their "Motion for Order Adjudging Defendant [EPA] and Defendant [DEP] in Civil Contempt" (hereinafter referred to as Plaintiffs' "Civil Contempt Motion"). [Doc. No. 133.] This motion evidently was the result of Ms. Haagensen's review of the ROIs prepared by Special Agent Martin Wright, wherein Agent Wright referenced certain tests reportedly performed on the Coombs Property. Based on her review of these documents, Ms. Haagensen concluded that there was additional information concerning environmental testing performed on the Coombs and/or Grine properties which the EPA had deliberately withheld from Plaintiffs and about which the DEP had lied. Plaintiffs alleged that "an off-the-books series of tests were performed by the DEP, apparently for the benefit of the chief suspect [i.e., William Coombs], and never released to Plaintiffs or made a part of the public record by the DEP." [*Id.* at p. 2] They charged that "the [EPA] is not proceeding in good faith, and in the face of Court orders is attempting to withhold important information crucial to the Plaintiffs' cause." [*Id.* at p. 3.] As for the DEP, Plaintiffs charged that "Attorney Wolford and his associates have represented to the Court and to the Plaintiffs that all documents relating to sample procurement and test analysis have been released to the Plaintiffs. The [DEP] has failed to abide by its own representations to the Court, and has failed to honor the Court's directives." [*Id.* at p. 4] Plaintiffs requested that this Court impose sanctions against the EPA and DEP, award Plaintiffs their attorney fees, and require the government Defendants to reimburse Plaintiffs for their independent lab testing in the amount of $2,500.00. [*Id.*]

On January 29, 1998 the Court held a status conference for the purpose of addressing Plaintiffs' motion. [Doc. No. 153.] Turning first to Plaintiffs' complaints with the DEP, Ms. Haagensen renewed her accusations that the DEP was in violation of court orders and that "an issue of serious perjury" had surfaced as a result of the EPA's release of its CID documents. [*Id.* at pp. 4–5.] Again, it was Ms. Haagensen's position that, because reference was made in Special Agent Wright's ROI to certain environmental tests supposedly conducted by the DEP, DEP officials therefore must have either deceived Plaintiffs and the Court by withholding this data or (if the tests were not actually performed) "perjured themselves" by mis-representing to Agent Wright that such tests were conducted. Mr. Wolford, counsel for the DEP flatly denied Ms. Haagensen's allegations that documents had been withheld from Plaintiffs. He pointed out that, although there was never any Court order directing the DEP to produce documents to Plaintiffs, he had offered at the preliminary injunction hearing to allow Plaintiffs to come to the Department and review all of DEP's records, whether or not they were in the public file, and photocopy any records they found especially pertinent. Plaintiffs had accepted that offer and obtained access to the DEP's file on June 20, 1996 in the presence of Mr. Wolford and other DEP representatives. It was Mr. Wolford's position that all records were made available to Plaintiffs but that Plaintiffs' counsel may have initially over-

looked the documents they now sought or may not have recognized their potential importance at that time. [*Id.* at pp. 5–8.] As was often the case, the debate at times became contentious:

MR. WOLFORD: ....[W]hat I'm telling you today, Your Honor, is that all of our samples, including the ones that Mr. Wright was referring to in his report, were made available to them on June 20, 1996.

MS. HAAGENSEN: Your Honor, they haven't produced them to the EPA or us.

MR. WOLFORD: We don't produce things to EPA, maybe that's part of her misunderstanding.

\* \* \*

... one of the problems I think they're running into is that they think the EPA's records and our records are identical, and they are not.

MS. HAAGENSEN: That's ridiculous.

THE COURT: Ms. Haagensen, let me request a favor of you, this really holds true for all counsel. I simply am not going to tolerate that level of discourse. It's unnecessary and, furthermore, it's unprofessional. So I'm going to request that, while everyone is free to disagree, that the disagreements be articulated in a reasonable, professional and courteous manner, do you understand?

MS. HAAGENSEN: Yes, Your Honor.

(*Id.* at pp. 8–9.)

Having heard from both sides, the Court resolved the issue as follows. First, it noted that the DEP had been dismissed from the case on the basis of Eleventh Amendment immunity; therefore, the Court lacked jurisdiction over the DEP. Secondly, the Court noted that Plaintiffs had other available means to pursue additional DEP documents, such as the ability to issue a subpoena duces tecum.[18] The Court also observed that the only dispute regarding production of documents over which the Court had proper jurisdiction concerned Plaintiffs' FOIA claim against the EPA, which did not involve the DEP. The Court therefore refused to entertain Plaintiffs' motion for contempt insofar as

it was directed against the DEP. Ms. Haagensen, nevertheless, continued to insist that the DEP was a proper target of her contempt motion:

MS. HAAGENSEN: The appellate court just finished telling us there's no final order in the case. When there's a final order, we'll appeal it. The DEP is in the case on the basis of misconduct on the site, it is not merely a FOIA inquiry.

THE COURT: Ma'am, with all due respect, did I not by opinion and order dismiss the DEP from the case in its entirety on Eleventh Amendment grounds?

MS. HAAGENSEN: That is apparently not a final order.

THE COURT: It is insofar as I'm concerned. It may not be appealable, but they are no longer in the case.

MS. HAAGENSEN: I think that is debatable.

THE COURT: I'm not going to debate with you, ma'am, let's go on to another aspect.

(*Id.* at pp. 12–13.)

The Court next addressed Plaintiffs' contempt motion as it pertained to the EPA. Ms. Haagensen alleged:

there are serious problems that relate to perjury regarding the EPA response. I'm sorry to say we have 600 extra pages to a report that was purportedly complete in 1995, and it's now 1998. And our expert tells us that there is a serious problem of which she would characterize as a problem relating to forgery. That pesticides which are banned in this country are identified in that report. Hence, the data has been doctored to reflect a non-detect, when in fact those pesticides are present in high levels in the drums and in the soil on the Coombs' site.

(Doc. No. 153, at pp. 13–14.) Mr. Skirtish summarized the EPA's position as follows. Insofar as Plaintiffs were complaining about copies of FOIA documents that were illegible, the EPA had requested better copies from the DEP and had since forwarded those

18. Mr. Wolford also noted that Ms. Haagensen had contacted the Pennsylvania Office of Attorney General with complaints that the DEP had

doctored records and/or videotapes. It was evident, therefore, that she was taking measures to address her dissatisfaction with the DEP.

documents to Ms. Haagensen. To the extent Plaintiffs alleged that the EPA violated FOIA by not producing certain test reports generated by the DEP as referenced in Agent Wright's report, it was the EPA's position that Agent Wright never physically received those reports from DEP officials and, consequently, the EPA never possessed those documents or produced them to Plaintiffs. Mr. Skirtish represented that:

> ... what we did, at my request, EPA took their entire files and I made them copy every piece of paper received from DEP, and they sent it to me, and I sent that to Ms. Haagensen to try and prove or comply with what she was looking for. I was told on every occasion by everybody involved in this case that prior copies had been made. And not withstanding that representation, we still sent what I consider another copy. So the motion for contempt is that the federal agency has not given up reports that they neither made, nor held copies to, nor analyzed. And my response is simply we cannot produce what we don't have. And [can]not produce [that] which we did not create. We cannot produce, Judge, [that] which we did not review.

(*Id.* at p. 15.) Mr. Wolford also proffered an explanation for how a particular test might have come to be referenced within the Agent's report, yet not contained within the EPA's files:

> [Dan Holler] was consulted by Mr. Wright during Mr. Wright's investigation as to what Mr. Holler knew. And on one occasion they were talking about some samples that Mr. Wozniak, I believe, had taken of a drum or maybe the drums at the [Coombs] property. Mr. Wozniak did not put enough ice or something on it, he made an error. Mr. Holler tells me he did not put new ice on a sample when it arrived at the lab because the ice was not there present anywhere, for which we're being alleged to have done something improper and criminal. But because he made that mistake of not having enough ice on it, the lab did not analyze it. So when Mr. Holler got a result back that the lab didn't analyze it because there was no ice on it, and the result would have been erroneous, he picked up the telephone and called Mr. Wright to tell him we got the sample anal-

ysis sheet back and it says they didn't do the tests. So Mr. Wright may well have a number referenced in his report but not have the sample results because he never got the results, because he heard on the telephone that the results were not run. And we're going to pay through this criminal process at our end for Mr. Wozniak not putting enough ice in the cooler, now we're being alleged to have done something criminal. That's our problem, ... From the EPA's standpoint, from the court's standpoint, there is an explanation why what Mr. Skirtish is telling you may be true.

\* \* \*

> ... But [Plaintiffs' counsel] did have an opportunity to look at all that stuff on June 20th. That was all part of what they had, the sample result that Mr. Holler looked at when he called Mr. Wright to tell him that the lab didn't run the sample, that sheet of paper was in those records that the plaintiffs already looked at. If they didn't want to copy it, well, that's their problem. But it was there for them to look at and a copy would have been provided had they asked for that.

MS. HAAGENSEN: Your Honor, that's patently false.

MR. WILLIAMS: ... My recollection that day that we were up, we had such a voluminous amount of records that they couldn't be gone through in one day. Therefore, we ceased activity that day and you were going to send them to us by copies and they never arrived.

MR. WOLFORD: I thought you were going to come back and continue your review, and you never came back. If you want to do it again, that's fine with me.

MR. WILLIAMS: I'd like to do it.

MR. WOLFORD: We can do it again.

MS. HAAGENSEN: Your Honor, I would still like to say there were two events in which Mr. Wozniak was supposed to have taken samples on the Coombs' site, he forget [sic] ice, he deep-sixed the samples. He did that on two different dates, according to what Mr. Wright states.

MR. WOLFORD: These we disagree with. These are all, she has avenues to seek recourse and she's seeking that. Believe it or not, we are continuing to attempt to cooperate with these [sic], even though we're being called liars and cheaters, conspirators and all these other things. I just made an offer in front of the court to have Mr. Williams come back and look at records again, that's fine.

\* \* \*

MR. WILLIAMS: I will call Mr. Wolford, we'll make arrangements.

(*Id.* at pp. 21–24.)

Having heard extensive comments from counsel, the Court left it to Ms. Haagensen and Mr. Skirtish to resolve any remaining illegible documents. With respect to Plaintiffs' other allegations, the Court granted Plaintiffs' request for an evidentiary hearing following which the Court would make credibility determinations and "get this taken care of once and for all." (*Id.* at p. 26.) The Court also cautioned that it was "going to keep a very close eye with respect to all parties as to whether everyone is in fact acting in good faith, advancing potentially arguably meritorious factual and legal positions." Thus the Court issued "fair warning" that "we are going to engage in this exercise, but it is the hope and expectation from the court's standpoint that this isn't useless wheel spinning." (*Id.*) The Court further clarified that the scope of its inquiry would be limited to only those factual allegations raised by Plaintiffs in their contempt motion in order to allow all parties to properly prepare for the hearing and avoid unfair surprise. To that end, the Court granted Ms. Haagensen an extension of time within which she could supplement her contempt motion, if appropriate, to raise any additional issues requiring redress.

Ms. Haagensen then raised the issue of a grand jury proceeding which had apparently been convened in connection with the government's investigation of a possible criminal occurrence at the Grine/Coombs properties:

> In the criminal investigative reports that were slowly released to us is evidence that a grand jury was convened, and the laboratories were subpoenaed and our clients were surveilled [sic] during the process of

it. And we will be petitioning whichever court presided in that proceeding to give us whatever we think we need from those grand jury proceedings. We would like to know if the attorney-client privilege was breached, if our telephone calls were in fact interfered with. If they were looking in windows, we would like to know what surveillance was done and whether our clients were being surveilled [sic]. And we believe that perjury [sic] evidence may have gone in front of the grand jury.

\* \* \*

> We don't have materials that may be crucial to this judicial proceeding. There's obvious conflict and impropriety and an offense against due process if in fact the people that are adversaries in a civil procedure were listening in on us during a grand jury proceeding. That seems improper, that seems a conflict, that seems a huge civil rights violation to us. We need time to obtain these materials and discover what in fact, what meaning they have for us at this point.

(*Id.* at p. 28–29.) The Court noted that it had nothing before it by way of a motion or anything else relative to a grand jury but reiterated that Plaintiffs were being given an opportunity to supplement their contempt motion. The Court also determined that the EPA's motion for a Rule 54(b) judgment would be taken under advisement pending the resolution of Plaintiffs' contempt motion.

Despite the Court's optimism that some of the parties' discovery disputes could be expeditiously resolved, the difficulties continued. Less than one week after the Court's lengthy status conference on the 29th, Mr. Wolford faxed correspondence to Mr. Williams dated February 4, 1998 which stated, in relevant part:

> Dear Mr. Williams:

> This letter will confirm our telephone conversation of January 29, 1998, which took place approximately one-half hour after the conference call with the Court. As I explained to you during our follow-up call, the following events transpired after the conference call ended:

1) in accordance with my offer to schedule another comprehensive records review, I retrieved the box containing the Department's public records, which was being maintained by Mr. Holler;

2) while looking for a secure location in my law offices to keep the box of records until your file review, I requested my Office Administrator to locate a secure file cabinet;

3) in response to my request, my Office Administrator suggested that I keep the box of records in the same file cabinet where we are currently keeping our duplicate set of photocopies of the records that we photocopied for you, at your request, following your records review of June 20, 1996;

4) because you had represented to the Court that you never received photocopies from me following your records review on June 20, 1996, I called you to ask you why you had represented to the Court that you had not received such photocopies when my Office Administrator stated that we had provided photocopies; and

5) in response, you acknowledged that your client, Robert Grine, had indeed retrieved a number of photocopies from the Department shortly after your records review of June 20, 1996.

In light of your acknowledgment that Mr. Grine had retrieved the photocopies that you requested following your records review of June 20, 1996—which included a copy of every record in the Department's files as of that date—I am extremely disappointed and concerned about your representation to the. Court that you were not provided the photocopies that you requested. Based on the duplicate set of photocopies that my Office Administrator showed me, coupled with your acknowledgment that Mr. Grine retrieved the set of photocopies that we prepared for you, it appears to me that you intentionally mislead [sic] the Court during the conference call. I view this as a very serious matter and a violation of Rule 3.3 of the Rules of Professional Conduct. Although I have come to expect this type of conduct from your co-counsel, I expect better from you.

During our follow-up call on January 29, 1998, I expressed my displeasure with your misrepresentation to the Court. You responded by stating that although your client may have received photocopies of the records, you did not personally receive them by mail. Accordingly, you believe that you did not technically mislead the Court. This is outrageous.

Notwithstanding your file review on June 20, 1996, and the fact that your client retrieved photocopies of every document that was contained in the Department's files as of that date, I am willing to proceed with another records review because of my offer to the Court. Accordingly, I will allow you to compare the photocopies that you already received with the Department's current public records. The first step is that you are going to contact your client to confirm, again, that he retrieved the voluminous package of photocopies from the Department that we prepared for you following your records review of June 20, 1996. Once you have done that, you are going to contact me. In the meantime, I am going to arrange for the files to be numbered and indexed (this should take approximately two weeks). When the numbering and indexing is completed, I will contact you to schedule your records review.

During your upcoming records review, we will adhere to the following procedure:

1) you are going to compare, document by document, all of the photocopied records that we already provided with the records that we will have numbered and indexed;

2) you may spend as much time reviewing the records as you wish, during regular business hours, and we will schedule as many days as you need;

3) you will be under strict supervision at all times, and you will not be permitted to leave the room with any originals;

4) we will provide you with photocopies of any document that you do not already have, and we will make said photocopies while you wait;

5) I will require you to sign a receipt and/or affidavit that you have had an

opportunity to review all of the numbered and indexed documents, and that you have been provided with every photocopy that you have requested.

I apologize that we are being forced to proceed as outlined above. Unfortunately, your recent misrepresentation to the Court and Ms. Haagensen's ongoing allegations concerning document falsification and forgery, make it imprudent to proceed in any other fashion. Obviously, in light of the procedure outlined above, we will not be conducting a records review tomorrow or Friday of this week, as Ms. Haggensen [sic] had requested.

\* \* \*

[Doc. No. 148.]

Notwithstanding the Commonwealth's notification that it was intending to index its documents and would need to reschedule the date of Plaintiffs' document review, Ms. Haagensen proceeded to the DEP's office on Thursday, February 5, 1998 (the date originally planned) and demanded the documents. The next day, this Court held another status conference at Ms. Haagensen's request to discuss the foregoing issues. [Doc. No. 195.] Ms. Haagensen confirmed to the Court that, prior to making the trip to the DEP, she had been on notice that the Department's file had been sent for indexing; nevertheless, she maintained that it was her right to inspect the records on February 5, since she was under a court-ordered deadline to supplement the Plaintiffs' civil contempt motion.[19] (*Id.* at p. 9.) Recognizing that Plaintiffs' deadline was coming due, the Court granted Ms. Haagensen an additional 10–day period, following her examination of the DEP's file, in which to file any supplement to her contempt motion. If necessary, the Court would reschedule its hearing on the Plaintiffs' contempt motion. In an order dated February 9, 1998 the Court confirmed this deadline extension and also reiterated that the hearing would be limited solely to allegations directed against the EPA, as the DEP had been dismissed from the case.

Two weeks later, the Plaintiffs filed an 18–page motion for reconsideration of this Court's February 9, 1998 order as well as its Memorandum Opinion of December 31, 1996 dismissing the Commonwealth Defendants from the case. Plaintiffs grounded their motion for reconsideration upon: (i) the Supreme Court's decision in *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), which Plaintiffs characterized as an "intervening legal development . . . challeng[ing] the propriety of the Court's [December 31, 1996] ruling"; (ii) new evidence supposedly showing that the DEP had withheld data necessary for the validation of certain test results, and (iii) various procedural objections. As to the latter ground, Plaintiffs argued that they were unfairly surprised and prejudiced by the Court's Rule 12(b)(1) analysis dismissing the Commonwealth Defendants for lack of subject matter jurisdiction. They contended that the Court had disposed of their claims on jurisdictional grounds without giving them an opportunity to develop the record on disputed factual issues relevant to the jurisdictional analysis. [Doc. No. 151.]

On March 10, 1998 Plaintiffs filed their supplemental brief relative to the civil contempt motion, once again directing their claims at both the EPA and the DEP. [Doc. No. 155.] Their 21–page brief was riddled with scatter-shot allegations that the EPA's witnesses had made intentionally false statements under oath and had concealed facts which they were under a duty to disclose. (Br. at p. 2.) Plaintiffs asked that all pleadings and defenses proffered by the EPA and DEP be stricken under Rule 37(b)(2) on the ground that Defendants had failed to obey the Court's orders to provide discovery. They attacked the May 28, 1996 Zenone declaration as perjured and asked that it be stricken. They similarly asked that the analytical data summary generated in connection with Marian Murphy's April 24, 1995 report be stricken on the ground that Ms. Murphy had misrepresented the detection results indicated by pesticide data which had been withheld from Plaintiffs. They also asked the Court to strike the January 8, 1998 declaration of Martin Wright on the basis that

---

19. Mr. Williams acknowledged to the Court that Robert Grine had gone to the DEP to obtain copies of documents; however he suggested that Mr. Grine may not have obtained all of the documents in the DEP's file. [Doc. No. 195 at pp. 7–8.]

Agent Wright had misrepresented material facts by "represent[ing] that his conclusions of record in a formal criminal investigation were based on the contents of documents which in fact do not exist." (*Id.*) With respect to the DEP, Plaintiffs alleged once again that the Department had failed to provide access to its complete analytical sampling results in defiance of this Court's prior orders.

The same day, Plaintiffs filed a 20–page motion asking this Court to reconsider and clarify its Memorandum Order of December 27, 1996 which disposed of Plaintiffs' motion for mandamus petition and Rule 11 sanctions, granted the EPA's motion to dismiss, and partially disposed of the EPA's motion for summary judgment on the FOIA claim. [Doc. No. 154.] In their motion, Plaintiffs objected that this Court had sua sponte dismissed the Plaintiffs' mandamus petition on subject matter jurisdiction grounds under Fed.R.Civ.P. 12(b)(1) without fair notice and without giving Plaintiffs an opportunity to develop the record relative to disputed jurisdictional issues. Plaintiffs also objected to the Court's dismissal of the petition *with prejudice* in light of the Court's rationale that it lacked jurisdiction to entertain the petition. In addition, Plaintiffs purported to base their motion in part on "discovery of new evidence indicating that Defendant U.S. EPA participated through the activities of its agents in the illegal disposal and transport of

listed hazardous wastes and banned pesticides," thus making this case analogous to *FMC Corp. v. U.S. Dept. of Commerce*, 29 F.3d 833 (3d Cir.1994).[20] Despite their allegation of "newly discovered evidence," Plaintiffs's motion for reconsideration consisted only of bare allegations of nefarious activities unsupported by any proffer of evidence.

Having received the Plaintiffs' supplemental brief in support of their civil contempt motion, the Court scheduled a hearing for April 20, 1998. Unfortunately, numerous delays impeded the Court's progress in resolving the motion. The Court initially granted Plaintiffs' request to postpone the hearing on the ground that more time was needed for Plaintffs to arrange for their witnesses and to review the EPA's responsive papers. Plaintiffs also represented that Robert Grine was unwell and could not travel to Erie for the hearing due to his health concerns. The Court initially rescheduled the contempt hearing for May 13, 1998. [Doc. No. 166.]

On May 1, 1998 the EPA filed a motion asking for an immediate status conference to clarify the scope of the contempt hearing. [Doc. No. 175.] This motion was prompted by Plaintiffs' supplemental brief in support of their contempt motion, which in large measure attacked the substantive information contained in the affidavits of Vincent Zenone and Martin Wright and the analytical report of Marian Murphy. It was the EPA's posi-

---

**20.** By way of example, Plaintiffs asserted in their motion that:

> [t]he EPA knew in May of 1995 that dangerous concentrations and quantities of listed hazardous wastes and banned pesticides were present in the Coombs drums and had been released into soil and water on the Coombs and Grine properties. The EPA deliberately withheld this information from the victims of the spill until January of 1998. Martin Wright, special agent for the EPA's Criminal Investigative Division, was informed by the chief suspect, William Coombs, that the DEP had assisted him in secretly transporting drums contaminated with hazardous substances and pesticides off the site, without benefit of any administrative order or permit.
>
> The EPA's investigating officer did nothing to abate this illegal transport of hazardous wastes but in fact attempted to hide this crucial information from the Plaintiffs .... the EPA in fact assisted in concealing the illegal transport from the Plaintiffs and from the citi-

zens of Tionesta. The EPA thus operated a storage facility and assisted in the disposal and transport of hazardous wastes, without benefit of a permit. The EPA was responsible for the releases, from a point source, without a permit of hazardous substances and pollutants into the navigable waters of the Untied States, in flagrant violation of the Clean Water Act.

[Doc. no. 154 at pp. 5–6.]

In opposition to Plaintiffs' motion for reconsideration, the EPA submitted a declaration from Martin Wright dated April 9, 1998. [Doc. No. 164.] Mr. Wright's declaration established that, contrary to Plaintiffs' allegations, Mr. Wright was never informed of any "secret" or illegal transport of hazardous materials and never sought to conceal any such transport. He attests that his only involvement in the activities alleged by Plaintiffs was to interview William Coombs and prepare a memorandum of interview summarizing that conversation, all of which were undertaken as part of his duties as a criminal investigator for the EPA. [*Id.*]

tion that these documents related solely to the issues of whether Plaintiffs could compel further investigatory and/or remedial measures on the Plaintiffs' property—issues which the Court had previously addressed in denying Plaintiffs' motion for preliminary injunction and petition for mandamus, and which were no longer part of the litigation. The EPA urged that the contempt hearing should be limited solely to issues involving the Agency's duty to produce documentation under FOIA, which had been this Court's sole basis for jurisdiction over the EPA.

These concerns were addressed during a status conference held on May 5, 1998. [Doc. Nos. 176, 196.] Aside from her allegation that the EPA had failed to turn over all documentation required under FOIA and the subpoena duces tecum issued to Vincent Zenone, Ms. Haagensen continued to insist that there has been "a gross problem with the veracity" of communications made by Zenone, Wright, and Murphy concerning the nature and extent of the contamination at the Coombs and Grine properties. [Doc. No. 196 at p. 10.] Ms. Haagensen represented that Plaintiffs had retained an expert by the name of Mark Kaltofen who, among other things, would apparently dispute some of the technical conclusions reached by the EPA officials involved in the removal assessment. Ms. Haagensen also continued to insist that the Plaintiffs had "evidence which indicates that the field agents polluted this [sic], they themselves committed illegal acts on the site, therefore, they are vulnerable as operators." [*Id.* at p. 19.] Given the multiplicity and ever-burgeoning scope of Plaintiffs' contempt allegations, the Court indicated that it would issue an order specifically delineating the issues to be addressed at the contempt hearing.

On August 17, 1998 the Court issued a memorandum order addressing Plaintiffs' motion for reconsideration of our December 31, 1996 and February 9, 1998 orders, which respectively dismissed the Commonwealth Defendants from the case and excluded the DEP from the civil contempt hearing. [Doc. No. 187.] Having declined to dismiss the Plaintiffs' motion as untimely, the Court first considered Plaintiffs' argument that the Supreme Court's decision in *Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028

(1997) represented an intervening change in the law casting doubt on the propriety of this Court's Eleventh Amendment analysis. We readily concluded that *Coeur d'Alene* did not change any aspect of federal jurisdiction relevant to our December 31, 1996 decision, particularly since that portion of *Coeur d'Alene* which advocated a new approach to the *Ex Parte Young* doctrine did not constitute a majority ruling. [*See id.* at pp. 6–7.] We next rejected Plaintiffs' argument that Defendants Wozniak and Holler had committed on-going violations of federal law by virtue of their alleged complicity in transporting barrels of hazardous waste *from* the Coombs campsite *to* Coombs's personal residence in McDonald, Pennsylvania. We concluded that this allegation, even if proven, failed to establish any injury-in-fact to Plaintiffs that would give them standing to pursue a federal environmental claim on this basis. [*Id.* at pp. 8–9.] The Court next considered Plaintiffs' various procedural objections to the December 31, 1996 decision. We promptly rejected Plaintiffs' claim that they were unfairly surprised when the Court analyzed the Commonwealth's Eleventh Amendment argument as a subject matter jurisdiction issue under Fed.R.Civ.P. 12(b)(1). We considered it "unfathomable" that Plaintiffs could claim unfair surprise since they had had ample opportunity to respond to the Eleventh Amendment immunity argument, it was well established that Eleventh Amendment immunity partakes of jurisdictional qualities, and numerous courts had addressed such claims under the rubric of Rule 12(b)(1). The Court also noted that Plaintiffs were not prejudiced by the Court's decision to analyze the Eleventh Amendment immunity questions as a 12(b)(1) issue because all factual averments were construed in Plaintiffs' favor and the Commonwealth Defendants bore the burden of establishing their entitlement to Eleventh Amendment immunity. We also rejected Plaintiffs' complaint that they had been denied an opportunity to resolve disputed issues of jurisdictional fact through an evidentiary hearing. We noted that the Court's Eleventh Amendment analysis was premised on purely legal grounds and "flowed ineluctably from the manner in which the Plaintiffs had pleaded their

Amended Complaint." [*Id.* at p. 12.] Finally, we considered Plaintiffs' argument that the dismissal should have been without prejudice, since it was premised on a lack of subject matter jurisdiction. The Court observed that, while Rule 12(b)(1) dismissals are normally without prejudice, a dismissal of Plaintiffs' RCRA, CWA and CERCLA claims without prejudice would serve no purpose because, in our view, those claims could only be pursued in federal court. Nevertheless, we amended our December 31, 1996 order to reflect that Plaintiffs' pendent state law claims against the Commonwealth Defendants were dismissed without prejudice. [*Id.* at p. 13.]

We then addressed Plaintiffs' motion for reconsideration of this Court's Order of February 9, 1998, excluding the DEP from the contempt hearing. Although Plaintiffs claimed that they had "new evidence" that the DEP withheld or destroyed data relating to the Department's investigation of the Grine/Coombs properties, we noted that this alleged evidence did not relate to any viable cause of action as pleaded in the Amended Complaint and, therefore, it did not establish a basis for this Court's jurisdiction over the DEP. Moreover, we noted that Plaintiffs could not meet the requisite criterion of establishing that the DEP had violated a specific Court order. At most, Plaintiffs had alleged the DEP's failure to follow through with the voluntary production of documents which they were under no formal obligation to produce. In short, the Court found no basis for a finding of civil contempt as against the DEP and it therefore declined to reconsider the Order of February 9, 1998. [*Id.* at pp. 13–15.] Given the Commonwealth Defendants' dismissal from the case on unique jurisdictional grounds, the Court entered a final judgment in their favor under Rule 54(b) in order that Plaintiffs could separately appeal that facet of the case while the remaining aspects moved closer to resolution.

The Court next turned its attention to clarifying those issues that could properly be considered at the hearing on Plaintiffs' civil contempt motion, now re-scheduled for September 17, 1998. Because of the disjointed nature of Plaintiffs' allegations, this exercise proved to be a significant challenge. Nevertheless, on August 25, 1998 the Court issued a 25–page Memorandum Order recalling the relevant aspects of Plaintiffs' litigation against the EPA and attempting to focus and define those issues that were still the subject of legitimate dispute. The Court perceived that Plaintiffs were essentially lodging five (5) distinct categories of allegations against the EPA, *to wit:*

1. the EPA had failed to produce certain documents in legible form;

2. the EPA was in possession of, and improperly withheld, analytical data relative to the testing of water, soil and sludge samples taken from the Grine/Coombs properties;

3. EPA officials and/or their agents made substantive misrepresentations in various EPA reports;

4. EPA officials made material misrepresentations in sworn affidavits; and

5. the EPA engaged in other miscellaneous "misconduct."

As to the first category, the Court concluded that it could not ascertain from the present record whether or not this "document legibility problem" had been cured as represented by the EPA. The Court therefore allowed the parties to address this issue, if necessary at the September 17 hearing.

As to the second category (the alleged withholding of water, soil and sludge testing data), the Court noted that it had previously ruled on this point when it passed upon the EPA's motion for summary judgment and Plaintiffs' motion for Rule 11 sanctions in its Memorandum Opinion of December 27, 1996. Because Plaintiffs were essentially attempting to re-litigate the Court's FOIA ruling by way of their civil contempt motion, the Court construed Plaintiffs' arguments as a motion for reconsideration of the December 27, 1996 ruling based on allegedly newly discovered evidence. Accordingly, the relevant inquiry for the Court was whether there was new evidence showing that the disputed testing data were "agency records" created or obtained by the EPA and under the EPA's control at the time of the Plaintiffs' FOIA request. While Plaintiffs did not coherently delineate the specific sampling events concerning which data had allegedly been withheld, we boiled their complaints down to seven distinct testing "events" and/or docu-

**350**

ments: (i) testing data relative to samples taken from the Coombs property by DEP agents sometime prior to 2/10/95; (ii) testing data relative to samples collected by the DEP from William Coombs's well on August 3, 1995; (iii) testing data relative to samples collected by the DEP from drums on William Coombs's property in early August 1995; (iv) testing data relative to samples procured by the DEP from the Grines' property on 1/19/96; (v) testing data relative to samples collected from the Coombs property (drum and soil samples) on 3/14/95; (vi) testing data relative to samples collected from the Grines' well on January 24 and 25, 1995, and (vii) a "Soil Sampling Assessment" report dated 2/9/95.

As to the first four "testing events," all of which had been conducted under the direction of the DEP, Plaintiffs were limited to exploring at the contempt hearing whether or not the EPA had maintained this information as part of its agency records at the time of Plaintiffs' FOIA request. Items (v) and (vi) involved testing events occurring under the EPA's direction in the course of its investigation. In their response papers opposing the Plaintiffs' contempt motions, the EPA had submitted declarations from Vincent Zenone and Marian Murphy rebutting Plaintiffs' allegations that the EPA withheld raw data relative to these events. The Court held that Plaintiffs could explore and/or challenge this evidence at the contempt hearing, but only with reference to the issue of whether or not the EPA possessed the relevant testing data at the time of Plaintiffs' FOIA request. The Court also ruled that Plaintiffs could explore at the hearing their allegation

that the EPA had improperly withheld the soil sampling report of February 9, 1995 (item (vii)) and/or misrepresented to the Court that the entire report had been turned over under FOIA.

Category 3 involved alleged misrepresentations and/or errors made by Marian Murphy in her report of April 24, 1995 and in various reports prepared by Special Agent Wright. We concluded that these complaints would be excluded from the September 17 contempt hearing because they could not serve as a proper basis for a finding of civil contempt. For example, Ms. Murphy's conduct in generating her April 24, 1995 could not serve as a basis for holding the EPA in civil contempt, since Ms. Murphy was not an agent of the EPA but an employee of its subcontractor, Weston Inc. Moreover, Ms. Murphy's alleged "misrepresentations" in no way implicated the violation of a court directive, since her report predated this litigation. Similarly, Plaintiffs' complaints about the alleged misstatements in Agent Wright's reports could not serve as an appropriate basis for a finding of civil contempt because they did not implicate any violation of a prior court order or other abuse of the judicial process for which coercive sanctions would be appropriate. As one example, Plaintiffs complained that Wright's ROI covering the period April 27 to August 25, 1995 failed to report the "true content" of a meeting Wright had had with the U.S. Attorney—the "true content" being Plaintiffs' allegation that DEP officials had altered a videotape taken of the Coombs' Property so as to eliminate any footage of the overpack drum which Coombs had kept at his campsite.[21]

21. We noted parenthetically that Plaintiffs' allegations had been dismissed as unsupported by the Pennsylvania Office of Attorney General. Following its "careful review of the facts and physical evidence," the AG's office closed its file, having found "no reasons to believe that any official tampered with evidence." (*See* Ex. 7 to United States' Suppl. Oppos. to Contempt Mot. [Doc. No. 165].) Interestingly, in a letter to Ms. Haagensen, the Chief Deputy Attorney General made the following observations:

> You [Ms. Haagensen] allege specifically:
> "This tape was eventually procured by the EPA's Criminal Investigative Division and delivered to the U.S. Attorney's Office. When viewed in the U.S. Attorney's Office by Robert Grine and his counsel, all footage of

the overpack drums and their identifying insignia had bee (sic) removed from the videotape."
I am constrained to inform you that the second quoted sentence is, quite simply, incorrect, inaccurate and not so. I viewed a copy of the tape moments ago and one of the first scenes depicts the outside wall of a building with a bright yellow, flat, round lid leaning against it. The narrator describes it as having a hole drilled or bored through it. The camera then pans away 15 or 20 feet to a bright yellow drum. The narrator describes it clearly as "an 85 gallon overpack drum." It is turned upside down, with a spout clearly visible. Since the drum is upside down, the spout is about 3 feet off the ground and it points upward, instead of down as it normally would.

We noted that this alleged conduct, even if true, could not constitute violation of a court order since it predated the instant litigation. Also, any sanction imposed by the Court for such conduct would be punitive rather than coercive, and therefore was not properly within the scope of the Court's civil contempt powers. In short, reliance on this Court's inherent civil contempt powers was an inappropriate mechanism for redress of Plaintiffs' allegations.

The fourth category concerned allegations that Vincent Zenone and Martin Wright had made false statements in their respective declarations of May 28, 1996 and January 8, 1998. Having again trudged through Plaintiffs' sundry allegations of contemptuous conduct, the Court winnowed out five distinct factual averments by Plaintiffs of alleged false statements, i.e.:

a) Vincent Zenone's declaration of May 28, 1996 falsely states that there were no PCBs, pesticides, or other semi-volatile compounds or VOCs detected in the drum and soil samples collected from Coombs property on March 14, 1995 when, in fact, high concentrations of banned pesticides and PCBs were detected in the samples.

b) Zenone's declaration of May 28, 1996 falsely states that he had viewed the entire analytical results of the tests conducted on the Coombs property sampling. According to Plaintiffs, this representation is contradicted by Zenone's later statement at deposition that he had never been in possession of the entire report until sometime in 1997.

c) Martin Wright falsely (or wrongly) stated in his January 8, 1998 declaration that he never received documentation from Gary Wozniak concerning the testing of samples that Wozniak had taken from Coombs's property during the period of investigation from November 4, 1994 to February 10, 1995 (as set forth in Wright's ROI).

d) Wright falsely stated in his January 8, 1998 declaration that he never received sampling analysis reports relating to the Pennsylvania DEP's August 3, 1995 sampling at Coombs's property.

e) Wright falsely stated in his declaration of January 8, 1998 that the EPA did not obtain actual sample analysis reports from the Pennsylvania DEP relative to sampling conducted in January 1996.

The Court determined that Plaintiffs could explore this topic at the September 17 contempt hearing, but only insofar as it related to the issue of whether Zenone or Wright had knowingly or recklessly made false statements relative to these five specific points.

Lastly, the Court addressed Plaintiffs' remaining allegations of miscellaneous misconduct on the part of EPA officials. The Court excluded these issues from the scope of the September 17 hearing because none of the averments (e.g., the Administrator's alleged failure to investigate possible pollution of navigable waters and to publish the results of the investigation, Martin Wright's alleged failure to adequately investigate the barrels on the Coombs Property) concerned activity for which a finding of civil contempt would be appropriate redress.

Despite this Court's considerable efforts to resolve the Plaintiffs' civil contempt motion by arranging an expeditious and sufficiently focused hearing, our progress continued to be impeded. Four days before the Court entered its August 25, 1998 order defining

---

We believe the tape was originally filed on October 5, 1994. Perhaps you or your client are somewhat confused by the passage of time. We secured the written "Declaration of Robert W. Grine, II" [dated July 5, 1997] ... Since you were co-counsel of record, I presume you are familiar with that declaration.

Paragraph 3 is the relevant paragraph. .... Mr. Grine states that he closely inspected the drums in *August*, 1994. There were multiple drums, including "additional yellow overpacks inside the Coombs' camp building."

Near the end of paragraph 3 your client states, "*One* of these overpacks remained out-side with its lid on *October, 4, 1994*, when Pa. DEP Agent Gary Wozniak videotaped the outside of the Coombs' camp." (emphasis added). We see no contradiction between the tape we viewed and the statement of your client.

Admittedly, the actual running time of the tape is several minutes shorter than the elapsed time shown by the counting clock in the lower corner of the videotape. We can find nothing sinister in that and believe it merely reflects the practice of the cameraman to pause the tape while he walked from place to place about the property.

(*Id.*)

the scope of the contempt hearing, Plaintiffs filed their aforementioned 47–page motion seeking the undersigned's recusal from the case on the ground that this Court's impartiality might reasonably be questioned. Then, on September 2, 1998 Plaintiffs took their third appeal to the Third Circuit. This time Plaintiffs appealed both the Courts' order of August 17, 1998 (denying Plaintiffs' motion for reconsideration of our December 31, 1996 and February 9, 1998 orders and entering a final Rule 54(b) judgment in favor of the Commonwealth Defendants) and also its interlocutory order of August 25, 1998 defining the scope of the contempt hearing. The appeal was docketed as C.A. No. 98–3494 ("Appeal No. 3"). [Doc. No. 190.] Meanwhile, counsel for Plaintiffs and the EPA were engaged in a dispute over the scheduling of Plaintiffs' expert's deposition in advance of the contempt hearing.

On September 4, 1998 another status conference was held to discuss the scheduling of the civil contempt hearing in light of these issues. [Doc. No. 197.] The hearing was again postponed from its intended date of September 17, 1998 pending resolution of the Plaintiffs' motion for recusal. The Court ultimately denied that motion on October 9, 1998 for the reasons discussed *supra.*

Following our October 9, 1998 ruling, the Court awaited further developments at the Court of Appeals. On November 2, 1998 the Third Circuit denied Plaintiffs' petition for writ of mandamus seeking the undersigned's removal from the case. [Doc. No. 198.] Plaintiffs' petition for certiorari was denied by the United States Supreme Court on May 17, 1999 and entered on this Court's docket on June 16, 1999. [Doc. No. 201.]

Meanwhile, Plaintiffs' third appeal in C.A. No. 98–3494 had been pending. On December 21, 1998, the Court of Appeals entered an order dismissing for lack of appellate jurisdiction that portion of Plaintiffs' appeal that concerned the Court's Memorandum Order of August 25, 1998 defining the scope of the contempt hearing. With respect to the Court's December 31, 1996 Order (as modified on August 17, 1998) dismissing of the

Commonwealth Defendants from the case, which this Court had certified as a final judgment under Rule 54(b), the Third Circuit issued a certified judgment in lieu of a formal mandate on October 12, 1999 modifying this Court's judgment and remanding the case. [Doc. No. 202.] The Third Circuit agreed with this Court's conclusions that the Commonwealth Defendants, having been sued in their official capacities, were entitled to Eleventh Amendment immunity and that Plaintiffs had not stated any valid exception under *Ex Parte Young;* however, it ruled that the dismissal of Plaintiffs' federal environmental claims should have been *without* prejudice in view of the uncertainty relative to the state courts' jurisdiction over RCRA, CWA or CERCLA claims.[22] With respect to this Court's view that Defendants Wozniak and Holler had been sued *only* in their official capacities, the Third Circuit found this interpretation of the Amended Complaint justified. Nevertheless, assuming for the sake of finality that Plaintiffs had asserted claims against Wozniak and Holler individually, the Court ruled that no valid cause of action could be stated under RCRA, CWA or CERLCA consistent with the Plaintiffs' allegations and, consequently, those claims should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) *with prejudice.* The Court of Appeals also directed this Court to clarify on remand whether or not it was declining to exercise its pendent jurisdiction over Plaintiffs' remaining state court claims against Wozniak and Holler. Finally, the Court of Appeals affirmed this Court's Order of February 9, 1998 excluding the DEP from the civil contempt hearing.

Plaintiffs attempted to challenge the Third Circuit's ruling in C.A. No. 98–3494 by filing a petition for writ of certiorari with the Supreme Court. On February 22, 2000, the Supreme Court denied certiorari. *See* 528 U.S. 1160, 120 S.Ct. 1172, 145 L.Ed.2d 1081 (2000). In the interim Plaintiffs filed a "Motion to Recall or Vacate the Mandate" with the Third Circuit, which was denied on March 29, 2000 and entered on this Court's docket on April 7, 2000. [*See* Doc. No. 207.]

---

22. The Court noted that at least one federal court of appeals had concluded that federal court jurisdiction is not exclusive under RCRA. [Doc. No. 202, p. 6 (citing *Davis v. Sun Oil Co.,* 148 F.3d 606, 612 (6th Cir.1998)); *but see Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)].

With Plaintiffs' Appeal No. 3 apparently now resolved, this Court turned its attention to complying with the Third Circuit's directive on remand. On April 18, 2000, this Court issued an Order modifying its Orders of December 31, 1996 and August 17, 1998 to clarify that: (a) Plaintiffs' RCRA, CWA and CERCLA claims against the Commonwealth Defendants in their official capacities were dismissed without prejudice pursuant to Fed. R.Civ.P. 12(b)(1); (b) any claims being asserted against Defendants Wozniak and Holler individually under RCRA, CWA and CERCLA were dismissed with prejudice pursuant to Fed.R.Civ.P. 12(b)(6); and (c) any remaining state law claims against Wozniak and Holler individually were being dismissed without prejudice under Rule 12(b)(1), as the Court was declining to exercise its supplemental jurisdiction over those claims. [Doc. No. 208.] Plaintiffs appealed the Court's April 18, 2000 order by filing a notice of appeal on April 28, 2000 ("Appeal No. 4"). [Doc. No. 209.] On December 20, 2000, the Third Circuit summarily affirmed our April 18, 2000 order in C.A. No. 00–1460. [Doc. No. 215.]

With the Commonwealth Defendants having finally been dismissed from the case, this Court once again attempted to bring Plaintiffs' civil contempt motion to resolution. On February 8, 2001 the Court notified the parties that the contempt hearing would be rescheduled for February 27, 2001. [Doc. No. 216.] However, more bizarre events intervened.

On February 9, 2001 Ms. Haagensen filed a motion on behalf of Plaintiffs asking this Court to issue a protective order "restraining all parties to this suit and their agents from harassing, stalking, threatening, or assaulting" the Grines. [Doc. No. 217 at p. 1.] In this motion Ms. Haagensen alleged that, since November of 1999, Plaintiffs had been subjected to "systematic attacks on their physical integrity and property" which were "designed to silence them as witnesses to an environmental crime." (*Id.*) Notably, the motion did not identify by name any of their assailants—with the exception of one "Harry Divido," whom Ms. Haagensen alleged was "an individual in the employ of the current title-holders to the Coombs site"[23] and whom, she claimed, "ha[d] been positively identified on three different occasions as the person responsible for threatening to kill Robert Grine, making other terroristic threats, recklessly discharging a firearm in his immediate vicinity, trespassing, and attempting an assault with a deadly weapon." (*Id.*) Ms. Haagensen also asserted that the

> total failure of the United States to even attempt to secure the Coombs site and the illegal disposal of waste and trafficking in hazardous materials on an unpermitted residential site has sanctioned the operation of a criminal enterprise and made the Grines extremely vulnerable to a series of assaults by persons engaged in such an enterprise, who remain in close physical proximity to the Grine family.

(*Id.* at pp. 1–2.) In her 12–page motion, which was unaccompanied by any affidavit or other appropriate proffer of evidence, Ms. Haagensen outlined several acts of aggression that Mr. Divido and various other unspecified persons had allegedly carried out against the Grines. These included episodes of alleged vandalism and thefts on Plaintiffs' property, shootings, and the like.[24] Plaintiffs

---

**23.** William Coombs had died on December 20, 1997. On August 31, 1999 the Court of Common Pleas of Allegheny County, Orphans' Division entered an order allowing Ronald Coombs, the Estate's executor, to renounce his right to administer the Coombs Property on behalf of the Estate. [*See* Doc. Nos. 252, 271.]

**24.** By way of example, the motion for protective order alleged:

> 1. On Saturday, November 27, 1999, Robert Grine and a teen-age friend who was helping him repair his roof were fired on by what appeared to be a drunken group of hunters who were shooting from about two hundred feet away at a cardboard target, directly in line

with the Grine home and property. The men were using high-powered rifles, and were shooting live rounds directed toward the Grine home and property....

> 2. More shooting with high-powered weapons in the immediate vicinity of the Grine home took place over the next several days without response or intervention from the State Police. The state police and game protector told the men responsible that they could continue shooting.

> 3. In the early morning hours of December 2, 1999, the Grines were awakened by a pickup truck gunning its engine in front of their house. Grine went toward the front door and turned on the lights; when the lights came on,

had evidently made numerous complaints to the State Police but were unsatisfied with their response.[25] In fact, Ms. Haagensen alleged that local state troopers began to follow and conduct surveillance on the Grines for no legitimate reason.

On February 21, 2001 Ms. Haagensen filed a motion on behalf of Plaintiffs seeking to further postpone the contempt hearing in light of the pending motion for a protective order and additional incidents of alleged harassment which Plaintiffs claimed was straining their physical and mental well-being. [Doc. No. 218.] Ms. Haagensen asserted that, because of the on-going assaults, Robert Grine was too ill to attend the contempt hearing and, in addition, Plaintiffs could not leave their home unattended "unless some provision [were] made to ensure their safety and the integrity of their home in their absence." (*Id.* at ¶ 5.) Ms. Haagensen continued to accuse Defendants Rotocast, the Coombs Estate, and the United States EPA of being responsible for these criminal acts. (*Id.* at ¶ 6.) Accompanying the motion were affidavits from Robert and JoAnne Grine which outlined the various incidents of alleged harassment and discussed the effects of the incidents on Plaintiffs' health, but in no way tied any of the Defendants to the alleged harassment. The EPA objected to the continuance, arguing that it wanted its day in court relative to the contempt charges and that Plaintiffs were once again trying to avoid the contempt hearing through legal machinations. [Doc. No. 219.]

During a status conference held on February 22, 2001, the Court granted Plaintiffs'

---

the shooting started. He turned out the lights and ducked to the floor; he believes that a magnum-caliber revolver, not a rifle was being fired. The pickup truck was driven through his yard before the shooters left, the truck had no headlights, tail lights, or lights of any kind on the vehicle. Deep tire tracks were left in his yard....

\* \* \*

10. In the summer of 2000, the Grines obtained a number of cameras which recorded any activity in their front yard or on their porch. The tapes ... showed persons getting out of cars parked on their private driveway and staring into cameras at the front of their house.... They also got on tape the entrance onto their property of two men on four-wheelers who parked and gunned their engines, and made no response to Bob Grine when he asked them who they were and what they wanted. The tapes proved that numerous intrusions took place on the Grine property.

\* \* \*

13. During the afternoon of Monday, October 24, 2000, Robert Grine was working in his backyard when he heard a flock of crows making a loud noise. He realized that someone was coming toward his property from the woods; he sat down behind some rock wall and brush to watch. Grine had left the engine of his tractor running while he waited to see who was making an approach. He ... recognized his neighbor, Harry Divido, against whom he had sworn out the initial criminal complaint ... moving through a line of pine trees and coming toward the tractor. Divido had what appeared to be a high-powered rifle in his hands. Divido spent approximately ten minutes watching the tractor from his vantage point in Grine's yard. Grine surmised that Divido was hoping that he, Grine, would be walking toward the tractor because the engine had been left running. Divido crossed the many no-trespassing signs in the Grine yard.... No arrest was made by the state police.

\* \* \*

15. During the early morning hours of November 20, 2000, before dawn, JoAnne Grine saw a pickup truck drive onto their property. Two men got out of the truck with what appeared to be high-powered rifles held in a firing position, and tore down a no-trespassing sign in the Grine yard.... This activity was recorded on the Grine's [sic] surveillance tape, which made it evident that the light in the passenger's cab was not functioning and the lights which normally illuminate the license plate had also been removed from the pickup truck. The police examined these tapes but took no further action and made no arrests. (*Id.* at ¶¶ 1–3, 10, 13, 15.)

25. As a result of Plaintiffs dissatisfaction with one trooper's response to their allegations about shootings occurring in late 1999, Ms. Haagensen requested that the Commonwealth's Bureau of Professional Responsibility investigate the conduct of the offending trooper. The Bureau found no wrongdoing on the part of the trooper and concluded that Robert Grine's allegation of being shot at was not credible:

... I have reviewed the investigative report and have determined that the results did not substantiate your allegations that our Department failed to perform their duties. The allegation that shots were fired at the Grine residence and endangered Mr. Grine is not true. Target practice did in fact take place, but in no way was Mr. Grine placed in jeopardy.... It is obvious to me Mr. Grine embellished the entire incident.

(*Id.*)

request for a continuance, despite the EPA's opposition. In lieu of the scheduled February 27 contempt hearing, the Court planned to hold argument on Plaintiffs' pending motions and would move the contempt hearing to the following month. [Doc. No. 220.]

On February 26, 2001 Plaintiffs filed an 18–page motion asking this Court to once again reconsider its August 25, 1998 order defining the scope of the contempt hearing. [Doc. No. 225.] In this motion Plaintiffs once again insisted that this Court had proper jurisdiction over the individual Commonwealth Defendants, as supposedly evidenced by the fact that (i) Plaintiffs' federal claims against Wozniak and Holler in their individual capacities had been dismissed *with* prejudice under Rule 12(b)(6)—as opposed to being dismissed *without* prejudice under Rule 12(b)(1), and (ii) this Court had declined to exercise pendent jurisdiction over Plaintiffs' state claims against Wozniak and Holler in their individual capacities. Plaintiffs also insisted that this Court's Order of August 25, 1998 was erroneous in that it relied on our prior ruling of December 31, 1996 as modified on August 17, 1998—both of which had technically been vacated by the Third Circuit in Appeal No. 3. With regard to the contempt issues lodged against the EPA, Plaintiffs objected that the Court's order defining the scope of the hearing served "to immunize selected government witnesses from cross-examination by plaintiffs." [Doc. No. 225 at p. 6.] Plaintiffs contended that: (i) the Court had improperly made findings of fact prejudging the witnesses' credibility; (ii) the Court had incorrectly defined the scope of the FOIA issues to be addressed under FOIA case law; (iii) the Court had incorrectly ruled that reports compiled prior to, and independent of, this litigation could not form the basis of an adjudication of civil contempt. [*Id.* at p. 9, 10–11, 12.] Plaintiffs also insisted that the EPA had deliberately refused to comply with a subpoena duces tecum issued by Plaintiffs on January 13, 1998 and challenged "[a]ny attempt by the district court to block the examination of government witnesses on this topic." [*Id.* at pp. 12–13.] The EPA opposed the motion, claiming that Plaintiffs were once again seeking "unlimited reign to question witnesses and to have no constraints placed on the issues to be ad-

dressed at the contempt hearing, regardless of whether those issues were raised in the contempt motion or are cognizable through a motion for civil contempt." [Doc. No. 232 at p. 7.]

As planned, the Court held a status conference on February 27, 2001 at which time it addressed these various matters. [Doc. No. 233.] Initially, the Court disposed of Plaintiffs' motion to reconsider the Memorandum Opinion of December 27, 1996 (which, in relevant part, had denied the Plaintiffs' request for a writ of mandamus against the EPA as well as any claims seeking to compel the EPA to take further remedial and/or investigative action on Plaintiffs' property). The Court denied Plaintiffs' motion for reconsideration for the reason that Plaintiffs had not presented any new evidence that would make the EPA liable for mandamus relief or cure the jurisdictional defects that this Court had heretofore cited. In addition, we determined that no procedural errors had occurred that in any way made the Court's December 27, 1996 ruling unfair to Plaintiffs or otherwise inappropriate. The Court therefore allowed the ruling to stand but clarified that the dismissal of these particular claims against the EPA were without prejudice, since the ruling had been premised on a lack of subject matter jurisdiction.

The Court also took up Plaintiffs' motion for a protective order at the February 27, 2001 conference. Considering the prior involvement of law enforcement agencies in investigating the situation, the Court inquired what evidence the Plaintiffs had to show that any of the named Defendants were actually responsible for the alleged harassment perpetrated against the Grines. Ms. Haagensen again alleged that Harry Divido was "working for the traffickers," was now in residence at the Coombs Property, and was "moving, incinerating, disposing of drums." [*Id.* at p. 16.] According to Ms. Haagensen, Mr. Divido, who was known to the Grines, had allegedly threatened to kill Robert Grine if Grine "got in the way of his plans" (i.e. "moving barrels around the neighborhood"); on a second occasion Mr. Divido had allegedly shown up next door screaming obscenities and shooting off a handgun; on a third occa-

sion Divido—according to Ms. Haagensen— "turned up on the Grine's property with his deer rifle, apparently stocking Grine, armed with evil intent." [*Id.* at 16–17.] Because the state police, in Plaintiffs' opinion, had not acted satisfactorily, Ms. Haagensen asked this Court to enter an order directing the state police to take prosecutorial action or, alternatively, "direct any party to this suit and their agents not to trespass on the Grine property, not to shoot at Mr. Grine, not to come up to his face and tell him they're going to kill him." [*Id.* at pp. 17–18.] The Court ruled that, while the alleged conduct (if true) was certainly disturbing, there was no evidence connecting the conduct to any Defendant in this case; additionally, the Court lacked jurisdiction to order the state police to take further investigative or prosecutorial action. Nevertheless, the Court granted Plaintiffs leave to re-petition the Court at a later date, in the event Plaintiffs were to obtain evidence tying such alleged conduct to any party in the case. The Court then set aside March 21–22, 2001 as the date for the contempt hearing. [Doc. No. 227.]

On March 14, 2001, one week before the scheduled contempt hearing, Plaintiffs filed a motion for further enlargement of time seeking to once again postpone the hearing. [Doc. No. 230.] In their motion, Plaintiffs represented that Robert Grine had been scheduled for a "specialized neurological assessment" on March 5, which had been canceled due to inclement weather and which could not be rescheduled until April 24, 2001. Plaintiffs represented that Mr. Grine's treating physicians continued to restrict him from any severe form of stress or extensive travel, which precluded him from attending the hearing. In addition, the Plaintiffs sought additional time to prepare for the hearing in the event that the Court granted Plaintiffs' motion for reconsideration of its August 25, 1998 order and altered the scope of the contempt hearing. [Doc. No. 230.]

At a status conference scheduled two days later, the Court granted the Plaintiffs' motion to continue the contempt hearing. [Doc. No. 231.] We ruled that, in the event Mr. Grine's physician precluded his active participation in the hearing, arrangements would be made for a video-taped deposition. The Court subsequently rescheduled the con-

tempt hearing for May 16–17, 2001. [Soc. No. 237.] It also entered an order on May 2 denying Plaintiffs' motion for reconsideration of its August 25, 1998 Order and reiterating that the hearing would be conducted along the parameters set forth in the Court's August 25, 1998 Order. [Doc. No. 238.]

On May 9, 2001, the Court held another status conference to address Plaintiffs' request for a further continuance of the contempt hearing. At the conference, Ms. Haagensen asserted that Robert Grine had suffered a "massive stroke" and related medical problems which, in turn, had resulted in severe pain causing a loss of short term memory and a limited attention span. [Doc. No. 241.] The Court directed Plaintiffs to submit a letter by May 18 from Robert Grine's physician clarifying Mr. Grine's medical condition and discussing his ability (or inability) to participate in the contempt hearing. Mr. Grine's physician subsequently rendered a report indicating that Grine could provide a deposition, provided it was taken under circumstances where Mr. Grine could rest or move about as needed.

On June 5, 2001, the Court held another status conference to discuss the implications of the physician's report. In light of Robert Grine's limitations, the Court suggested that a videotaped deposition of Mr. Grine be taken for use at the contempt hearing and that Mr. Grine participate in the hearing from his own home via speaker phone. Taking into consideration the need to acquire the deposition and the other commitments of EPA's counsel, the Court rescheduled the contempt hearing for August 13–14, 2001. [Doc. NO. 246.]

In August of 2001 the Court at last conducted the evidentiary hearing relative to Plaintiffs' motion for an adjudication holding the EPA in civil contempt. The hearing included four days of testimony on August 13, 14, 15, and 31. The Court received and took under consideration the videotaped deposition of Robert Grine along with all exhibits introduced through him. In addition, testimony was heard from JoAnne Grine, Gary Wozniak, Vincent Zenone, Marian Murphy, and Martin Wright. In all, the Court re-

ceived hundreds of pages of evidence in the form of testimony and documentation.

On September 19, 2001 the Court entertained argument relative to the contempt motion and thereafter made findings of fact and conclusions of law concerning the motion. By way of factual findings, the Court determined that there was no evidence that the EPA had failed to produce documents in legible form to Plaintiffs. In addition, the Court found no evidence that the EPA had wrongfully withheld sampling test data from Plaintiffs in violation of FOIA. Specifically, we found that the disputed testing data generated by the DEP was not within the EPA's possession at the time of the Plaintiffs' FOIA request. Some of the contested materials had come into the EPA's possession from Weston or other third parties *after* the Court entered its judgment on the Plaintiff's FOIA claim and was produced to Plaintiffs in conjunction with the subpoena duces tecum served on Vincent Zenone in January of 1998. As for the challenged declarations from Zenone and Agent Wright, the Court found that Zenone's declaration of May 28,-1996 was accurate in all material respects. The Court further found that the challenged portions of Agent Wright's January 8, 1998 declaration were truthful and accurate; the Court found no reckless or knowingly false statements attributable to Agent Wright. As to certain disputed portions of Zenone's logbooks, the Court found no evidence of any intentional falsification as Plaintiffs had alleged. Finally, the Court found no evidence that any EPA representative or witness had offered perjured testimony during the course of the contempt hearings.

The Court also concluded as a matter of law that there was no evidence that documents had been improperly withheld from Plaintiffs, that any affiant had knowingly or recklessly made any false statements in the affidavits or declarations under review, or that any chain-of-custody documentation had been intentionally falsified. Finally, the Court concluded that the record contained an "utter lack of evidence ... that any representative of the EPA has engaged in any conduct sufficient to support ... an adjudication of civil contempt." (*Id.* at p. 20.)

The Court then verbally granted the EPA's motion for an order of final judgment under Rule 54(b). However, the Court also indicated that it would stay the enforcement of the judgment pending final resolution of the entire case. In this manner, the Court sought to bring some finality to the Plaintiffs' claims against the EPA and foreclose further collateral discovery disputes while at the same time preventing further piecemeal appeals of the litigation. On October 23, 2001 the Court formally entered its Rule 54(b) judgment in favor of the EPA. [Doc. No. 256.]

*Post–Contempt Proceedings*

During the September 19, 2001 conference this Court also set a case management schedule imposing deadlines for discovery, pretrial statements, and dispositive motions. No formal discovery had yet been served by Plaintiffs' counsel on the non-governmental defendants, save a set of interrogatories which had been served upon, and answered by, Defendant Rotocast. [Doc. No. 278 at pp 7–8.] The Court therefore allowed 120 days (or until January 18, 2002) for the parties to conduct additional discovery and indicated that, if need be, more time would be allotted. Dispositive motions were to be filed on or before February 8, 2002 with responses being due no later than February 28, 2002. Plaintiff's pretrial statement would be due on March 20, 2001 and those of any remaining Defendants' would be due on April 10, 2002. [*See* Doc. No. 254, 278.]

The Court's hope for a prompt completion of pre-trial matters proved to be short-lived, however. Despite this Court's decision to stay the enforcement of our October 23, 2001 Rule 54(b) judgment for the express purpose of preventing further piecemeal appeals, Plaintiffs on October 30, 2001 filed a notice of appeal from the order of judgment (C.A. 01–4118, "Appeal No. 5"). (Doc. No. 257.)

On January 14, 2002, a status conference was held at the prompting of defense counsel, who wanted to clarify the status of the Court's pretrial schedule in light of Plaintiffs' recent appeal. The EPA had prepared a motion asking the circuit court to dismiss Appeal No. 5 on the ground that the underlying Rule 54(b) judgment was not yet an appealable ruling. It was Ms. Haagensen's position, on the other hand, that her appeal

of the October 23, 2001 judgment order automatically divested this Court of jurisdiction and effectuated a stay of the district court case, thus relieving Plaintiffs of any obligation to comply with the deadlines set forth in the Court's extent case management schedule. This Court expressed its skepticism about the ripeness of the appeal and Ms. Haagensen's jurisdictional argument; however, given the imminent filing of the EPA's motion to dismiss the appeal, the Court determined that the safer course would be to officially stay further proceedings pending further direction from the Third Circuit.

Ultimately, the Third Circuit Court of Appeals dismissed Appeal No. 5 for lack of appellate jurisdiction by Order dated February 27, 2002. The Third Circuit's order was entered on this Court's docket on March 1, 2002. [Doc. No. 266.] Plaintiffs' petition for rehearing en banc was denied on April 23, 2002.[26]

No further docket activity occurred until August 12, 2002, when the Court entered an order denying Plaintiffs' "Motion to Conform the Federal Defendants' Pleadings to Proof." [Doc. Nos. 262, 267.] That same day this Court issued a memorandum opinion granting Defendant Scott Daum's motion to dismiss the Plaintiffs' claims for insufficiency of service of process. [Doc. No. 268.][27] The

Court subsequently issued a notice scheduling a status conference for September 25, 2002 for the purpose of determining where the parties stood on discovery and other pretrial matters.

In the interim, Plaintiffs filed a motion on September 24, 2002 asking this Court to vacate all of its orders and/or rulings entered after April 23, 2002 on the grounds that said orders and rulings had been entered without the requisite subject matter jurisdiction. [Doc. No. 270.] This motion was based on Ms. Haagensen's insistence that the Court of Appeals still retained "exclusive jurisdiction" of the case and that Appeal No. 01–4118 ("Appeal No. 5") was still alive and well—despite the Third Circuit's certified order of February 27, 2002 dismissing the appeal for lack of appellate jurisdiction and its subsequent denial of Plaintiffs' petition for a rehearing en banc.[28] Aside from asking this Court to vacate all of its orders entered after April 23, 2002, Plaintiffs' asked us to seek clarification from the Court of Appeals as to when precisely the appellate court had divested itself of jurisdiction.

The Plaintiffs' motion was addressed at the following day's status conference. [Doc. No. 272, 277.] The Court began by inquiring whether any discovery had occurred since the Court's issuance of a case management

---

26. Plaintiffs subsequently filed a petition for certiorari with the United States Supreme Court, which was denied on November 18, 2002. [Doc. No. 284.]

27. The Court noted that Daum had left his position as Manager of Tionesta Borough on June 28, 1995 and had not been employed by the Borough in any capacity since that date. He was first named as a defendant in this action when the Plaintiffs filed their Amended Complaint on April 2, 1996. Plaintiffs attempted to serve Daum on April 3, 1996 by leaving a copy of the summons and Amended Complaint with Gordon Nygren, then the Borough Administrator. Both the summons and Amended Complaint were addressed to "Scott Daum, Borough Manager." Plaintiffs made no other attempt to serve Daum within the 120 day time period prescribed by Rule 4(m). Finding *Gaynor v. Martin*, 77 F.Supp.2d 272, 282–83 (D.Conn.1999) to be instructive, this Court ruled that Plaintiffs' attempted service was ineffective under Fed.R.Civ.P. 4(j) because Daum was not employed by the Borough at the time and because there was no indication in the record that Mr. Nygren had been authorized to accept service on behalf of Daum. In addition,

this Court declined to exercise its discretion to extend the prescribed time period, notwithstanding the fact that the relevant statute of limitations had expired. The Court reasoned that Plaintiffs had not demonstrated good cause for their failure to serve Daum properly and, further, there was no indication that Daum, Nygren, or anyone else acting on behalf of the Borough had attempted to evade or otherwise interfere with the Plaintiffs' attempt at service. [Doc. No. 268.]

28. Ms. Haagensen apparently believed that the Third Circuit improperly disposed of her petition for rehearing in Appeal No. 01–4118. She therefore filed a motion with the Court of Appeals for correction of the record and issuance of a mandate, citing Rule 27 of the Federal Rules of Appellate Procedure. Having received an adverse response from Marcia Waldron, the Clerk of Courts for the Third Circuit Court of Appeals, Ms. Haagensen suggested that she would file yet another petition for rehearing en banc of Ms. Waldron's denial of her Rule 27 motion. [Doc. No. 270, ¶ 14.]

schedule a full year prior. Although the Borough Defendants, Rotocast and Yost had all served discovery on Plaintiffs, Plaintiffs had served no discovery on the remaining Defendants. In addition, Plaintiffs had refused to respond to the Defendants' discovery requests on the ground that, in Ms. Haagensen's opinion, her filing of the notice of appeal in Appeal No. 5 had divested this Court of jurisdiction and relieved her of the responsibility to answer discovery. (Doc. No. 277, p. 5.) Having considered Ms. Haagensen's arguments, the Court denied Plaintiffs' motion to vacate its post-April 23, 2002 orders and also refused Plaintiffs' request to seek clarification from the Third Circuit concerning its own jurisdiction. (*Id.* at p. 6.) The following discussion then ensued:

> THE COURT: ... Well okay, then let's swing back now and figure out collectively how we can jump start—this is my oldest case, this is absolutely my oldest case. And try as I might, I can't seem to move this thing along. And I do try and periodically, as you say, I lose my jurisdiction and it's off sometimes to the Third Circuit, sometimes to the Supreme Court. I'm doing the best I can, and I would like to get a schedule today that comports with everybody's—that everybody can live with. And I guess I'm somewhat disappointed— why hasn't any discovery taken place from your end?
>
> MS. HAAGENSEN: Because I didn't believe the district court had jurisdiction, I still don't.
>
> THE COURT: I don't care if you don't, I do. And you sat on your hands for months. If you needed a clarification concerning jurisdiction, I would have been happy to provide it to you. Now, that having been said, I am not going to penalize you at this time for what was a mistake in belief as to your ability to push ahead. Whatever that may have been, the fact of the matter is the decks are now clear for you to do what you need to do.

(*Id.* at pp. 8–9.) Indicating its desire to "get out of the blocks on discovery now" (p. 11), the Court inquired of Ms. Haagensen how much time she would need to complete her own discovery, including the taking of any necessary depositions, and respond to the discovery which had previously been served upon her. Ms. Haagensen asked for three months, and this Court granted the request. (*Id.* at p. 12.) The Court's amended case management schedule set a discovery cut-off date of December 25, 2002 and a dispositive motions deadline of January 15, 2003; any responses thereto would be due no later than February 4, 2003. The Plaintiffs' pretrial statement was due on February 19, 2003; the Defendants' would be due on March 5, 2003. In addition, a pretrial conference was set for March 10, 2003 and a jury trial set for March 17, 2003. (Doc. No. 273.) Finally, Plaintiffs were given twenty days (or until October 15, 2002) in which to submit a response to Ronald Coombs' summary judgment motion, which had been filed that day.[29] (Doc. No. 277 at pp. 14–15.)

Notwithstanding this Court's efforts to get discovery once and for all completed, Plaintiffs promptly appealed this Court's order denying the motion to vacate all post-April 23, 2002 orders (Appeal No. 02–3816, "Appeal No. 6"). (Doc. No. 274.) Not surprisingly, the Third Circuit dismissed this interlocutory appeal for lack of jurisdiction by certified order dated January 8, 2003. (Doc. No. 279.) In the interim, Plaintiffs continued to decline to respond to Defendants' outstanding discovery. No extension of the discovery schedule was ever sought by Plaintiffs.

On January 17, 2003 this Court held yet another status conference for the purpose of addressing case scheduling matters in the wake of the Third Circuit's most recent order quashing Plaintiffs' Appeal No. 6. The Court having received motions for summary judgment on behalf of Rotocast and the Coombs Estate, it granted the parties until February

---

**29.** Ronald Coombs's summary judgment motion is driven by the Pennsylvania Orphans' Court's ruling allowing him, in his capacity as executor of William Coombs's Estate, to renounce administration of the Coombs Property and thus exclude that property from the Estate. In light of this ruling, Ronald Coombs asserts that he has no ownership of, fiduciary interest in, or responsibility for the Coombs Property; in fact, title to the Coombs Property has now vested in a third party who acquired the property as the result of a judicial sale. Ronald Coombs contends that he has no individual or fiduciary liability in his action because of the fact that he is neither an owner nor a fiduciary of the Coombs Property. [Doc. No. 271.]

7, 2003 to file any remaining dispositive motions and set February 28, 2003 as the deadline for any responses in opposition to dispositive motions. (Doc. No. 293 at p. 5.) At that point, Ms. Haagensen noted that she intended to file a petition for rehearing en banc before the Third Circuit relative to its Order of January 8, 2003 dismissing Appeal No. 6. Ms. Haagensen continued to insist that this Court lacked jurisdiction over any pending motions until such time as her petition for rehearing en banc in Appeal No. 6 would be ruled upon or until the time for filing the petition had expired. (*Id.* at pp. 5–6.) Relying on *Mondrow v. Fountain House*, 867 F.2d 798 (3d Cir.1989), for the proposition that "district courts should continue to exercise their jurisdiction when faced with clearly premature notices of appeal," the Court made clear its view that it was *not* divested of jurisdiction and that no further extensions of time would be granted as to the briefing schedule:

> THE COURT: ... Now, I note for the record in this case that I have the benefit of the Third Circuit ruling on this issue [i.e. Appeal No. 6] dismissing it for lack of appellate jurisdiction. Quite frankly, I anticipated that it would be because, in my opinion, it was patently interlocutory and non-final.
>
> All of that is by way of saying I am not divested of jurisdiction under controlling Third Circuit case law. It's certainly your right, Ms. Haagensen, to file a petition for rehearing en banc. You can go ahead and do that. What I'm telling you is in the meantime this case is going forward. And I also note, parenthetically, having checked the docket, that there have been 11 appeals [30] that you filed, that have been filed in this case. Possibly more, many of them interlocutory and quashed on the basis of being interlocutory.
>
> So the point is this case is going forward. That is the briefing schedule, and given the age of this case, the briefing schedule is not going to be modified....

(Doc. No. 293, p. 7.)

Consistent with the Court's final briefing schedule, the Borough Defendants and Defendant Yost filed their motions for summary judgment on February 4 and 6, 2003, respectively. (Doc. Nos. 286 and 288.) On February 7, 2003 this Court issued an administrative notice setting a deadline of February 19, 2003 for Plaintiff's pretrial statement and March 5, 2003 for the Defendants' pretrial statements. Oral argument relative to the pending summary judgment motions was set for March 12, 2003. (Doc. No. 290.)

On February 19, 2003, Plaintiffs failed to file their pretrial narrative statements and instead filed a seventh notice of appeal, this time appealing the Court's amended case management schedule as set forth orally on the record at the January 17, 2003 status conference. (*See* Doc. No. 292.) That same day, Plaintiffs filed with the Third Circuit a "Petition for Writ of Prohibition and/or Writ of Mandamus" against the undersigned in C.A. No. 03–1457, requesting that this Court:

> 1. ... be directed to stay the issuance of a new and amended [case management] order until the Court of Appeals disposes of appellants' Petition for Rehearing [in Appeal No. 6], and issues its mandate subsequent to that decision.
>
> 2. ... be instructed that his order of September 26, 2002 was stayed through the filing of a duly perfected and non-frivolous appeal, which precludes that order from taking effect in the district court for the duration of said appeal.
>
> 3. ... be prohibited from attempting to prejudice the appellants by eliminating their rights to discovery in retaliation for their filing of an appeal and his acceleration of deadlines prior to trial, in response to their exercise of their fundamental right to challenge the court's dispositive orders. Discovery rights should be restored to ap-

---

**30.** Due to the complexity of these proceedings as reflected on the docket sheet, the Court inadvertently misinterpreted the number appeals initiated by Plaintiffs. In fact, as of the Court's January 17, 2003 status conference, Plaintiffs had taken six separate appeals from various rulings issued by this Court and had filed at least one petition with the Court of Appeals requesting mandamus relief against the undersigned.

pellant-petitioners, and deadlines prior to trial extended for a reasonable period.

\* \* \*

5 ... be instructed to enter all orders of record *on* the record in compliance with the separate-document rule, Fed.R.Civ. Proc. 58.

[*See* C.A. No. 03–1457, Pet. for Writ of Prohibition and/or Writ of Mandamus, filed 2/19/03.]

On March 5, 2003 Plaintiffs filed a motion with this Court asking us to stay all proceedings under the theory that this Court lacked jurisdiction over the case by virtue of the Plaintiffs having filed their notice of appeal in C.A. 03–1509 ("Appeal No. 7"). By order dated March 14, 2003, this Court denied the motion to stay, as it remained convinced that Plaintiffs' seventh appeal was premature and did not divest this Court of jurisdiction. Thereafter, the Third Circuit Court of appeals denied Plaintiffs' Petition for Writ of Prohibition and/or Writ of Mandamus in C.A. No. 03–1457. [Doc. No. 303.] On April 8, 2003 the Third Circuit similarly denied Plaintiffs' motion (filed in Appeal No. 6) to stay this Court's unpublished case management order of January 17, 2003. [Doc. No. 304.] Finally, on April 25, 2003 the Clerk of Court for the Third Circuit Court of Appeals issued a certified order in Appeal No. 6 clarifying that no mandate would issue, as the appeal had been dismissed on an order for lack of appellate jurisdiction.[31] [Doc. No. 305.]

To date, the Court still has not received any memorandum by the Plaintiffs in opposition to the Defendants' outstanding summary judgment motions, nor have Plaintiffs submitted their pretrial narrative statement. In fact, Defendant Rotocast's summary judgment motion suggests that Plaintiffs never responded to requests for admissions that were served upon them on December 5, 2001. [Doc. No. 282 at ¶¶ 53–57.]

## II. DISCUSSION

■ Rule 41(b) of the Federal Rules of Civil Procedure addresses the involuntary dismissal of an action and claim and provides that:

> [f]or failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

Fed.R.Civ.P. 41(b). Courts have recognized that motions to dismiss an action under Rule 41 may be raised *sua sponte* by the court under its inherent case management powers. *See Link v. Wabash Railroad Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ("[t]he authority of a court to dismiss sua sponte for lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."). *See also In re Bluestein & Co.,* 68 F.3d 1022, 1025 (7th Cir.1995); *Rogers v. Kroger Co.,* 669 F.2d 317, 319–20 (5th Cir. 1982). "No precise rule can be laid down as to what circumstances justify a dismissal for

---

**31.** The April 25, 2003 certified order was issued in response to the Plaintiffs' "Motion to Stay of [sic] Mandate Pending Petition for Certiorari" and the "Motion of Appellees for Leave to File Response to Appellant's Motion Out of Time," and stated (in relevant part):

> No action will be taken with respect to the foregoing motions. No mandate has, or will, issue in the appeal. The appeal was decided by an order on a motion and not by the entry of a formal judgment. Rule 41, *Federal Rules of Appellate Procedure,* requires the issuance of a mandate only when a formal judgment is entered. The purpose of the mandate is to return jurisdiction back to the district court and to convey any directives of the court of appeals to [the] district court. *Since this Court determined that it lacked appellate jurisdiction over the appeal,* neither of those purposes would have been served by issuance of a mandate. *Moreover, a notice of appeal from an unappealable order does not divest the district court of jurisdiction. Sheet Metal Workers' International Association, Local 19 v. herre[Herre] Bros.,* 198 F.3d 391, 394 (3d Cir.1999).

\* \* \*

[Doc. No. 305 (emphasis in italics added).]

failure to prosecute, but the procedural history of each case must be examined in order to make that determination." The power of the court to prevent undue delays and to achieve the orderly disposition of cases must be weighed against the policy of law which favors disposition of litigation on its merits. *Marshall v. Sielaff,* 492 F.2d 917, 918 (3d Cir.1974) (citations and quotations omitted).

 Generally, courts are required to consider six factors when entertaining a Rule 41(b) dismissal: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal; and (6) the meritoriousness of the claim or defense. *Emerson v. Thiel College,* 296 F.3d 184, 190 (3d Cir.2002) (citing *Poulis v. State Farm Fire and Cas. Co.,* 747 F.2d 863, 868 (3d Cir.1984)). Having carefully reviewed these factors, the Court concludes that final dismissal of this case under Rule 41(b) is appropriate. We address each of the foregoing consideration individually, although not in the order listed above.

### The History of Plaintiffs' Dilatoriness

Plaintiffs' refusal to comply with this Court's case management order of January 17, 2003 must be considered against the broader context of the history of this litigation. Although at first blush the size of this case file and length of the docket sheet would suggest a high degree of diligence on the part of all parties, on closer inspection the record bespeaks a history of vexatious conduct on the part of Plaintiffs and their counsel which has greatly impeded the progress of this case. Several factors have contributed to the Court's difficulty in keeping this litigation on track.

One factor is the Plaintiffs' refusal to accept and respect the rulings of this Court, as evidenced by their repeated attempts to relitigate certain issues. A case in point is Plaintiffs' continual efforts to obtain legal relief and/or discovery from the DEP, despite our ruling that the Department was not a proper party to this lawsuit. Shortly after this litigation was commenced, counsel for the DEP corresponded with Plaintiffs' counsel and outlined his views as to why this Court lacked jurisdiction over Plaintiffs' federal environmental claims against the Department. Counsel for the DEP requested that Plaintiffs' claims against the Department be withdrawn and advised that, if they were not, the Department would seek Rule 11 sanctions against the Plaintiffs. [*See* Doc. Nos. 50, 51.] Plaintiffs' counsel declined to withdraw the claims and this Court subsequently considered the merits of the DEP's jurisdictional arguments in its motion to dismiss. Having expressed concern at the preliminary injunction hearing about our lack of jurisdiction over the claims directed against the DEP, this Court formally ruled on December 31, 1996 that the those claims should be dismissed for lack of subject matter jurisdiction.[32] Despite our December 31, 1996 ruling, the Plaintiffs directed their "civil contempt motion" against both the EPA and DEP. This Court expressed its view, both at the January 29, 1998 status conference and again in its Order of February 9, 1998 that the DEP was not a proper party to the contempt motion. This was true for at least two reasons: first, the DEP had previously been dismissed from the case on jurisdictional grounds and, second, the DEP had never been under any court order concerning the disclosure of information (even though it had voluntarily opened its files to Plaintiffs' counsel). Notwithstanding this directive, Plaintiffs' supplement to their civil contempt motion continued to target both the DEP and the EPA. Plaintiffs subsequently filed a motion asking this Court to reconsider its December 31, 1996 ruling, claiming that the Court had erred in dismissing the Common-

---

**32.** By order dated March 31, 1997, the Court denied the Commonwealth Defendants' motion for Rule 11 sanctions, stating:

"Although Plaintiffs' factual and legal theories [in support of their claims against the Commonwealth Defendants] can be characterized as tenuous and did not ultimately survive the Defendants' motion to dismiss, the analysis undertaken by the Court in its Memorandum Opinion granting the motion demonstrates that, while a close case, sanctions are not appropriate here."
[Doc. No. 104.]

wealth Defendants from the case. Although the Court modified its dismissal order in one minor respect,[33] we found the Plaintiffs' motion for reconsideration to be otherwise legally and factually unfounded and based in part on specious procedural objections. After this Court denied the Plaintiffs' motion for reconsideration of the December 31, 1996 order and entered a final Rule 54(b) judgment on August 17, 1998 dismissing the Commonwealth Defendants from the case, Plaintiffs filed a timely appeal of the Rule 54(b) judgment to the Third Circuit and even sought (unsuccessfully) a petition for certiorari in the United States Supreme Court. Once that avenue was exhausted, this Court on April 18, 2000 modified its order of December 31, 1996, consistent with the Third Circuit's directive on remand, to clarify that: (a) *all* of Plaintiffs' official-capacity-claims against the Department and its agents were dismissed without prejudice, (b) any federal environmental claims asserted against the Department agents in their individual capacities were being dismissed with prejudice under Rule 12(b)(6); and (c) any remaining state law claims against the Department's agents in their individual capacities were being dismissed without prejudice based on the Court's discretion not·to exercise pendent jurisdiction over those claims. Our April 18, 2000 order was entered on the docket the following day and summarily affirmed by the Third Circuit Court of Appeals on December 20, 2000. Notwithstanding these events, Plaintiffs filed a motion on February 26, 2001 asking this Court to reconsider its ruling excluding the DEP from the contempt hearing. We denied this motion on May 2, 2001 and finally concluded the hearing in September of that year. Ultimately, however, the DEP's status as a party to this case was repeatedly litigated in one fashion or another for over four years.

Another issue repeatedly litigated has been the Plaintiffs' claim that they are entitled to a court order requiring the DEP and EPA to take further investigatory and/or remedial actions relative to their environmental complaints. Plaintiffs initially sought this relief in their temporary restraining order, which was summarily de-

nied for procedural deficiencies. They next attempted to obtain this relief in their motion for preliminary injunction which was denied in large part because of the Court's concerns that it lacked jurisdiction to compel further investigatory or remedial action on the part of the government Defendants. Undeterred, Plaintiffs then sought essentially the same relief against the EPA in their petition for mandamus. In denying that petition and in granting the federal and Commonwealth Defendants' motions to dismiss, the Court reiterated its view that it lacked jurisdiction to compel further environmental intervention by the EPA or the DEP; the Court also explained that mandamus relief was not an appropriate means to compel what was essentially discretionary action on the part of the EPA. (*See* Mem. Ops. dated December 27, 1996 [Doc. No. 81] and December 31, 1996 [Doc. No. 82].) Plaintiffs subsequently filed their civil contempt motion and supplemental civil contempt brief which openly challenged, in part, the substantive accuracy and/or truthfulness of the DEP and EPA's environmental testing data as well as the agencies' conclusions about the advisability of further investigation and/or remediation on the Grine and Coombs properties. These substantive challenges were not directly related to any remaining cause of action against the governmental Defendants, but appeared instead to be another attempt by Plaintiffs to establish their theory that the government agencies had failed to sufficiently respond to their environmental problems. The Court took great pains in its Memorandum Order of August 25, 1998 to sift through Plaintiffs' contempt allegations in an effort to coherently delineate for all parties the proper scope of the civil contempt hearing. Nevertheless, two and a-half years later, the Plaintiffs filed their motion for reconsideration of the August 25, 1998 Memorandum Order, accusing this Court of having made premature credibility determinations and "acting as bodyguard for government witnesses who have been accused ... of making false statements and other misrepresentations in affidavits, declarations

---

**33.** The Court indicated that dismissal of Plaintiffs' pendent state law claims would be *without* *prejudice,* since the dismissal was jurisdictional in nature.

and in official reports." [Doc. No. 225 at p. 7.] Plaintiffs objected, for example, that they should be able to question Special Agent Wright about the substance of his investigative reports relative to the "nature and extent of contamination on the Coombs and Grine properties" and to explore whether the DEP "has created an off-the-books (for-its-eyes-only) sample procurement and test program, and in doing so has compromised a federal investigation." [*Id.* at p. 9.] Finding no basis to alter our previous order defining the scope of the contempt hearing, we denied Plaintiffs' motion for reconsideration. [Doc. No. 238.] Nevertheless, while Plaintiffs repeatedly litigated their grievances about the alleged inadequacies of the state and federal governments' responses to their environmental problems, this Court and the remaining parties were diverted from expeditiously resolving the remaining claims in the case.

A second factor contributing to the delay of this case has been Plaintiffs' repeated attempts to obtain *carte blanche* discovery through inappropriate litigation tactics. Plaintiffs filed their motion for preliminary injunction, for example, partly in an attempt to compel document production from the DEP and EPA regarding their case. This approach was misguided in that the DEP itself was never properly subjected to this Court's jurisdiction and—as for the EPA—the Plaintiffs already had an adequate remedy in the form of their extent FOIA claim, which Plaintiffs had not yet administratively exhausted. Plaintiffs' motion for Rule 11 sanctions against the EPA was similarly misguided. Having failed to comply with the rule's mandatory 21–day notice and timeliness requirements, Plaintiffs sought Rule 11 sanctions against the EPA because of alleged "serious factual errors" supposedly contained in the May 28, 1996 declaration of Vincent Zenone and the quality control reports prepared by Marian Murphy and because of the EPA's alleged failure to turn over data relative to radiation scanning tests performed on the Grines' property. Litigation of this motion essentially became an exercise in merits discovery, however, rather than a legitimate means for enforcing Rule 11, as is borne out in the EPA's brief in opposition to the Rule 11 motion and the parties' replies and sur-reply briefs. [*See* Doc. Nos. 65, 75, 77, 78, 80.]

Thereafter, Plaintiffs filed their contempt papers which, once again, generated proceedings that evolved into a convoluted discovery dispute. The Court's August 25, 1998 Memorandum Order delineate in great detail those allegations which were, and those which were not, the proper subject of inquiry at the scheduled contempt hearing. The Court made it clear that, e.g., alleged misrepresentations of fact in the reports of Marian Murphy and Martin Wright were not the proper basis of an adjudication of civil contempt, as the subject reports predated all court orders in this case, were not susceptible to corrective (as opposed to punitive) sanctions, and (in the case of Ms. Murphy) were not chargeable to the EPA. The Court similarly refused to consider allegations that, e.g.—EPA officials violated miscellaneous statutory and/or regulatory provisions, or that Agent Wright failed to adequately investigate barrels on the Coombs Property—since civil contempt was not the proper mode of redressing these alleged deficiencies. Nevertheless, we gave the Plaintiffs free reign to explore other alleged misconduct by EPA employees to the extent Plaintiffs' allegations bore on: (a) the truthfulness (or untruthfulness) of statements contained in sworn documents submitted to the Court or (b) the withholding of agency documents in violation of FOIA. Though Plaintiffs did not coherently list all of the test sampling "events" concerning which they were alleging that data had been withheld, we took pains to specifically delineate the seven (7) distinct topics that seemed to be at issue as set forth in the Plaintiffs' own contempt papers. We similarly enumerated five (5) specific averments of false statements as gleaned from Plaintiffs' papers. We clarified that the hearing would be limited to exploring these specifically delineated topics as set forth in our August 25, 1998 order.

Despite our directive, Plaintiffs filed their motion for reconsideration of the August 25, 1998 order, insisting that they should be able to explore additional topics at the contempt hearing such as whether Agent Wright lied in his April 27, 1995 Report of Interview about the true subject of a meeting he and

Mr. Grine had with the U.S. Attorney's Office (concerning the alleged doctoring of a videotape by DEP officials). Plaintiffs also objected that the Court had improperly limited the number of testing events at issue to those seven categories outlined in our order. In short, Plaintiffs appeared to be seeking, under the guise of contempt proceedings, an open-ended discovery expedition into matters totally unrelated to their remaining legal claims. The Court denied the Plaintiffs' motion for reconsideration on May 2, 2001 and reiterated that the contempt hearing would be conducted along the parameters established by our previous order of August 25, 1998. Even so, at the time of the hearing, the Court had to contend with evidentiary proffers outside the scope of our August 25, 1998 order. Plaintiffs' ever-changing allegations of governmental misconduct and constant attempts to expand the scope of discoverable information through misapplication of the procedural rules have significantly convoluted matters and slowed the progress of these proceedings.

A third factor contributing to the delay of this case has been the propensity of Plaintiffs' counsel to initiate appeals of order that were clearly unripe for appellate disposition. Of the six appeals which the Third Circuit has disposed of thus far in this case, five have been dismissed, in part or in whole, as premature and therefore lacking in any appellate jurisdictional basis. This Court remains convinced that Plaintiffs' seventh appeal is likewise premature and likely to be dismissed by the Third Circuit for want of jurisdiction. In any event, Plaintiffs' appellate practice has repeatedly put this Court in the position of having to choose between (a) staying the district court litigation pending the outcome of Plaintiffs' piecemeal appeals out of an abundance of caution and due respect for the appellate court, or (b) attempting to pre-determine issues of appellate jurisdiction in an effort to advance the district court litigation. The latter option, of course, presents some risk that this Court might rule on substantive issues over which it is lacking in jurisdiction. On the other hand, the former option results in an untenable situation whereby this Court and the remaining parties are held hostage by the Plaintiffs' improvident appeals.

A fourth factor contributing to delay is the Plaintiffs' misguided view that, by initiating a premature appeal, they are relieved of any responsibility to conduct or answer discovery. After nearly six years, the Court on September 19, 2001 was finally able to posture the case for a case management order that established a discovery deadline and pretrial schedule. Plaintiffs thereafter initiated their fifth appeal which was dismissed for lack of appellate jurisdiction several months later; however, Plaintiffs continued to pursue an unsuccessful challenge of this ruling at the Court of Appeals until at least August of 2002. In the meantime, Plaintiffs had engaged in no discovery and had declined to answer discovery propounded on them. Thus, one year after this Court issued its case management order of September 19, 2001, Plaintiffs still had declined to pursue discovery. Even after the Court on September 25, 2002 granted Plaintiffs an additional 90 days of discovery at Ms. Haagensen's request, Plaintiffs counsel opted instead to lodge yet another premature appeal (Appeal No. 6) and to forego discovery in the interim. After Appeal No. 6 was dismissed for lack of jurisdiction, this Court on January 17, 2003 set a deadline of February 7 for all dispositive motions and February 28 for any responses thereto. The parties were expressly advised on the record that no further extensions of time would be granted and that the Court would move ahead with its business irrespective of Plaintiffs' on-going, post-dismissal appellate litigation in Appeal No. 6, as the Court did not consider itself divested of jurisdiction. Plaintiffs again disregarded the Court's admonition and proceeded instead to file their seventh notice of appeal, this time challenging the Court's oral pretrial order of January 17. Both this Court and the Court of Appeals have issued orders refusing to stay our case management order of January 17, 2003. In addition, the Third Circuit's Order of April 25, 2003 reiterates what this Court made clear at the January 17, 2003 status conference: i.e., a notice of appeal from an unappealable order does not divest the district court of jurisdiction. [See Doc. No. 305, Order of 4/25/03, citing *Sheet Metal Workers' Int'l Ass'n, Local 19 v. Herre Bros.*, 198 F.3d 391, 394 (3d Cir.1999).] At this juncture, it is unfathomable to this Court

that Plaintiffs still have not completed discovery, have in fact disregarded discovery propounded on them by other parties, and have failed to assemble any response to the Defendants' pending summary judgment motions. At some point, the cycle of improvident appeals must end and the litigation brought to closure.

The Court certainly acknowledges and respects the right of litigants to zealously advocate their cause, part of which involves seeking reconsideration of the Court's ruling under appropriate circumstances and exercising a party's right to direct appeal of final, appealable orders. However, when a party's refusal to respect a court ruling results in multiple attempts to get a "second bite at the apple" through misapplication of the rules and/or other inappropriate litigation tactics—thus unnecessarily impeding the progress of a case—such conduct exceeds the bounds of legitimate advocacy. Delay is sometimes unavoidable while parties diligently litigate their respective causes; however, unnecessary and vexatious delay is offensive to the Court and to all parties.

A fifth factor contributing to the delay of this case is the nature of the Plaintiffs' papers themselves, which have been not only numerous and lengthy but often poorly organized and unsupported by proper legal and factual authority.[34] Here again, Plaintiffs' civil contempt motion is a case in point. Despite this Court's admonition that it did not wish to engage in "useless wheel spinning," that is exactly what the contempt hearing turned out to be. Because of Plaintiffs' disjointed factual allegations and apparent misunderstanding of the law relative to this Court's civil contempt powers, considerable time was invested by the Court trying to coherently define those issues that were properly before it in the form of a civil contempt motion. The Court's efforts to bring the contempt motion to resolution were frustrated in no small measure by Plaintiffs' repeated attempts to drag the DEP back into the litigation and to expand the scope of issues to be addressed at the hearing. In the meantime, the Court gave Plaintiffs the benefit of the doubt that they were proceeding in good faith, despite Ms. Haagensen's blatant accusations that agents of the EPA had falsified official reports, deliberately concealed discoverable information, and even perjured themselves. Ultimately, several days worth of evidence was received by the Court, none of which credibly substantiated Ms. Haagensen's allegations or established any basis for finding the EPA in civil contempt.

Unfortunately, this extremely troubling propensity of Plaintiffs and their counsel to make unsupported accusations against the Defendants and/or their counsel has been a recurring theme throughout this litigation. Plaintiffs' motion for a protective order, for example, accused the Defendants of harassing, stalking, and threatening the Plaintiffs. This motion was unaccompanied by any proffer of evidence linking the Defendants to the alleged acts of harassment. Though Ms. Haagensen asserted that one of the offenders—"Harry Divido"—was employed by the current title-holders to the Coombs site, she offered no evidence attributing his alleged conduct to any named Defendant.

Another example is Plaintiffs' motion to strike certain affidavits submitted by Defendants Coombs and Yost in opposition to Plaintiffs' motion for summary judgment. Based on their perception that Ronald Coombs and Randall Spence had made statements in their affidavits that contradicted other evidence in the case (including their own prior unsworn and/or hearsay state-

---

34. Although it forms no basis for our opinion, similar criticism has been lodged by the Pennsylvania Superior Court relative to Ms. Haagensen's performance in *Estate of William R. Coombs*, 784 A.2d 150, 154 (Pa.Super.2001):

In our prior Memorandum, we noted the following deficiencies with Appellants' brief and style of argument:

Appellants' current brief contains many scattershot assertions of law and fact without citation to the certified record or to relevant statutory or case law. Oftentimes, Appellants cite to testimony and transactions for which there is no evidence in the certified record. Appellants also interweave arguments about the merits of their federal action with issues in the instant case in such a manner that makes it difficult for this Court to address any issue intelligently and thoroughly.

*In re Estate of Coombs*, [776 A.2d 300, 410 WDA 2000, 2001 Pa.Super. Lexis 861 (unpublished memorandum)] at 9[]. We note with disapproval that Appellants' current brief has made no improvements in these respects.

ments), Plaintiffs concluded that Coombs and Spence had deliberately perjured themselves in their affidavits and asked that the affidavits be stricken from the record. The Court denied this request, in part because the evidence did not establish a basis for finding bad faith under Fed.R.Civ. P. 56(g) and also because the alleged misstatements were more properly left for exploration by way of deposition and/or cross-examination.

Throughout the history of this case, the Court has repeatedly entertained allegations by the Plaintiffs that Defendants, their agents or their counsel have engaged in various forms of nefarious activity. These have included allegations of trafficking in hazardous wastes, deliberately concealing and/or destroying evidence, offering falsified and/or perjured evidence, engaging in witness intimidation, and even threatening to kill Robert Grine. Cumulatively, this practice has impeded the progress of the case by causing the Court to invest considerable resources in the resolution of collateral disputes which have, thus far, proved unfounded for the Plaintiffs. Such tactics obviously exceed the bounds of responsible advocacy.

### Prejudice to Defendants

█ We next consider the degree to which Plaintiffs' conduct has prejudiced the Defendants in this case. "Prejudice" in this sense "need not be 'irremediable harm that could not be alleviated by (the) court's reopening discovery and postponing trial.'" *Adams v. Trustees of the New Jersey Brewery Employees' Pension Trust Fund,* 29 F.3d 863, 874 (3d Cir.1994) (quoting *Curtis T. Bedwell and Sons, Inc. v. Int'l Fidelity Ins. Co.,* 843 F.2d 683, 693 (3d Cir.1988)). Rather, it can include such factors as the irretrievable loss of evidence, the dimming of witnesses' memories, excessive burdens or costs imposed on opposing parties, the deprivation of information through non-cooperation with discovery, or costs expended in obtaining court orders to force compliance with discovery. *Id.* (citations omitted).

█ In this case, the prejudice to the Defendants resulting from Plaintiffs' failure to respect our January 17, 2003 case management order must be considered in proper context. This is not simply a situation where resolution of the parties' summary judgment motions has been delayed for a few months. To the contrary, the prejudice to Defendants resulting from this long and drawn-out litigation has been considerable. The record speaks for itself in terms of the number of filings, telephonic conference, and court appearances that have been required in response to Plaintiffs' various motions. As we have noted, matters have been unduly complicated by the Plaintiffs' tendency to raise unsupported, scatter-shot factual assertions and to constantly expand the scope of their complaints. Considerable time and expense has been wasted on ill-founded motions asking this Court to reconsider and re-litigate issues previously decided. In addition, Plaintiffs' sundry premature appeals have needlessly added to the parties' burdens in defending this litigation. As we discussed above, Plaintiffs and their counsel have accused the various Defendants of misdeeds ranging from trafficking in hazardous wastes to falsifying evidence and engaging in witness intimidation. The Defendants have been denied an opportunity to have an expeditious day in court in large measure because of the vexatious tactics that Plaintiffs and their attorneys have engaged in. Over the course of time, witnesses' memories have undoubtedly dimmed and/or evidence has been lost altogether. During the course of these proceedings, for example, William Coombs (the primary Defendant in this case) was adjudicated incompetent, died, and his estate substituted as the relevant party in interest. The pendency of this litigation has so impaired the value of the Coombs Property that the Estate has successfully divested itself of the Property on the grounds that it is more of a liability than an asset. *See In re Estate of Coombs,* 784 A.2d 150 (Pa.Super.2001).[35]

35. William Coombs was adjudicated incapacitated on August 26, 1997 (*See* Case No. 4373 of 1997, Allegheny Court of Comm. Pleas, Orphans' Court Division) and died on December 20, 1997. While he was alive, Mr. Coombs had spent in excess of $12,000 in defense of this litigation. At the time of his death, the fair market value of the Coombs Property was approximately $18,000 and the general debts of the Estate exceeded $12,000 plus unpaid administrative expenses. On August 31, 1999, the Court of Common Pleas of Allegheny County, Orphans' Court Division (Mazur, J.) entered an order permitting Ronald Coombs, as executor of his father's estate, to

Although not technically a factor weighing in our decision, we note parenthetically that the Court has also been greatly prejudiced by the Plaintiffs' conduct in terms of the time and resources that have been needlessly diverted from other legitimate court business. The Court has attempted over the past several years to balance the policy favoring liberal discovery on one hand against the need for an orderly and expeditious resolution of Plaintiffs' claims on the other hand. However, our progress in steering this litigation towards resolution has been greatly frustrated by all of the factors previously discussed. The record will speak for itself in terms of the number of order and opinions that this Court has issued in an effort to control the course of this litigation. While the Court respects the parties' rights to zealously advocate their cause, it cannot tolerate abuses which result in an unnecessary and excessive drain upon its limited resources.

### The Degree to Which Plaintiffs' Claims Appear Meritorious

Because the law favors a policy of resolving litigation on its merits, we must also consider the degree to which Plaintiffs' claims appear to be meritorious. The claims against the Commonwealth and federal Defendants have already been resolved and those parties are no longer involved in this litigation. Claims against Tionesta Borough have been partially resolved already in the Borough's favor. In addition, Defendant Scott Daum has been dismissed from the case because of Plaintiffs' failure to effectuate service. As to those Defendants still remaining in the case, several factors cause the Court to view the merits of Plaintiffs' claims as dubious.

Plaintiffs' primary target, as it appears from the Amended Complaint was originally Defendant William Coombs who, having since passed away, has been replaced by his estate as the relevant party in interest. Billie Yost also remains a Defendant in the case. As to both Coombs and Yost, the investigations conducted by the DEP and EPA concerning the Grines' complaints has led those agencies to conclude that: (a) some type of pollution incident occurred on the Grines' property; (b) the source of the contamination has not been definitively resolved; (c) it does *not* appear that either the Coombs or Yost properties are the source of Plaintiffs' environmental problems; and (d) in any event, the pollution which has occurred on the Grines' property has not posed any imminent risk to their health or well-being. While Plaintiffs have vigorously disputed these conclusions, Plaintiffs' attempts thus far to establish Coombs's and/or Yost's liability for the pollution incidents on their property—as in, e.g., their motion for preliminary injunction and motion for summary judgment—have been premised on comparatively weak circumstantial evidence consisting of their own lay observations and their own attempts to personally interpret scientific data pertaining to the environmental tests conducted on their property and the Coombs property. Given the age of this case, the Grines' decision to obtain independent environmental testing through Stewart Laboratories, and Ms. Haagensen's references during court proceedings to Plaintiffs' expert witness, it would seem that Plaintiffs have had ample opportunity to try and locate an expert who could support their theory of Defendants' liability. To the best of this Court's knowledge, however, Plaintiffs have never come forward with any expert report or testimony in these proceedings that establishes to a reasonable degree of scientific certainty that hazardous substances on the Coombs or Yost properties are in fact the geological source of the pollutants detected on the Grines' property and/or that the pollutants on the Grines' property are the proximate cause of Plaintiffs' symptoms. To the extent Plaintiffs would claim that they have been deprived the necessary data from the DEP/EPA investigations, the Court would simply note that Plaintiffs have inspected the DEP's file on

renounce his right to administer the Coombs Property. In so ruling, Judge Mazur found that "[i]t appears the cost of the continued defense of the property will exceed its value, making it more of a liability than an asset to the estate." (*See* Case No. 8583 of 1997, Court of Common Pleas Of Allegheny County, Orphans' Court Division, Opinion and Order dated 8/31/99, at p. 3, appended as Ex.A to Ronald Coombs's mot. for summ. judg. [Doc. No. 271].) As of September 2001, title to the Coombs Property had been vested in a third party, who acquired the Property through a judicial sale. [*See generally* Doc. Nos. 252, 271.]

multiple occasions and have litigated their discovery claims against the EPA at great length. Accordingly, it is this Court's view that Plaintiffs have obtained all discoverable information from the DEP and EPA to which they were legally entitled. We also note that Defendant Yost's summary judgment motion relies on affidavits from Yost and Randall Spence that have been of record for several years. Although Plaintiffs have previously alleged that these affidavits are "perjured" and/or otherwise legally deficient, the affidavits have apparently gone unchallenged by way of deposition or other discovery. Given Plaintiffs' failure to respond to the pending summary judgment motions, these affidavits presently stand unchallenged.

Defendant Rotocast has submitted evidence, presently unrebutted, that it was the purchaser of Essex Environmental's assets, but not Essex's legal successor-in-interest. Thus, it is Rotocast's position that it can incur no liability for any culpable conduct on the part of Essex. Rotocast acknowledges that it is in the business of manufacturing overpack drums for use by other parties. Nonetheless, it has submitted uncontroverted evidence that it is *not* in the business of using overpack drums for any particular purpose. During the course of this litigation, the Court has seen no evidence suggesting that Rotocast was involved in any manner in the unlawful storage, handling or disposal of hazardous waste on the Coombs or Yost properties.

The remaining Borough Defendants have likewise submitted affidavits from numerous officials denying that they had any involvement whatsoever in the storage, handling, or disposal of hazardous wastes on the Coombs Property. As far as this Court can tell, those affidavits presently stand unrebutted. On balance, based on our familiarity with the case, we consider this "merits" factor to be one which weighs in favor of a dismissal of all claims with prejudice.

### Willfulness or Bad Faith Conduct

█ The Court is also required to consider whether the actions of Plaintiffs or their counsel were willful or in bad faith. *Emerson*, 296 F.3d at 190. We have previously discussed at length Ms. Haagensen's conduct in disregarding this Court's extent case management schedule, which established deadlines for discovery, pretrial narrative statements, and responses to the Defendants' summary judgment motions. Any claim that Plaintiffs are exempted from the January 17, 2003 case management order by virtue of having filed a good-faith, non-frivolous appeal is unconvincing. Ms. Haagensen has been put on notice, both by this Court and by the Third Circuit Court of Appeals, that this Court's case management order of January 17 would not be stayed during the pendency of her recent appeals. Both courts have similarly advised Ms. Haagensen that a premature appeal does not prevent the district court from continuing to exercise its jurisdiction over the case.[36] Any suggestion that Ms. Haagensen made an innocent mistake in judgment concerning the viability of her recent appeals is belied by her historic complicity in vexatious and dilatory practices, including a history of initiating improvident appeals. The Court therefore finds that Ms. Haagensen's failure to file summary judgment responses on behalf of her clients is willful and not merely negligent or inadvertent. This finding likewise supports a dismissal of the Plaintiffs' claims, with prejudice.

### The Extent of the Grines' Personal Responsibility

We must also consider the extent to which the Plaintiffs themselves are personally responsible for failing to prosecute this case. Although much of the Court's criticism herein has been directed at Ms. Haagensen, the Court cannot confine responsibility to her alone. "There is no question ... that a party is bound by the acts of his attorney." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir.1995) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 632–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). Accordingly:

> decisions rendered during the pendency of Appeal No. 1. [*See* Mem. Ops. of March 31, 1997 (Doc. No. 103, p. 1.) and April 11, 1997 (Doc. No. 105, p. 1).]

---

**36.** In fact, this Court brought *Mondrow v. Fountain House,* 867 F.2d 798 (3d Cir.1989) to the attention of Plaintiffs and their counsel as early as 1997, when we cited that case in two separate

if an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice. But keeping this suit alive merely because plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of plaintiff's lawyer upon the defendant.

*Link,* 370 U.S. at 634 n. 10, 82 S.Ct. 1386 (quoted in *Woodson,* 57 F.3d at 1418).

■ In this case, we find that the sanctionable conduct is fairly attributable to Plaintiffs as well as their counsel. Considering the seven-year history of this litigation, Plaintiffs have undoubtedly been on constructive (if not actual) notice of their attorneys' conduct relative to these proceedings. Many of the allegations and requests for relief submitted by Ms. Haagensen in this litigation appear to have been premised on information obtained directly from the Grines. Robert Grine personally appeared and/or offered testimony both at the preliminary injunction hearing and the civil contempt hearing. In addition, the Grines have submitted numerous affidavits, videotapes, and other materials in support of their cause (*see, e.g.,* their motions for a preliminary injunction, for summary judgment, for the undersigned's recusal, and for enlargement of time relative to the scheduling of the contempt hearing). Robert Grine was personally and intimately involved with the environmental investigation carried on at his property, even to the extent of securing his own independent testing of soil and water samples, conducting surveillance of the properties, and obtaining assistance from numerous local and state agencies. In short, this is not a case where an innocent party has been duped by a rogue trial counsel. To the contrary, a review of this record leads inescapably to the conclusion that the theories, arguments, and tactics advanced by Ms. Haagensen have been those of her clients. In short, Plaintiffs and their counsel have at all times marched in lockstep throughout these proceedings.

### The Potential Effectiveness of Lesser Sanctions

Recognizing that an involuntary dismissal is a harsh sanction to be used only in the most extreme of cases, we consider the potential efficacy of alternative sanctions. These can include a warning, a formal reprimand, placing the case at the bottom of the calendar, fines, imposition of costs or attorney fees, temporary suspension of culpable counsel from practice before the court, dismissal of the suit unless new counsel is secured, preclusion of claims or defenses, or imposition of fees and costs on plaintiff's counsel. *See Titus v. Mercedes Benz of North America,* 695 F.2d 746, 749 n. 6 (3d Cir.1982).

■ We find that none of these lesser sanctions would be suitable in this case. Ms. Haagensen has previously been advised about the level of decorum expected of all counsel in this case and she has also been warned that unprofessional conduct would not be tolerated by this Court. Nevertheless, Ms. Haagensen's behavior throughout these proceedings has been consistently belligerent toward opposing counsel and, at times, disrespectful of this Court. She has consistently displayed a tendency to lodge hyperbolic accusations of misconduct against the Defendants and their counsel without the support of competent record evidence, as demonstrated more recently in the Plaintiffs' motion for a protective order. Despite this Court's explicit notice to Ms. Haagensen that proceedings in this Court would move forward and that responses to the Defendants' summary judgment motions would be expected notwithstanding her latest appeals, the Court's admonitions have gone unheeded. Quite frankly, in light of counsel's historic behavior in this case, there is little reason for this Court to believe that counsel will change her ways in the face of lesser sanctions. Any additional warning or formal reprimands are likely to be ineffective, as Plaintiffs and their counsel have already openly challenged the competency and impartiality of this Court. Placing this case at the bottom of the Court's calendar is clearly not a viable option, given the age of this case and the additional prejudice to the Defendants that would result from further delay. Imposition of fines, costs, or attorney fees on the Plaintiffs does not appear appropriate in light of their already considerable expenditures relative to this case. We also doubt the efficacy of

temporarily suspending Plaintiffs' counsel from further appearance in this Court and/or removing counsel from this litigation, since we have previously determined that Plaintiffs are themselves culpable in failing to move this case forward. In any event, it would be unfair to the Defendants to further delay this litigation while new counsel took the time necessary to acquaint herself with the seven-year history of this case. Similarly, the Court doubts the effectiveness of assessing costs or attorney fees against Ms. Haagensen and/or barring certain claims or defenses. Again, the history of this case has shown that such measures are unlikely to cause Plaintiffs or their counsel to exhibit future compliance with this Court's orders. Our prior rulings dismissing certain of the Plaintiffs' claims have resulted in premature appeals that diverted the parties' attention away from resolution of the remaining claims in the case. The Court therefore has serious concerns that a further dismissal of less than all claims will similarly result in more piecemeal appeals, which will only serve to further delay these proceedings and prejudice the other parties. For all of these reasons, the Court reluctantly concludes that the only appropriate sanction is to dismiss this cause of action, in its entirety, with prejudice.

### III. CONCLUSION

The Court recognizes that the law favors disposing of a party's claims on the merits and that dismissal of a case for lack of prosecution is a harsh remedy that should be used only in extreme situations. Accordingly, the Court does not take lightly its use of inherent dismissal powers. Nevertheless, for all of the reasons discussed above, the Court finds that dismissal of Plaintiffs' claims with prejudice is warranted and, indeed, the only fair penalty for the willful conduct of Plaintiffs and their counsel in disrespecting the Court's January 17, 2003 case management order. Plaintiffs' claims will therefore be dismissed in their entirety, with prejudice.

An appropriate order follows.